Michael Ng (SBN 237915)
Michael.Ng@kobrekim.com
Daniel Zaheer (SBN 237118)
Daniel.Zaheer@kobrekim.com
**KOBRE & KIM LLP**
150 California Street, 19th Floor
San Francisco, CA 94111
Telephone: (415) 582-4800
Fax: (415) 582-4811

*Attorneys for Plaintiff*
SANAS.AI INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANAS.AI INC., a Delaware corporation, | Case No. _____ |
| Plaintiff, | **COMPLAINT FOR DECLARATORY JUDGMENT, PATENT INFRINGEMENT, TRADE SECRET MISAPPROPRIATION, AND FALSE ADVERTISING** |
| v. | |
| KRISP TECHNOLOGIES, INC., a Delaware corporation, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Sanas.AI Inc., a Delaware corporation ("Plaintiff" or "Sanas"), by and through their attorneys, bring this Complaint against defendant Krisp Technologies, Inc. ("Defendant" or "Krisp") and allege as follows:

## INTRODUCTION

### *Sanas' Revolutionary Accent Translation Technology*

1.    Sanas is dedicated to helping humanity communicate better, by developing technologies that allow the people of the world to understand and be understood when speaking to each other.

2.    The company's inventions have been revolutionary.   Sanas uses artificial intelligence tools to break down barriers that prevent even native, fluent speakers from effectively communicating.  The company's accent translation technology was the first that translates accents in real time, converting regional accents into local ones, thereby minimizing difficulties that hinder conversation between speakers of the same language from different countries or regions.

3.    The company's technical innovation has received widespread acclaim for its smooth, real-time operation, low latency, and for preserving the individual speaker's authenticity and natural intonation.  Among other prizes, Sanas received Frost & Sullivan's North American Technology Innovation Leadership Award in 2024, for its "real-time Accent Translation solution built on patented, AI-powered technology that enables users to control how they sound," and which "[u]nlike competing offerings . . . maintains the authenticity of the agent's voice, ensuring a more natural and genuine communication experience."[1]

4.    Sanas' innovations have also been lauded for their positive social impact.  Sanas' tools have helped overcome discrimination based on accent, and have paved the way for thousands of highly qualified professionals who might otherwise be held back based on the fact that they speak a common language in a different way.  In a recent Washington Post article focused on

---

[1] www.frost.com/news/press-releases/frost-sullivan-recognizes-sanas-as-the-2024-north-american-technology-innovation-leader/

Sanas' innovations, one industry insider noted that such AI technologies are not eliminating the need for people: "What we are seeing is that it is adding value to individual people."[2]

5.      Sanas has won rapid adoption in the market and praise from its customers.  As the same Washington Post article states about Sanas' accent translation system: "[C]ompanies say it's delivering results: happier customers, satisfied agents, faster calls."[3]  Sanas has been used by tens of thousands of customers to facilitate spoken communications and has rapidly become the recognized market leader in the new product category that Sanas created.

*Krisp's Copycat Technology*

6.      Unfortunately, such innovation invites copycats.  And that is exactly what happened here.

7.      On March 25, 2025, Defendant Krisp launched what it called "Krisp AI Accent Conversion v3," a product it claims is built on its "unique" approach to accent conversion, including real-time operation and preservation of speaker identity.[4]

8.      Krisp's product bears a striking resemblance to Sanas' invention.  The structure of its system, and the methodologies utilized to implement accent conversion, mimic those that Sanas invented.  Even the words Krisp uses to describe what its product is and how it works are ripped from Sanas' marketing and technical materials.

9.      The similarity is not random chance.  Krisp did not come up with what it claims is its own, "new" accent translation software—Krisp stole it from Sanas.

**THE PARTIES**

10.      Plaintiff Sanas.AI Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in this district at 437 Lytton Ave Ste 200, Palo Alto, California, 94301.

---

[2] www.washingtonpost.com/world/2025/06/21/india-ai-bpo-call-centers/
[3] *Id.*
[4] https://krisp.ai/blog/krisp-ai-accent-conversion-v3/

COMPLAINT

11.     Upon information and belief, Defendant Krisp Technologies, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in this district at 2150 Shattuck Ave. Suite 1300, Berkeley, California, 94704.

## JURISDICTION AND VENUE

12.     This action arises under the patent laws of the United States, 35 U.S.C. § 271 *et seq.*  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and/or 2202, based on the actual controversy between Sanas and Krisp arising under the patent laws of the United States, 35 U.S.C. § 100 *et seq*.

13.     This Court has supplemental jurisdiction over the declaratory judgment and state law claims herein pursuant to 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Krisp and venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b), (c), (d) and 1400(b) because Krisp has a permanent and continuous presence in, has committed acts of infringement in, and maintains a regular and established place of business in this district.

## FACTUAL BACKGROUND

### *Sanas' Origins*

15.     Like many leading technology companies, Sanas originated with a conversation between friends, in a dorm room, about a real-world problem they faced.

16.     In 2020, a Stanford student returned for a stint home in Nicaragua.  To help his family there, he took a temporary job answering customer service calls for an international company.  He spoke perfect English—he was thriving as a college student at a top American university.  But even he was held back in the workplace by his accent, which made effective communication cumbersome.

17.     Upon his return to Stanford, he relayed his frustrations to his fellow students.  His experience intrigued three of his friends, who wondered if a solution might lie in the new technologies they were studying.  Could artificial intelligence be used to help humans communicate more clearly with each other?

18.    Together, Maxim Serebryakov, Shawn Zhang, and Andrés Pérez Soderi set about looking for a solution, applying new techniques to the problem and generating the first ideas that would eventually become Sanas.

19.    Their goal was straightforward: to use artificial intelligence to allow speakers with one regional accent to be understood by listeners accustomed to a different accent, without sacrificing the individual intonation, cadence, and other nuances that convey meaning with both subtlety and depth in spoken language.

20.    Their initial efforts proved promising, so they plunged in, dedicating themselves to creating the first accent translation technology.

21.    As the trio built out the technology, they were joined by Sharath Keshava Narayana, an acclaimed entrepreneur who joined them as a co-founder.  In 2021, Sanas launched its first product, and quickly found eager investors in some of Silicon Valley's leading venture capital firms.  In 2022, they scaled up, raising a $32 million Series A investment round, including investment from Google.

22.    By 2023, Sanas was being used by more than 5,000 contact center agents across 25 cities.  Over the next two years, as it expanded its operations, the company found even more success in the market.  As of today, Sanas' software has been used by hundreds of thousands of agents.

23.    From the outset, Sanas has understood the need to protect its inventions, and has diligently sought patent protection for them.  On May 6, 2021, Sanas filed Provisional Patent Application #63/185,345 (Real-Time Accent Conversion Model).  This was followed by numerous other applications which disclosed and protected the innovations that solved major problems in execution and implementation of Sanas' market-leading accent translation product.

### *Krisp Seeks Sanas' Accent Translation Technology*

24.    On September 7, 2021, Sanas co-founder Shawn Zhang received the following LinkedIn message from Krisp's COO, Robert Schoenfield:

4



25.     The message was unexpected, unsolicited, and unannounced.  Sanas and Krisp had no prior direct contact, though Sanas was aware of Krisp.

26.     Originally founded as 2Hz and with operations based in Armenia, Krisp had been focused on noise cancellation.  According to a blog post from Krisp CEO and co-founder Davit Baghdasaryan in October 2018, the company's objective was "a technology which will completely mute the background noise in human-to-human communications, making it more pleasant and intelligible."[5]

27.     Without receiving a response, Schoenfield followed up again with Zhang the next day:

28.     Sanas was curious about the outreach.  Krisp had made some inroads with the call center market, selling its product as a way to reduce background noise in those sometimes

---

[5] https://developer.nvidia.com/blog/nvidia-real-time-noise-suppression-deep-learning/

crowded working environments. Sanas thought there was some possibility that the two companies might be complimentary.

29.    Krisp continued to press to connect with Sanas. On September 27, 2021, Krisp CEO Baghdasaryan reached out to one of Sanas' venture capital investors, congratulating him on his firm's investment in Sanas and asking if he could help set up a meeting, saying: "We are quite interested in Accent Reduction technologies . . . I would love to connect with the founders and start exploring future partnerships."

30.    Through that contact, on October 6, 2021, Baghdasaryan held an introductory Zoom meeting with Sanas' Andrés Pérez Soderi and Maxim Serebryakov. Baghdasaryan followed up enthusiastically, reaching out to Pérez and Serebryakov seeking to meet face-to-face four days later. The Sanas team could not make the last-minute scheduling work, but Baghdasaryan sought another Zoom meeting, saying "this time a deeper one. The main question we have is how this works in real time. Experiencing it somehow would be really important to us."

31.    Sanas told him they were willing to conduct a product demonstration and asked for the two parties to enter into a non-disclosure agreement. Krisp agreed, and Krisp's COO Schoenfield sent an NDA, which the parties executed on November 17, 2021.

*Krisp and Sanas' Year-Long Partnership Discussions and Technical Evaluation*

32.    Over the course of the next year, and under the umbrella of their NDA, the two companies explored a possible collaboration. From Sanas' perspective, Krisp had developed a complimentary technology that could supplement its offering to the market, and Krisp had begun rolling out to customers, developing a market presence that could help accelerate Sanas' sales efforts.

33.    And from the outset, that collaborative partnership is expressly how Krisp represented its interest as well. COO Schoenfield's first cold outreach stated that Krisp had "100's of global contact centers as customers for background noise removal and voice quality enhancements," and said he was interested in talking to Sanas because "I would like to explore licensing your tech and share more about our business and customers." When CEO Baghdasaryan

made his initial overture through Sanas' investor, he said "We are quite interested in Accent Reduction technologies . . . I would love to connect with the founders and *start exploring future partnerships*." (emphasis added).

34.     Through both its words and actions, Krisp told Sanas that it sought out a collaborative partnership through which it would license Sanas' accent translation technology, and to explore ways the two companies might improve the marketing of their respective accent translation (Sanas) and noise reduction (Krisp) offerings.

35.     The NDA signed by the parties reflected that.  Krisp agreed (as did Sanas) that information it learned in the discussions could not be used without permission for any purpose other than the potential collaboration.

36.     One thing was clear: at the time, ***Krisp did not have any accent translation capabilities of its own***.

37.     After the parties signed the NDA, Sanas demonstrated its accent translation product and began discussions between the senior business leadership of the companies to explore the possibility of a collaborative approach.  A December 1, 2021 meeting included co-founders from both Sanas and Krisp: Andrés Pérez Soderi and Maxim Serebryakov from Sanas along with Krisp co-founders Davit Baghdasaryan and Artavazd Minasyan, as well as Krisp's COO, Robert Schoenfield, and Sanas' Head of Operations Ashley Walker.

38.     As those discussions progressed, Baghdasaryan, as Krisp's CEO, reported back that the company wanted to move ahead with the collaboration.  On January 13, 2022, Baghdasaryan wrote: "We discussed this internally and think there is a great opportunity to work together.  I would like to take this a step further and introduce our engineering teams."

39.     At the time, Sanas' leadership team was busy completing its Series A fundraising round, but Krisp kept pushing.  On April 13, Krisp's Schoenfield reached back out, resulting in direct discussions with Sanas' co-founder and then-COO, Sharath Keshava Narayana.  After further discussions, Schoenfield sent Keshava a proposed letter of intent (LOI) on June 8, 2022, laying out the parameters for the proposed collaboration.

40.    On June 13, 2022, Krisp CEO Baghdasaryan sent Sanas' Serebryakov an email laying out the parameters of a "technical evaluation" he wanted to do and "perform . . . a fast-track evaluation" that same week.  Specifically, he wanted the technical evaluation to focus on the minutia of performance, compatibility, and implementation:

> "There are several things we would like to test:
> -    objective evaluation of accent tech
> -    how robust is the tech for diff acoustic conditions (headsets, echo, noise, etc)
> -    how compatible are Krisp's noise cancellation and Sanas tech
> -    min h/w requirements to run the tech (cpu, memory, disc)"

41.    The Krisp team also proposed creating a Slack channel—to be controlled by Krisp—as the forum for the technical exchange of information.  Operating under the NDA, Sanas agreed.

42.    The senior leadership continued discussions about the terms of a commercial partnership, including "integration approaches" and economic terms.  By late summer, Krisp told Sanas that it wanted to move ahead with the partnership.

43.    In an email dated August 16, 2022, Krisp's Schoenfield told Sanas' Keshava and Serebryakov:

> "Sharath and Max,
> We spent time this past week with our teams looking at our technical and commercial approach for accent translation.  The short of it is that we want to proceed with our partnership."

44.    But as they held out prospects for a collaborative partnership, Krisp continued pushing Sanas to provide it with increasingly detailed technical information, representing that it was necessary to assess performance in order to bring the Sanas product to their existing customers.  For example, in the same email, Schoenfield laid out Krisp's demand for specific details across multiple conditions:

> "Here is a partial list of our open questions regarding the technical evaluation:
> • performance in case of strong accent, no accent, different dialects
> • intelligibility of the converted audio (converted voice quality, robotic or not)

8

- performance in case of noise conditions SNR -5db
- what happens if there is another background voice
- quality in case of different speaking pace - wpm
- how it works if we apply Krisp NC, VC before/after Sanas technology?
- end to end latency with different call center platforms
- support of different microphones and cases in reverberated audio
- CPU utilization"

45.     Sanas was open to the potential benefits of the prospective relationship but appropriately wary of a full disclosure without a commitment.  Sanas CEO Keshava explained that Sanas would have liked to have included an exclusivity provision in the letter of intent to "make[] it easier for [the parties'] technology teams to work together" but explained that he was satisfied that the parties' NDA would provide sufficient protection for the technical discussions.

46.     Mr. Keshava also stated that, "I wanted to reiterate the primary reason for both of us to partner should be to assert market dominance . . . As long as we can commit to each other on volumes we would chase for next year by end of Dec I am fine with the construct of the partnership."  Schoenfield explained that "the primary reason" to pursue the partnership was "to get to market and secure a first-mover footprint in the industry."

47.     Over the ensuing weeks, Krisp continued to push aggressively for the technical teams of the two companies to delve into the details and exchange engineering information directly.  On August 21, 2022, Krisp told Sanas that company co-founder Artavazd Minasyan would "lead our technical assessment project" and also brought Stepan Sargsyan, the company's chief scientist, into the discussions.

48.     The technical teams from both companies then set about working closely to comb through the details of the Sanas system.  On August 23, 2022, for example, Krisp's engineering team sent another list of detailed technical questions they wanted from Sanas:

- "Can a real-time demo of the technology be scheduled?
- Is there a web API we could call or can we somehow test your SDK?
- What is the algorithmic look ahead of your technology? Any estimates for end-to-end latency with different call center platforms?
- What are the estimates for Flops / CPU utilization?
- What is the performance in case of noisy input (like -5 or 0 dB SNR) and in case of reverberated speech?
- How is the technology performing with different microphones? Some

9

microphones are doing internal signal processing which can impact your algorithm performance.

- What happens if there is another background voice(s)?
- Are the input speaker voice characteristics retained? If not, then how is the generated voice based on the input voice chosen?
- Are there any requirements for input audio bandwidth (narrowband, wideband or full band) and what is the bandwidth of converted speech?
- Do you evaluate the voice quality, acoustic quality, intelligibility, and accentedness of output speech? Are there any objective or subjective evaluation scores of the technology?
- Which accents are supported today?
- What is the performance in case of strong accent and no accent cases?
- Is the technology robust to accented speech variations due to various Indian dialects?
- Is the technology robust to different speaking rates -wpm?
- Are input speaker emotions, prosody or laughter in converted speech retained?"

49.     Although Sanas had reservations about the breadth and depth of these inquiries, it provided answers across numerous calls and meetings and in the dedicated Slack channel.

50.     The information provided by Sanas to Krisp included information that was at the time nonpublic and highly valuable, as it reflected Sanas' years of development of a new and unprecedented technology; Sanas' solutions to key technological challenges in developing a commercially viable accent translation solution; and information validating that doing so was both achievable and had been achieved through Sanas' innovations.

51.     The information disclosed included but is not limited to information concerning:

- Real world performance indicators of Sanas' developed accent translation software, including for example:
  - CPU utilization;
  - End-to-end latency on call-center platforms;
  - Performance in noisy environments;
  - Performance of the software using different types of microphones;
  - Performance of the software in strong and no accent cases;
  - Performance with high speaking rates; and
  - Robustness to laughter;

- Challenges with accent translation software that Sanas had identified as areas of focus for the deployment of development resources, including for example relating to:
  - Performance in noisy environments;
  - Performance problems created by certain types of input sounds;

- Whether Sanas preprocesses audio;
- Approaches for evaluating voice quality, acoustic quality, intelligibility, and accentedness of speech;
- Specific algorithm design tradeoffs;
- Sanas' development of a teacher-student architecture;
- That Sanas' product runs locally on a personal computer CPU; and
- Sanas' use of a parallel speech data processing model.

52. Sanas also provided a demo of its product in action to Krisp.

53. For its part, Krisp expressed gratitude for Sanas' participation in the discussions, while continuing to press for additional disclosures.

54. By the fall, the teams had moved on to the details of integrating the two companies' systems, and discussions about piloting at a select group of customers. Business discussions also appeared to be progressing well, with both remote and in-person meetings between the senior leadership.

*Krisp Terminates the Discussions and Copies Sanas' Product*

55. At the end of October 2022, Krisp went cold. Sanas' senior management attempted to reach out to their Krisp counterparts but received only silence.

56. Then, without warning, Krisp terminated the discussions. In an email dated November 4, 2022, Krisp's Schoenfield emailed Sanas' Keshava and said that Krisp did not want to proceed with the partnership. He blamed an alleged lack of "visibility" into Sanas' technology—a contention squarely at odds with his engineering team's deep access to Sanas' product. But he also said that Krisp was not yet interested in pursuing accent translation, saying he hoped the companies' prospects for collaboration might change in the future as "Krisp's roadmap and priorities get more aligned with accent technology."

57. Those representations were untrue.

58. At the same time that Krisp was using the prospect of a business relationship to gain access to Sanas' proprietary technology, the details of its performance, how to implement the accent translation technology in real-world customer environments, and Sanas' positioning in the market, ***Krisp was secretly working on its own competing product, using what it learned from Sanas under NDA.***

11

59.    The first hints of the deception came to light only a few months later on April 27, 2023, when Krisp posted an article on its company blog titled "Krisp AI Accent Conversion: Get Ready for a Communication Revolution":



60.    The post makes clear that Schoenfield's excuses were lies.  Krisp was not waiting for its "roadmap and priorities get more aligned with accent technology"—Krisp was, by its own admission, developing its own competing accent translation system.  The post proudly states: "We are excited to announce early access to our newest product release, **Krisp AI Accent Conversion!**"[6]  The blog states expressly that the project was not prospective, but the result of past work by the Krisp team:

> "Now, we are excited to announce the addition of yet another game-changing technology to our offering: AI Accent Conversion.
> ***Our team at Krisp has been working tirelessly to create a technology that utilizes real-time inflection changes to help customers understand agents better by dynamically changing agents' accents into the customer's natively understood accent.***
> This innovative product is designed to create better human-to-human connection and communication effectiveness for customers and call centers that are located outside of the United States in countries such as India and the Philippines."

*Id.*  (emphasis added).

---
[6] https://krisp.ai/blog/krisp-accent-conversion/

61.     And the posting shows that the product already had broad capabilities across a "wide range of Indian dialects" with additional capability for "English-speaking Filipino, South African, and Chinese call center agents" "soon to follow."  *Id.*

62.     The reality is that Krisp used its purported interest in a collaborative partnership with Sanas—a discussion that spanned almost a year—to access Sanas' proprietary technology, its testing of that technology, and the details about how to most effectively implement it, and then misused that information to develop and launch its own competing product just a few months later.

63.     Krisp asserts that its products are the result of its own hard work and innovation. "Every day we solve problems that we have never seen in the past.  We solve these problems by working hard, constantly learning, adapting, and in the end - always get things done despite obstacles along our path."[7]  But that is not true.  Krisp's accent conversion is copied from Sanas, and resulted not from Krisp's hard work, but from Sanas'.

## DIVISIONAL ASSIGNMENT

64.     This Complaint includes an intellectual property action, which is an excepted category under Civil Local Rule 3-2(c).  Consequently, this action is assigned on a district-wide basis.

## PATENTS-IN-SUIT

65.     This action concerns U.S. Patent Nos. 11,948,550 ("the '550 Patent"), 12,125,496 ("the '496 Patent"), 12,131,745 ("the '745 Patent"), and 11,715,457 ("the '457 Patent") (together, the "Asserted Patents").

### *U.S. Patent No. 11,948,550*

66.     Sanas is the lawful owner of all right, title, and interest in the '550 Patent entitled "REAL-TIME ACCENT CONVERSION MODEL," including the right to sue and recover for infringement thereof.  The '550 Patent was duly and legally issued on April 2, 2024, naming Maxim Serebryakov and Shawn Zhang as the inventors.

---

[7] https://krisp.ai/about-us/

67.     The '550 Patent has 22 claims: 3 independent claims and 19 dependent claims.

68.     The '550 Patent describes and claims Sanas' pathbreaking approach to producing high quality, high accuracy, low-latency accent translation that has created a new and valuable commercial market.  Sanas' solution produces remarkably natural sounding outputs, which preserve the speaker's voice and personality while converting only the speaker's accent to a more intelligible form.  Sanas achieves this high-quality conversion in real-time, thereby allowing for natural conversation without lags or dropped content—all of which are critical for customer-facing applications such as call centers.  Sanas delivers these valuable features even while the software runs on a local computer—i.e., without reliance on streaming or a remote computer with the massive computing resources typically used for machine learning models.  The '550 Patent describes particular methods and systems which can be used to achieve the foregoing benefits.

69.     A true and correct copy of the '550 Patent is attached as **Exhibit A**.

*U.S. Patent No. 12,125,496*

70.     Sanas is the lawful owner of all right, title, and interest in the '496 Patent entitled "METHODS FOR NEURAL NETWORK-BASED VOICE ENHANCEMENT AND SYSTEMS THEREOF," including the right to sue and recover for infringement thereof.  The '496 Patent was duly and legally issued on October 22, 2024, naming Shawn Zhang, Lukas Pfeifenberger, Jason Wu, Piotr Dura, David Braude, Bajibabu Bollepalli, Alvaro Escudero, Gokce Keskin, Ankita Jha, and Maxim Serebryakov as the inventors.

71.     The '496 Patent has 20 claims: 3 independent claims and 17 dependent claims.

72.     The '496 Patent describes and claims a novel approach to enhancing the intelligibility and quality of voice communication by, for example, removing background noise. The inventions of the '496 Patent address a particularly difficult problem with creating a functional and effective accent translation system.  An accented voice communication, for example in a call center, may include elements that need to be excluded in order for the outputted, converted speech to be intelligible.  Those elements could also confuse the artificial intelligence in performing the conversion—thereby potentially jumbling the converted voice.  The '496 Patent describes inventions which include using a low-dimensional representation of input speech frames

14

to generate target speech frames and ultimately target audio—an approach which enhances the quality and clarity of the output speech.  Using this approach produces converted accent audio which is distinct and easily comprehended.

73.    A true and correct copy of the '496 Patent is attached as **Exhibit B.**

### U.S. Patent No. 12,131,745

74.    Sanas is the lawful owner of all right, title, and interest in the '745 Patent entitled "SYSTEM AND METHOD FOR AUTOMATIC ALIGNMENT OF PHONETIC CONTENT FOR REAL-TIME ACCENT CONVERSION," including the right to sue and recover for infringement thereof.  The '745 Patent was duly and legally issued on October 29, 2024, naming Lukas Pfeifenberger and Shawn Zhang as the inventors.

75.    The '745 Patent has 20 claims: 3 independent claims and 17 dependent claims.

76.    The '745 Patent discloses Sanas' solution to another key problem in deploying a commercially valuable implementation of real-time accent translation: how to align phonetically dissimilar audio of two distinct accents.  Sub-optimal alignment can lead to poor accent translation accuracy as well as unstable, unintelligible, and/or unnatural sounding speech.  It may also provide poor conversions when the source accent is complex and differs substantially from the accents on which the machine learning model was trained.  The '745 Patent provides a solution to the alignment problem that produces remarkably smooth, natural-sounding, and accurate accent translated speech.

77.    A true and correct copy of the '745 Patent is attached as **Exhibit C.**

### U.S. Patent No. 11,715,457

78.    Sanas is the lawful owner of all right, title, and interest in the '457 Patent entitled "REAL TIME CORRECTION OF ACCENT IN SPEECH AUDIO SIGNALS", including the right to sue and recover for infringement thereof.  The '457 Patent was duly and legally issued on August 1, 2023, naming Andrei Golman and Dmitrii Sadykov as the inventors and Intone Inc. as its assignee.  Subsequently, on January 14, 2025, Intone assigned the '457 Patent to Sanas.

79.    The '457 Patent has 20 claims: 3 independent claims and 17 dependent claims.

80.    A true and correct copy of the '457 Patent is attached as **Exhibit D.**

15

81.     Sanas is the owner of record of each of the Asserted Patents and owns all rights in each of them, including without limitation all rights to recover for past infringement thereof.

82.     Sanas has been in compliance with the marking provisions of 35 U.S.C. § 287(a).

### KRISP'S WILLFUL INFRINGEMENT OF SANAS' PATENTS

83.     Krisp markets and sells a product called "AI Accent Conversion," and has also marketed a product called "Accent Localization."  On information and belief, these products, along with prior and subsequent versions (collectively, "the Accused Products") infringe the Sanas patents asserted herein.  Krisp's infringement includes the making, using, selling, offering for sale the listed products, as well as Krisp's active inducement of infringement and contributory infringement, including by supplying the listed products to third parties that use those products to practice the claimed methods of the Asserted Patents and that make and use the claimed systems and apparatuses of the Asserted Patents.  Sanas reserves the right to supplement and amend its identification of the Accused Products as permitted by the Court.

84.     Krisp infringes and continues to infringe the Asserted Patents by making, using, selling, offering to sell, and/or importing, without license or authority, the Accused Products as alleged herein.  For example, Krisp advertises, offers for sale, and otherwise promotes the Accused Products on its website.  Therein, Krisp describes and touts the use of the subject matter claimed in the Asserted Patents, as described and alleged below.  Krisp has also made, used, sold, and offered for sale its products in the United States in connection with its marketing and demonstration of the Accused Products via direct customer marketing in the United States, and marketing at trade shows including the Customer Contact Week (CCW) trade show held annually in Las Vegas, Nevada.  Moreover, on information and belief, Krisp has offered for sale and sold the Accused Products to major customers in the United States.

85.     Krisp markets, advertises, offers for sale, and/or otherwise promotes the Accused Products and does so to induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, and/or offer to sell their Accused Products.

86.     On information and belief, Krisp has had knowledge of the '550, '496, '745, and '457 Patents since at or around the time of each patent or its parent application being published.

16

This knowledge is reflected in the fact that such publications are cited in Krisp's own accent conversion patents—U.S. Patent Nos. 12,205,609 ("the '609 Patent") and 12,223,979 ("the '979 Patent"). Those patents both cite U.S. Patent Application 2022/0358903 (which is a parent application for the '550 Patent); and U.S. Patent Application 2024/0347070 (which is a parent application for the '745 Patent). The Krisp patents also cite Sanas' asserted '496 and '457 Patents.

87.    In addition, on information and belief, Krisp has paid close attention to Sanas' and Intone's patenting practices and routinely reviews published applications and patents from those companies. As alleged herein, Krisp expressed deep interest in Sanas' accent translation technology as early as 2021 and acknowledged Sanas' leading position in innovating in this space. When the Krisp-Sanas discussions broke off, Krisp told Sanas that the companies were in direct competition. This suggests a systematic effort to assemble competitive intelligence on Sanas, its products, its customers, its market behavior, and its patents.

88.    On information and belief, Krisp has made, used, sold, or offered for sale the Accused Products with full knowledge of those patents as described above, and knowing that such conduct would constitute an infringement. Krisp acknowledged that Sanas was the leader in development of accent translation technology and affirmatively sought to license Sanas' technology or otherwise form a partnership. But after learning of Sanas' market-ready solutions, Krisp elected to copy Sanas instead. Krisp's imitation rises to the level of willful patent infringement of Sanas' patents and willful misappropriation of Sanas' trade secrets.

## COUNT ONE: INFRINGEMENT OF U.S. PATENT 11,948,550

89.    Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

90.    On information and belief, Krisp directly infringes, either literally or under the doctrine of equivalents, at least claim(s) 1-4, and 6-22, of the '550 Patent by making, using, offering for sale, and selling the Accused Products in violation of 35 U.S.C. § 271(a).

91.     For example, Krisp's website describes this product as follows: "Accent Conversion enhances communication for customers and call centers by softening accents while preserving the speaker's voice for authenticity and personal connection in every interaction."







92.     A Krisp blog[8] indicates that Krisp's technical approach uses "high-quality parallel data" to "directly map input accented speech to target native speech" such that it "generat[es] a native target-accent sounding output for each accented speech input, maintaining consistent emotions, naturalness, and vocal characteristics, and achieving an ideal frame-by-frame alignment with the input data." A video demo of Krisp's software[9] in use similarly promotes the software as keeping the speaker's "voice intact while softening challenging parts of my accent" and preserving their "natural tone and personality."

---

[8] https://krisp.ai/blog/deep-dive-ai-accent-conversion-for-call-centers/
[9] www.youtube.com/shorts/uV3xJ5-Sna8

18

93.    The Krisp blog further describes Krisp's technical approach, which includes (among other things) "utterance alignment" and "feature extraction":



94.    Krisp has also filed multiple patent applications related to its accent translation product, which have resulted in the issuance of Krisp's two U.S. translation patents, the '609 Patent and the '979 Patent.  On information and belief, the written descriptions and/or claims of these patents describe the technical approach employed in the Accused Products.

95.    For example, the '979 Patent, along with the web pages, blog post, and demo videos described above, demonstrate that each of the Accused Products is a system that contains all of the elements of claim 1 of the '550 Patent.

96.    With knowledge of the '550 Patent, Krisp has also actively induced the infringement of one or more claims of the '550 Patent in violation of 35 U.S.C. § 271(b) by its

19

customers and/or end users of their products, including at least the Accused Products, by selling products with a particular design, providing for support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '550 Patent, including claim(s) 1-4, and 6-22 , with intent to encourage those customers and/or end-users to infringe the '550 Patent.

97.    By way of example, Krisp has actively induced infringement of the '550 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use the Accused Products, to make, use, sell, and/or offer to sell Krisp's products, including the Accused Products, in a manner that infringes at least one claim of the '550 Patent, including claim(s) 1-4, and 6-22.

98.    With knowledge of the '550 Patent, Krisp has also contributed to the infringement of one or more claims of the '550 Patent in violation of 35 U.S.C. § 271(c) by its customers and/or end users of their products, including at least the Accused Products, by offering to sell and selling software that constitutes a component of the infringing systems and computer-readable media claimed by the '550 Patent, and/or a material for use in practicing the methods claimed by the '550 Patent, which constitutes a material part of the inventions and is not a staple article or commodity of commerce suitable for non-infringing uses.  In doing so, Krisp knew that the software would contribute to infringement of the '550 Patent.

99.    With knowledge of the '550 Patent, Krisp has willfully, deliberately, and intentionally infringed the '550 Patent.  Krisp had actual knowledge of the '550 Patent and Krisp's infringement of the '550 Patent as set forth above.  After acquiring that knowledge, Krisp directly and indirectly infringed the '550 Patent as set forth above.  Krisp knew, or should have known, that its conduct amounted to infringement of the '550 Patent at least because Krisp had sought out technical information from Sanas about the state of its development of Sanas' products; on information and belief, Krisp was reviewing Sanas' patent applications and patents in order to build a software product based on Sanas' innovations; and Krisp's own products, as reflected in its patents, closely follow the Sanas template for accent translation.

100.    Krisp will continue to infringe the '550 Patent unless it is enjoined by this Court. Krisp, by way of its infringing activities, has caused and continues to cause Sanas to suffer damages in an amount to be determined, and has caused and is causing Sanas irreparable harm. Sanas has no adequate remedy at law against Krisp's acts of infringement and, unless enjoined from its infringement of the '550 Patent, Sanas will continue to suffer irreparable harm.

101.    Sanas is entitled to recover from Krisp damages at least in an amount adequate to compensate for its infringement of the '550 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

102.    Sanas has complied with the requirements of 35 U.S.C. § 287 with respect to the '550 Patent.

**COUNT TWO: INFRINGEMENT OF U.S. PATENT 12,125,496**

103.    Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

104.    On information and belief, Krisp directly infringes at least claim(s) 1- 20 of the '496 Patent by making, using, offering for sale, and selling the Accused Products in violation of 35 U.S.C. § 271(a).

105.    Krisp's infringement of the '496 Patent is reflected in the web pages, blog posts, demo videos, and patents previously mentioned.

106.    A Krisp blog post asserts that "[t]he speech synthesis part of the model, which is sometimes referred to as the vocoder algorithm in research, should . . . be robust against noise and background voices,"[10] suggesting that the Accused Products have these characteristics.

107.    Krisp has also represented that the Accused Products provide "Background noise and voice cancellation robustness" which is "highly robust, automatically included in the Accent Conversion models."[11]  Krisp further asserts that "Krisp maintains speech quality in real-world noisy conditions, including multi-speaker and contact center environments."

---

[10] https://krisp.ai/blog/deep-dive-ai-accent-conversion-for-call-centers/

[11] https://krisp.ai/blog/krisp-vs-sanas-accent-conversion-comparison/.  The "comparison" post by Krisp contains numerous falsehoods and radically distorts the relative performance of Krisp's accent conversion product to Sanas'.  The reality is that Sanas has long been the market leader,

108.    For example, each of the Accused Products, when installed on a computer, constitutes a voice enhancement system that contains all of the elements of claim 1 of the '496 Patent.

109.    With knowledge of the '496 Patent, Krisp has actively induced the infringement of one or more claims of the '496 Patent, in violation of 35 U.S.C. § 271(b), by its customers and/or end users of their products, including at least the Accused Products, by selling products with a particular design, providing for support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '496 Patent, including claim(s) 1- 20, with intent to encourage those customers and/or end-users to infringe the '496 Patent.

110.    By way of example, Krisp has actively induced infringement of the '496 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use the Accused Products, to make, use, sell, and/or offer to sell Krisp's products, including the Accused Products, in a manner that infringes at least one claim of the '496 Patent, including claim(s) 1-20.

111.    With knowledge of the '496 Patent, Krisp has also contributed to the infringement of one or more claims of the '496 Patent in violation of 35 U.S.C. § 271(c) by its customers and/or end users of their products, including at least the Accused Products, by offering to sell and selling software that constitutes a component of the infringing systems and computer-readable media claimed by the '496 Patent, and/or a material for use in practicing the methods claimed by the '496 Patent, which constitutes a material part of the inventions and is not a staple article or commodity of commerce suitable for non-infringing uses.  In doing so, Krisp knew that the software would contribute to infringement of the '496 Patent.

112.    With knowledge of the '496 Patent, Krisp has willfully, deliberately, and intentionally infringed the '496 Patent.  Krisp had actual knowledge of the '496 Patent and Krisp's infringement of the '496 Patent as set forth above.  After acquiring that knowledge, Krisp directly

_____

and even with Krisp's brazen misappropriation of Sanas' intellectual property, Krisp's product is manifestly inferior to Sanas'.

22

and indirectly infringed the '496 Patent as set forth above.  Krisp knew or should have known that its conduct amounted to infringement of the '496 Patent at least because Krisp had sought out technical information from Sanas about the state of its development of Sanas' products; on information and belief, Krisp was reviewing Sanas' patent applications and patents in order to build a software product based on Sanas' innovations; and Krisp's own products, as reflected in its patents, closely follow the Sanas template for accent translation.

113.    Krisp will continue to infringe the '496 Patent unless it is enjoined by this Court. Krisp, by way of its infringing activities, has caused and continues to cause Sanas to suffer damages in an amount to be determined, and has caused, and is causing, Sanas irreparable harm. Sanas has no adequate remedy at law against Krisp's acts of infringement and, unless enjoined from its infringement of the '496 Patent, Sanas will continue to suffer irreparable harm.

114.    Sanas is entitled to recover from Krisp damages at least in an amount adequate to compensate for its infringement of the '496 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

115.    Sanas has complied with the requirements of 35 U.S.C. § 287 with respect to the '496 Patent.

## COUNT THREE: INFRINGEMENT OF U.S. PATENT 12,131,745

116.    Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

117.    Krisp directly infringes at least claim(s) 1-20 of the '745 Patent by making, using, offering for sale, and selling the Accused Products in violation of 35 U.S.C. § 271(a).

118.    For example, a Krisp blog[12] explains that "getting precise alignment is exceedingly challenging due to variations in the duration of phoneme pronunciations.  Nonetheless, improved alignment accuracy contributes to superior results."    The blog further suggests that Krisp's software "generat[es] a native target-accent sounding output for each accented speech input, maintaining consistent emotions, naturalness, and vocal characteristics, and achieving an ideal

---

[12] https://krisp.ai/blog/deep-dive-ai-accent-conversion-for-call-centers/

23

frame-by-frame alignment with the input data." The blog also includes a block diagram which includes a step of "utterance alignment."

119. Krisp's '979 Patent also describes Krisp's alignment process, providing further indication of Krisp's infringement of the '745 Patent.

120. Finally, Krisp's website and other public materials include demonstrations of the output speech produced by the Accused Products. An evaluation of that output speech suggests that the Accused Products do not use non-infringing approaches to alignment of the speech and instead uses an infringing approach including differentiable alignment by maximization of cosine distance between phonetic embedding vectors.

121. Together, the blog, the '979 Patent, and the information available on Krisp's website (including the demonstrations of output speech), reflect that each of the Accused Products when installed on a computer is, on information and belief, an accent translation system containing all of the elements claimed in Claim 1 of the '745 Patent.

122. With knowledge of the '745 Patent, Krisp has actively induced the infringement of one or more claims of the '745 Patent in violation of 35 U.S.C. § 271(b) by its customers and/or end users of their products, including at least the Accused Products, by selling products with a particular design, providing for support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '745 Patent, including claim(s) 1-20, with intent to encourage those customers and/or end-users to infringe the '745 Patent.

123. By way of example, Krisp has actively induced infringement of the '745 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use the Accused Products, to make, use, sell, and/or offer to sell Krisp's products, including the Accused Products, in a manner that infringes at least one claim of the '745 Patent, including claim(s) 1-20.

124. With knowledge of the '745 Patent, Krisp has also contributed to the infringement of one or more claims of the '745 Patent in violation of 35 U.S.C. § 271(c) by its customers and/or end users of their products, including at least the Accused Products, by offering to sell and selling

24

software that constitutes a component of the infringing systems and computer-readable media claimed by the '745 Patent, and/or a material for use in practicing the methods claimed by the '745 Patent, which constitutes a material part of the inventions and is not a staple article or commodity of commerce suitable for non-infringing uses.  In doing so, Krisp knew that the software would contribute to infringement of the '745 Patent.

125.    With knowledge of the '745 Patent, Krisp has willfully, deliberately, and intentionally infringed the '745 Patent.  Krisp had actual knowledge of the '745 Patent and Krisp's infringement of the '745 Patent as set forth above.  After acquiring that knowledge, Krisp directly and indirectly infringed the '745 Patent as set forth above.  Krisp knew or should have known that its conduct amounted to infringement of the '745 Patent at least because Krisp had sought out technical information from Sanas about the state of its development of Sanas' products; on information and belief, Krisp was reviewing Sanas' patent applications and patents in order to build a software product based on Sanas' innovations; and Krisp's own products, as reflected in its patents, closely follow the Sanas template for accent translation.

126.    Krisp will continue to infringe the '745 Patent unless it is enjoined by this Court. Krisp, by way of its infringing activities, has caused and continues to cause Sanas to suffer damages in an amount to be determined, and has caused and is causing Sanas irreparable harm. Sanas has no adequate remedy at law against Krisp's acts of infringement and, unless enjoined from its infringement of the '745 Patent, Sanas will continue to suffer irreparable harm.

127.    Sanas is entitled to recover from Krisp damages at least in an amount adequate to compensate for its infringement of the '745 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

128.    Sanas has complied with the requirements of 35 U.S.C. § 287 with respect to the '745 Patent.

## COUNT FOUR: INFRINGEMENT OF U.S. PATENT 11,715,457

129.    Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

130.    Krisp directly infringes at least claim(s) 1-20 of the '457 Patent by making, using, offering for sale, and selling the Accused Products in violation of 35 U.S.C. § 271(a).

131.    Krisp's website includes audio demos of the performance of the Accused Products, which in turn display the availability of "Voice Profiles" in the Accused Products, which are features that are described and claimed in the '457 Patent.



132.    The Accused Products' Voice Profiles Mode is likewise described in a Krisp user guide[13]:

133.    Krisp has also claimed in a blog post[14] that the Accused Products have an audio latency of 220ms, as claimed in the '457 Patent.

134.    The Krisp blog, websites, demonstrations, and patents described above disclose that each of the Accused Products when installed on a computer is, on information and belief, a computing apparatus containing each of the elements of claim 14 of the '457 Patent.

---

[13] https://help.krisp.ai/hc/en-us/articles/18308013509916-Krisp-Accent-Conversion-user-guide
[14] https://krisp.ai/blog/krisp-vs-sanas-accent-conversion-comparison/

135.    With knowledge of the '457 Patent, Krisp has actively induced the infringement of one or more claims of the '457 Patent in violation of 35 U.S.C. § 271(b) by its customers and/or end users of their products, including at least the Accused Products, by selling products with a particular design, providing for support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '457 Patent, including claim(s) 1-20, with intent to encourage those customers and/or end-users to infringe the '457 Patent.

136.    By way of example, Krisp has actively induced infringement of the '457 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use the Accused Products, to make, use, sell, and/or offer to sell Krisp's products, including the Accused Products, in a manner that infringes at least one claim of the '457 Patent, including claim(s) 1-20.

137.    With knowledge of the '457 Patent, Krisp has also contributed to the infringement of one or more claims of the '457 Patent in violation of 35 U.S.C. § 271(c) by its customers and/or end users of their products, including at least the Accused Products, by offering to sell and selling software that constitutes a component of the infringing computing apparatuses and computer-readable storage media claimed by the '457 Patent, and/or a material for use in practicing the methods claimed by the '457 Patent, which constitutes a material part of the inventions and is not a staple article or commodity of commerce suitable for non-infringing uses. In doing so, Krisp knew that the software would contribute to infringement of the '457 Patent.

138.    With knowledge of the '457 Patent, Krisp has willfully, deliberately, and intentionally infringed the '457 Patent. Krisp had actual knowledge of the '457 Patent and Krisp's infringement of the '457 Patent as set forth above. After acquiring that knowledge, Krisp directly and indirectly infringed the '457 Patent as set forth above. Krisp knew or should have known that its conduct amounted to infringement of the '457 Patent at least because on information and belief, Krisp was reviewing Intone's patent applications and patents in order to build a software product to compete in the accent translation marketplace.

139.    Krisp will continue to infringe the '457 Patent unless it is enjoined by this Court. Krisp, by way of its infringing activities, has caused and continues to cause Sanas to suffer damages in an amount to be determined, and has caused and is causing Sanas irreparable harm. Sanas has no adequate remedy at law against Krisp's acts of infringement and, unless enjoined from its infringement of the '457 Patent, Sanas will continue to suffer irreparable harm.

140.    Sanas is entitled to recover from Krisp damages at least in an amount adequate to compensate for its infringement of the '457 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

141.    Sanas has complied with the requirements of 35 U.S.C. § 287 with respect to the '457 Patent.

### COUNT FIVE: DECLARATORY JUDGMENT

### (Co-Inventorship and Co-Ownership Over U.S. Patent Nos. 12,205,609 and 12,223,979)

142.    Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

143.    To the extent they are not invalid, Sanas is at least the joint owner of the '609 and '979 patents by virtue of the facts alleged herein, including that during the technical discussions between the parties in 2022, Sanas employees, including Maxim Serebryakov, disclosed to Krisp that Sanas' accent translation software was being developed based upon a teacher-student architecture; Sanas' product runs locally on a personal computer CPU; and Sanas' product uses a parallel speech data processing model.

144.    The '609 and '979 Patents both incorporate these concepts as central features of the claimed inventions therein.  For example, patents (which share a common specification) summarize the inventions in the Abstract as claiming "[t]echniques . . . for generating parallel data for real-time speech form conversion" which include "training a teacher machine learning model that is offline and is substantially larger than a student machine learning model for converting speech form" and "[t]ransferring 'knowledge' from the trained Teacher model for training the Production Student Model that performs the speech form conversion on an end-user computing device."  Independent claims 1, 13, and 19 of the '609 patent include the limitations

28

of a "teacher machine learning (ML) model;" "parallel speech data;" and "a student machine learning algorithm." The claims of the '979 Patent likewise encompass these concepts.

145. The inventive contributions of one or more Sanas employees, including Mr. Serebryakov, to the subject matter claimed in the '609 and '979 Patents require that they be named as joint inventors of such patents.

146. Sanas' property interests in the '609 and '979 Patents will be prejudiced if the issue of ownership is not adjudicated in connection with the instant action. Unless Sanas obtains from this Court a declaratory judgment of its ownership rights, title, and interests in the '609 and '979 Patents, it faces significant harm, as Krisp's assertion of ownership of the patents prevents Sanas from licensing those patents.

147. Krisp's conduct in asserting that it is the sole owner of the '609 and '979 Patents, and not recognizing the Sanas employees' inventive contributions and Sanas' co-ownership, is a direct and proximate cause of Sanas' injury, which would be redressed by the declaratory judgment sought herein.

148. An actual, present, and justiciable controversy has arisen between Sanas and Krisp concerning ownership of the '609 and '979 Patents.

149. Accordingly, Sanas seeks a declaration that the Sanas employees are co-inventors of the '609 and '979 Patents and that Sanas owns a pro rata undivided interest in the '609 and '979 Patents.

## COUNT SIX: MISAPPROPRIATION OF TRADE SECRETS
### (Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)

150. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

151. As set forth above, Defendant has also improperly and without Sanas' consent accessed, acquired, remained in possession of, used, and/or disclosed certain confidential and proprietary information of Sanas constituting "trade secrets" as defined by 18 U.S.C. § 1839(3). These trade secrets, as described above, are related to a product or service that is used in, that has been used in and/or that is intended for use in interstate and/or foreign commerce. Sanas is the

29

owner of such information. This information is integral to Sanas' speech AI software solutions and services, and is the result of extensive research, development and investment. These trade secrets were developed, compiled, and enhanced over time by Sanas employees.

152.    Sanas has taken numerous, reasonable precautions to protect and to maintain the value of its trade secrets. Sanas employees are subject to obligations to maintain the confidentiality of the trade secrets, including pursuant to employee confidentiality agreements. Licensees of Sanas' software are likewise subject to contractual confidentiality obligations. Sanas also maintains IT security practices and processes, which are designed to and do protect Sanas' sensitive information from being accessed by malicious outside parties. Sanas also divulged sensitive and confidential information to Krisp only after the parties signed a non-disclosure agreement, and Sanas reminded Krisp that the parties' technology teams were working together pursuant to that NDA.

153.    Sanas' trade secrets derive actual or potential independent economic value from not being generally known to and not being readily ascertainable through proper means by any other person who can obtain economic value from the disclosure or use of the information.

154.    Such trade secrets are not accessible to the public and are not generally known within the trade or by special persons who are skilled in the trade, other than by those who are bound to maintain their secrecy and confidentiality.

155.    On information and belief, Krisp has used the Sanas trade secrets without express or implied consent from Sanas, while knowing or having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.

156.    As a result of the above-described misappropriation, Sanas has been harmed, including by enabling Krisp to improve its ability to compete with Sanas to win customers by using improperly obtained Sanas information to inform the development of its own product, to save on research and development costs, and to otherwise unfairly gain a competitive advantage.

157.    As a direct and proximate result of Defendant's unlawful, tortious conduct, Sanas has been damaged and Defendant has been unjustly enriched. The damage to Sanas includes the

loss of revenue from Krisp's use of Sanas' own trade secrets to compete with Sanas for business and to offer services based on those trade secrets at a lower price. The unjust enrichment includes the profits Krisp has obtained through its misappropriation of the trade secrets and the value attributed to the misappropriated information, including amounts Defendant saved in research and development costs using the misappropriated information and increased productivity from use of the misappropriated information.

158.    Defendant's conduct constitutes willful and malicious misappropriation within the meaning of the DTSA. In wrongfully and intentionally misappropriating Sanas' trade secrets, as outlined above, Defendant has demonstrated specific intent to cause substantial injury or harm to Sanas. As such, Sanas is entitled to an award of exemplary damages as well as an award of its reasonable attorneys' fees pursuant to the DTSA.

159.    Unless Defendant is enjoined from misappropriating Sanas' trade secrets, Sanas will suffer irreparable harm for which there is no adequate remedy at law.

**<u>COUNT SEVEN: MISAPPROPRIATION OF TRADE SECRETS</u>**

**<u>(Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 _et seq._)</u>**

160.    Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

161.    As set forth above, Defendant has improperly and without Sanas' consent accessed, acquired, remained in possession of, used, and/or disclosed certain confidential and proprietary information of Sanas constituting "trade secrets" as defined by Cal. Civ. Code § 3426 _et seq._ Sanas is the owner of these trade secrets.

162.    Sanas has taken reasonable precautions to protect and maintain the value of its trade secrets, including as described above.

163.    Sanas' trade secrets derive actual or potential independent economic value from not being generally known to the public or to other persons who can obtain economic value from the disclosure or use of the information.

164.    On information and belief, Krisp has used the Sanas trade secrets without express or implied consent from Sanas, while knowing or having reason to know that the trade secrets

31

were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

165.    As a result of the above-described misappropriation, Sanas has been harmed, including by enabling Krisp to improve its ability to compete with Sanas to win customers by using improperly obtained Sanas information to inform the development of its own product, to save on research and development costs, and to otherwise unfairly gain a competitive advantage.

166.    Sanas has suffered and will continue to suffer damages and irreparable harm as a direct and proximate result of Defendant's misappropriation of Sanas' trade secrets.  As a direct and proximate result of Krisp's misappropriation of Sanas' trade secrets, Defendant has been unjustly enriched and Sanas has sustained damages in an amount to be proven at trial.

167.    Defendant's conduct is malicious, oppressive, and deceitful, justifying an award of exemplary damages and attorneys' fees recovery.

168.    Unless Defendant is enjoined from misappropriating Sanas' trade secrets, Sanas will suffer irreparable harm for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for entry of judgment for Sanas and against Krisp and enter the following relief:

**For Patent Infringement:**

A.    A judgement that Krisp has infringed (directly and/or indirectly) one or more claims of the Asserted Patents, namely U.S. Patent Nos. 11,948,550 ("'550 Patent"), 12,125,496 ("'496 Patent"), 12,131,745 ("'745 Patent"), and 11,715,457 ("'457 Patent") and continues to do so with respect to the '550, '496, '745, and '457 Patents;

B.    That Sanas recover all damages to which it is entitled under 35 U.S.C. § 284, including its lost profits, but in no event less than a reasonable royalty;

C.    That Krisp be permanently enjoined from further infringement of the Asserted Patents;

D.    That Sanas, as the prevailing party, shall recover from Krisp all taxable costs of court;

E.      That Sanas shall recover from Krisp all pre- and post-judgment interest on the damages award, calculated at the highest interest rates allowed by law;

F.      That Sanas shall recover from Krisp an ongoing royalty in an amount to be determined for continued infringement after the date of judgment;

G.      That Krisp's conduct was willful and that Sanas should therefore recover treble damages, including attorneys' fees, expenses, and costs incurred in this action, and an action in the damages award pursuant to 35 U.S.C. § 284;

H.       That this case is exceptional and that Sanas shall therefore recover its attorneys' fees and other recoverable expenses, under 35 U.S.C. § 285;

I.      That Sanas shall recover from Krisp such other and further relief as the Court deems appropriate;

**For Declaratory Judgment:**

J.      Enter declaratory judgment that the Sanas employees are co-inventors of the '609 and '979 Patents and that Sanas holds an undivided pro rata ownership interest in the '609 and '979 Patents.

**For Trade Secret Misappropriation:**

K.      Permanent injunctive relief enjoining Krisp, and each of their respective agents, servants, employees, attorneys, representatives, and all others acting on their behalf or in concert with them:

        1.  From any further misappropriation of Sanas' trade secrets;

        2.  From selling or marketing any product or process derived from misappropriation of any Sanas trade secret;

        3.  From otherwise further accessing, using, or disclosing Sanas' trade secrets;

        4.  To return and/or destroy all of Sanas' trade secrets, any record or reflection thereof, and any information derived in whole or in part thereof;

        5.  To place appropriate restrictions on personnel who have been exposed to any of Sanas' trade secrets or information derived therefrom, including any involvement in product development or customer interactions;

33

6. To identify and destroy any code (including any source code or operating code) that includes, was derived from, or the creation or modification of which was influenced in any way by the improper access to and/or use of Sanas' trade secrets, including any features or aspect thereof whose creation was aided or motivated by Krisp's access to Sanas' trade secrets;

7. From making false or misleading statements complained of herein or otherwise; and

8. Any other injunctive relief deemed appropriate by the Court;

L. Compensation in an amount to be proven at trial, including but not limited to unjust enrichment, actual losses, lost profits, and/or imposition of a reasonable royalty;

M. An order requiring Krisp to account for all gains, profits, and advantages derived from its misappropriation of Sanas' confidential, proprietary, and/or trade secret information;

N. General and special damages according to proof;

O. Compensatory, exemplary, and punitive damages according to proof;

P. Disgorgement of profits;

Q. Restitution;

R. Pre-judgment and post-judgment interest;

S. Costs of suit;

T. Reasonable attorneys' fees and costs incurred in prosecuting this action;  and

U. Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable, pursuant to Fed. R. Civ. P. 38(b).

COMPLAINT

Dated: July 7, 2025

Respectfully submitted,

*/s/ Michael Ng*

Michael Ng (SBN 237915)
Michael.Ng@kobrekim.com
Daniel Zaheer (SBN 237118)
Daniel.Zaheer@kobrekim.com
**KOBRE & KIM LLP**
150 California Street, 19th Floor
San Francisco, CA 94111
Telephone: (415) 582-4800
Fax: (415) 582-4811

*Attorneys for Plaintiff*
SANAS.AI INC.

35

COMPLAINT