Michael Ng (SBN 237915)
Michael.Ng@kobrekim.com
Daniel Zaheer (SBN 237118)
Daniel.Zaheer@kobrekim.com
**KOBRE & KIM LLP**
150 California Street, 19th Floor
San Francisco, CA 94111
Telephone: (415) 582-4800
Fax: (415) 582-4811

Jessica Fender (Admitted *pro hac vice*)
Jessica.Fender@kobrekim.com
**KOBRE & KIM LLP**
800 Third Avenue, 6th Floor
New York, NY 10022
Telephone: (202) 488-1200
Fax: (212) 488-1220

Victoria Fordin (Admitted *pro hac vice*)
Victoria.Fordin@kobrekim.com
Zachary Ritz (SBN 301281)
Zachary.Ritz@kobrekim.com
**KOBRE & KIM LLP**
201 South Biscayne Blvd., Suite 1900
Miami, FL 33131
Telephone: (305) 967-6100
Fax: (305) 967-6120

*Attorneys for Plaintiff*
SANAS.AI INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

SANAS.AI INC.,
a Delaware corporation,

Plaintiff,

v.

KRISP TECHNOLOGIES, INC.,
a Delaware corporation,

Defendant.

Case No. 3:25-cv-05666-RS

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT, PATENT INFRINGEMENT, TRADE SECRET MISAPPROPRIATION, AND FALSE ADVERTISING**

**DEMAND FOR JURY TRIAL**

Plaintiff Sanas.AI Inc., a Delaware corporation ("Plaintiff" or "Sanas"), by and through its attorneys, brings this First Amended Complaint against Defendant Krisp Technologies, Inc. ("Defendant" or "Krisp") and alleges as follows:

## INTRODUCTION

### *Sanas' Revolutionary Accent Translation Technology*

1. Sanas is dedicated to helping humanity communicate better, by developing technologies that allow the people of the world to understand and be understood when speaking to each other.

2. The company's inventions have been revolutionary. Sanas uses artificial intelligence tools to break down barriers that prevent even native, fluent speakers from effectively communicating. The company's accent translation technology was the first that translates accents in real time, converting regional accents into local ones, thereby minimizing difficulties that hinder conversation between speakers of the same language from different countries or regions.

3. The company's technical innovation has received widespread acclaim for its smooth, real-time operation, low latency, and for preserving the individual speaker's authenticity and natural intonation. Among other prizes, Sanas received Frost & Sullivan's North American Technology Innovation Leadership Award in 2024, for its "real-time Accent Translation solution built on patented, AI-powered technology that enables users to control how they sound," and which "[u]nlike competing offerings . . . maintains the authenticity of the agent's voice, ensuring a more natural and genuine communication experience."[1]

4. Sanas' innovations have also been lauded for their positive social impact. Sanas' tools have helped overcome discrimination based on accent and paved the way for thousands of highly qualified professionals who might otherwise be held back simply because they speak a common language in a different way. In a recent Washington Post article focused on Sanas' innovations, one industry insider noted that such AI technologies are not eliminating the need for people: "What we are seeing is that it is adding value to individual people."[2]

---

[1] www.frost.com/news/press-releases/frost-sullivan-recognizes-sanas-as-the-2024-north-american-technology-innovation-leader/

[2] www.washingtonpost.com/world/2025/06/21/india-ai-bpo-call-centers/

5. Sanas has won rapid adoption in the market and praise from its customers. As the same Washington Post article states about Sanas' accent translation system: "[C]ompanies say it's delivering results: happier customers, satisfied agents, faster calls."[3] Sanas has been used by tens of thousands of customers to facilitate spoken communications and has rapidly become the recognized market leader in the new product category that it created.

*Krisp's Copycat Technology*

6. Unfortunately, such innovation invites copycats. And that is exactly what happened here.

7. On March 25, 2025, Defendant Krisp launched what it called "Krisp AI Accent Conversion v3," a product it claims is built on its "unique" approach to accent conversion, including real-time operation and preservation of speaker identity.[4]

8. Krisp's product bears a striking resemblance to Sanas' invention. The structure of its system, and the methodologies utilized to implement accent conversion, mimic those that Sanas invented. Even the words Krisp uses to describe what its product is and how it works are ripped from Sanas' marketing and technical materials.

9. The similarity is not random chance. Krisp did not come up with what it claims is its own "new" accent translation software—Krisp stole it from Sanas.

**THE PARTIES**

10. Plaintiff Sanas.AI Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in this district at 437 Lytton Ave Ste 200, Palo Alto, California, 94301.

11. Upon information and belief, Defendant Krisp Technologies, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in this district at 2150 Shattuck Ave. Suite 1300, Berkeley, California, 94704.

---

[3] *Id.*
[4] https://krisp.ai/blog/krisp-ai-accent-conversion-v3/

## JURISDICTION AND VENUE

12. This action arises under the patent laws of the United States, 35 U.S.C. § 271 *et seq*. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and/or 2202, based on the actual controversy between Sanas and Krisp arising under (i) the patent laws of the United States, 35 U.S.C. § 100 *et seq*.; (ii) the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, and (iii) Section 43 of the Lanham Act (15 U.S.C. § 1125).

13. This Court has supplemental jurisdiction over the declaratory judgment and state law claims herein pursuant to 28 U.S.C. § 1367.

14. This Court has personal jurisdiction over Krisp and venue is proper in this judicial district pursuant to 28 U.S.C. §§1391(b), (c), (d) and 1400(b) because Krisp has a permanent and continuous presence in, has committed acts of infringement in, and maintains a regular and established place of business in this district.

## FACTUAL BACKGROUND

### *Sanas' Origins*

15. Like many leading technology companies, Sanas originated with a conversation between friends, in a dorm room, about a real-world problem they faced.

16. In 2020, a Stanford student returned for a stint home in Nicaragua. To help his family there, he took a temporary job answering customer service calls for an international company. He spoke perfect English—he was thriving as a college student at a top American university. But even he was held back in the workplace by his accent, which made effective communication cumbersome.

17. Upon his return to Stanford, he relayed his frustrations to his fellow students. His experience intrigued three of his friends, who wondered if a solution might lie in the new technologies they were studying. Could artificial intelligence be used to help humans communicate more clearly with each other?

18. Together, Maxim Serebryakov, Shawn Zhang, and Andrés Pérez Soderi set about looking for a solution, applying new techniques to the problem and generating the first ideas that would eventually become Sanas.

19. Their goal was straightforward: to use artificial intelligence to allow speakers with one regional accent to be understood by listeners accustomed to a different accent, without sacrificing one's individual intonation, cadence, and other nuances that convey meaning with both subtlety and depth in spoken language.

20. Their initial efforts proved promising, so they plunged in, dedicating themselves to creating the first accent translation technology.

21. The path to developing a real-world, elegant solution was long and arduous. Over the months and years that followed those early brainstorming sessions, Sanas repeatedly encountered unexpected challenges and had to innovate at every turn. Because artificial intelligence tools had never successfully been deployed against a problem set like this, Sanas was inventing and adapting in real time: writing its own unique algorithms, creating its own architecture to train its artificial intelligence models, and, ultimately, developing its own unique, end-to-end, real-time accent translation product.

22. The data-gathering necessary to perfect Sanas' accent translation model alone required substantial work and thousands of hours of labor.

23. By way of example, Sanas conducted its own market research, directly engaging customer support personnel all over the world, and personally deploying Sanas employees to the very environments where many of its potential customers ultimately would use its accent translation technology, such as remote call-center locations in rural India. At significant expense, Sanas patiently and comprehensively gathered information on the customer service providers' and callers' experiences and concerns; the real-world environmental challenges in these target locations; and the nature of the fragmentation in the communication centers' technology stacks and the effect it might have on Sanas' technology, among other things.

24. Sanas used this painstakingly-gathered, closely held, and confidential data to fine-tune its approach to accent translation.

25. For example, based upon that research, Sanas determined what, for many of its customers, constituted an "ideal" target accent, which it then used to train its models. To find this "ideal" target accent, the Sanas team hired carefully selected voice actors and recorded thousands

of hours of human speech in a rigorously controlled recording studio environment, sifting through the recordings to identify a small subset of target data to feed into its model. To ensure that only the highest quality data was carried forward, Sanas built an application to apply its proprietary approach, which ensured that any recording having a similarity score below a certain threshold was rejected and would prompt the voice actor to re-record the desired audio track.

26. Likewise, Sanas developed its own proprietary "ideal latency period" to provide a frictionless back-and-forth conversational experience between two users. In short, Sanas' technology works in real time, despite the massive amounts of processing and translation that take place within its algorithms. Some amount of time is required to allow the algorithms to complete translation of the source speech before outputting the target accent. If the latency period—*i.e.*, the period between when a user finishes speaking and when the listener realizes it is their turn to respond—is too long, the speakers will talk over each other, frustrating the conversation; if the latency period is too short, the translation quality suffers. By virtue of Sanas' unique understanding of the complex trade-off between latency and central processing unit ("CPU") utilization, and by numerous iterations of trial and error, Sanas identified and its software has been developed to execute an ideal latency period, providing users with a real-time experience.

27. As Serebryakov, Zhang, and Pérez built out the new technology, they were joined by Sharath Keshava Narayana, an acclaimed entrepreneur who joined them as a co-founder. In 2021, Sanas launched its first product, and quickly found eager investors in some of Silicon Valley's leading venture capital firms. In 2022, it scaled up, raising a $32 million Series A investment round, including investment from Google.

28. By 2023, Sanas was being used by more than 5,000 contact center agents across 25 cities. Over the next two years, as it expanded its operations, the company found even more success in the market. As of today, Sanas' software has been used by hundreds of thousands of agents.

29. From the outset, Sanas has understood the need to protect its inventions, and has diligently sought patent protection for them. On May 6, 2021, Sanas filed Provisional Patent Application #63/185,345 (Real-Time Accent Conversion Model). This was followed by

numerous other applications which disclosed and protected the innovations that solved major problems in execution and implementation of Sanas' market-leading accent translation product.

30. Sanas has also developed and protected confidential and valuable trade secrets relating to the research and development of its accent translation product, among other data, compilations, and learnings.

*Krisp Seeks Sanas' Accent Translation Technology*

31. On September 7, 2021, Sanas co-founder Shawn Zhang received the following LinkedIn message from Krisp's COO, Robert Schoenfield:

32. The message was unexpected, unsolicited, and unannounced. Sanas and Krisp had no prior direct contact, though Sanas was aware of Krisp.

33. Originally founded as 2Hz and with operations based in Armenia, Krisp had been focused on noise cancellation. According to a blog post from Krisp CEO and co-founder Davit Baghdasaryan in October 2018, the company's objective was "a technology which will completely mute the background noise in human-to-human communications, making it more pleasant and intelligible."[5]

[5] https://developer.nvidia.com/blog/nvidia-real-time-noise-suppression-deep-learning/

34. Without receiving a response, Schoenfield followed up again with Zhang the next day:

> **Robert Schoenfield** in • 1:41 PM
>
> Following up with more specifics with my connection request: we have 100's of global contact centers as customers for background noise removal and voice quality enhancements. I would like to explore licensing your tech and share more about our business and customers.

35. Sanas was curious about the outreach. Krisp had made some inroads with the call center market, selling its product as a way to reduce background noise in those sometimes crowded working environments. Sanas thought there was some possibility that the two companies might be complimentary.

36. Krisp continued to press to connect with Sanas. On September 27, 2021, Krisp CEO Baghdasaryan reached out to one of Sanas' venture capital investors, congratulating him on his firm's investment in Sanas and asking if he could help set up a meeting, saying: "We are quite interested in Accent Reduction technologies . . . I would love to connect with the founders and start exploring future partnerships."

37. Through that contact, on October 6, 2021, Baghdasaryan held an introductory Zoom meeting with Sanas' Andrés Pérez Soderi and Maxim Serebryakov.

38. Baghdasaryan followed up enthusiastically, reaching out to Pérez and Serebryakov seeking to meet face-to-face four days later. The Sanas team could not make the last-minute scheduling work, but Baghdasaryan sought another Zoom meeting, saying "this time a deeper one. The main question we have is how this works in real time. Experiencing it somehow would be really important to us."

39. Sanas told him it was willing to conduct a product demonstration that would show Krisp how Sanas' unique end-to-end technology translated accents and asked for the two parties

to enter into a non-disclosure agreement. Krisp agreed, and Krisp's COO Schoenfield sent an NDA, which the parties executed on November 17, 2021.

*Krisp and Sanas' Non-Disclosure Agreement*

40. Sanas sought from Krisp and received assurances that Krisp would protect and not misuse Sanas' valuable confidential information. The parties' NDA reflected Krisp's assurance to do just that.

41. The NDA, which had been provided to Sanas by Krisp, acknowledged that Sanas "ha[d] disclosed, and may further disclose certain confidential technical and business information . . . that [Sanas] desires [Krisp] to treat as confidential."

42. Pursuant to the NDA, Krisp also promised not to use Sanas' confidential information "for any purpose except to evaluate and engage in discussions" relating to the business opportunity COO Schoenfield had solicited, and not to "reverse engineer, disassemble, or decompile any prototypes, software, samples, or other tangible objects that embody" the confidential information Sanas provided. The NDA further provides that "[n]othing in this Agreement is intended to . . . grant [Krisp] any rights in or to the Confidential Information of [Sanas] except as expressly set forth in this Agreement."

43. The NDA also reflected Krisp's commitment that any of its employees who were granted access to Sanas' confidential information would, themselves, be required to sign a non-use and non-disclosure agreement at least as protective as the NDA before they could receive Sanas' confidential information.

*Krisp and Sanas' Year-Long Partnership Discussions and Technical Evaluation*

44. Over the course of the next year, and under the umbrella of the NDA, the two companies explored a possible collaboration. From Sanas' perspective, Krisp had developed a complimentary technology (noise cancellation) that could supplement its unique offering to the market (accent translation), and Krisp had begun rolling out to customers, developing a market presence that could help accelerate Sanas' sales efforts.

45. And from the outset, that collaborative partnership is expressly how Krisp represented its interest as well. COO Schoenfield's first cold outreach stated that Krisp had "100's

of global contact centers as customers for background noise removal and voice quality enhancements," and said he was interested in talking to Sanas because "I would like to explore licensing your tech and share more about our business and customers." When CEO Baghdasaryan made his initial overture through Sanas' investor, he said "[w]e are quite interested in Accent Reduction technologies . . . I would love to connect with the founders and *start exploring future partnerships*." (emphasis added).

46.     Through both its words and actions, Krisp told Sanas that it sought out a collaborative partnership through which it would license Sanas' novel accent translation technology, and to explore ways the two companies might improve the marketing of its respective accent translation (Sanas) and noise reduction (Krisp) offerings.

47.     One thing was clear: at the time, ***Krisp did not have any accent translation capabilities of its own***.

48.     After the parties signed the NDA, Sanas demonstrated its accent translation product and began discussions between the senior business leadership of the companies to explore the possibility of a collaborative approach. A December 1, 2021 meeting included co-founders from both Sanas and Krisp: Andrés Pérez Soderi and Maxim Serebryakov from Sanas along with Krisp co-founders Davit Baghdasaryan and Artavazd Minasyan, as well as Krisp's COO, Robert Schoenfield, and Sanas' Head of Operations Ashley Walker.

49.     As those discussions progressed, Baghdasaryan, as Krisp's CEO, reported back that the company wanted to move ahead with the collaboration. On January 13, 2022, Baghdasaryan wrote: "We discussed this internally and think there is a great opportunity to work together. I would like to take this a step further and introduce our engineering teams."

50.     At the time, Sanas' leadership team was busy completing its Series A fundraising round, but Krisp kept pushing. On April 13, Krisp's Schoenfield reached back out, asking Sanas if there was an "opportunity to engage with [Sanas'] solution," which resulted in direct discussions with Sanas' co-founder and then-COO, Sharath Keshava Narayana.

51.     After further discussions, Schoenfield sent Keshava a proposed letter of intent ("LOI") on June 8, 2022, laying out the parameters for the proposed collaboration. In recognition

that it was Sanas with the expertise and capability to support accent translation related content, the proposed LOI stated that Sanas would "license its accent translation technology for integration into Krisp applications," and that Krisp would provide marketing services, while Sanas would be responsible for "accent-translation related content, collateral and expertise." The LOI also stated there was "a genuine interest of Krisp Technologies, Inc. in licensing the Technology from Sanas, Inc."

52. On June 13, 2022, Krisp CEO Baghdasaryan sent Sanas' Serebryakov an email laying out the parameters of a "technical evaluation" he wanted to do and "perform . . . a fast-track evaluation" of Sanas' product that same week. Specifically, he wanted the technical evaluation to focus on the minutia of performance, compatibility, and implementation:

> "There are several things we would like to test:
> - objective evaluation of accent tech
> - how robust is the tech for diff acoustic conditions (headsets, echo, noise, etc)
> - how compatible are Krisp's noise cancellation and Sanas tech
> - min h/w requirements to run the tech (cpu, memory, disc)"

53. The LOI and the technical questions reflected a deepening of the seriousness of the parties' discussions. Soon after suggesting a "technical evaluation" and posing questions seeking proprietary information about Sanas' developments, the Krisp team proposed creating a Slack channel, to be controlled by Krisp, as the forum for the exchange of information. Operating under the NDA and based on the (believed to be shared) understanding that the technical information Sanas would provide through the Slack channel would be subject to the NDA's protections, Sanas agreed. Reflecting its understanding, Mr. Serebryakov told Krisp that Sanas' answers to the pending technical questions would be made via the confidential Slack channel.

54. At the same time, Sanas was concerned about providing Krisp with sensitive and proprietary information that Sanas had developed over years and significant investment. Sanas sought heightened protections, including an exclusivity agreement. Krisp responded by providing positive assurances as to "the pace of our discussions and alignment regarding our LOI," but expressed that exclusivity was "premature" until "technical evaluation" of Sanas' developments

had occurred. The parties continued to discuss Krisp's request for information and Sanas' desire for protections over the next few months.

55. During that period, the senior leadership discussed the terms of a commercial partnership, including "integration approaches" and economic terms. By late summer, Krisp told Sanas that it wanted to move ahead with the partnership.

56. In an email dated August 16, 2022 with the subject "Krisp-Sanas Partnership," Krisp's Schoenfield told Sanas' Keshava and Serebryakov:

> "Sharath and Max,
> We spent time this past week with our teams looking at our technical and commercial approach for accent translation. The short of it is that we want to proceed with our partnership."

57. The email was accompanied by a revised letter of intent, which included goals of completing "[t]echnical integration and performance evaluation by Oct 31" and ultimately the "[l]aunch" of a "PoC [proof of concept] with target customers by Dec 1."

58. But as they held out prospects for a collaborative partnership, Krisp continued pushing Sanas to provide it with increasingly detailed technical information regarding Sanas' novel technology, representing that such "technical and market diligence" was necessary to assess performance in order to bring the Sanas product to its existing customers. For example, in the same email, Schoenfield laid out Krisp's demand for specific details across multiple conditions:

> "Here is a partial list of our open questions regarding the technical evaluation:
> - performance in case of strong accent, no accent, different dialects
> - intelligibility of the converted audio (converted voice quality, robotic or not)
> - performance in case of noise conditions SNR -5db
> - what happens if there is another background voice
> - quality in case of different speaking pace - wpm
> - how it works if we apply Krisp NC, VC before/after Sanas technology?
> - end to end latency with different call center platforms
> - support of different microphones and cases in reverberated audio
> - CPU utilization"

59. Sanas was open to the potential benefits of the prospective relationship, but appropriately wary of a full disclosure without a commitment. Addressing Sanas' ongoing request

for exclusivity protections, Schoenfield again said that those would not be included "at this time." Sanas CEO Keshava explained that it had proposed such protections to "make[] it easier for [the parties'] technology teams to work together"—*i.e.*, to facilitate Sanas' disclosure of competitively valuable and proprietary confidential technical information, as well as the extensive market research underlying Sanas' technology. However, given the assurances from Krisp that it had a genuine intent to pursue a partnership, Keshava explained that he was satisfied that the parties' NDA would provide sufficient protection for the technical discussions—thereby communicating that Sanas' responses to Krisp's requests for technical information were and would be subject to the protections of the NDA.

60. Krisp led Sanas to believe that it shared that understanding. Had Krisp responded to Mr. Keshava's email by indicating in any way that Sanas' disclosures would not be protected by the NDA, Sanas would not have made further disclosures of its technical and market research information in the ensuing weeks.

61. But Krisp did not say that. Instead, Krisp's response to Sanas' email about the NDA appeared to adopt the same view, with Schoenfield stating that he was "really glad to get us all started" and "[w]e will get back to you shortly with our team setup and lead to begin the engagement." This validated Sanas' understanding that subsequent discussions would be covered by the NDA, particularly as Krisp also sought feedback regarding which of its technical questions would be best to prioritize.

62. Mr. Keshava also reiterated that "the primary reason for both of us to partner" was "to assert market dominance . . . As long as we can commit to each other on volumes we would chase for next year by end of Dec I am fine with the construct of the partnership." Schoenfield agreed, reassuring Mr. Keshava that they were "aligned" and that "the primary reason" to pursue the partnership was "to get to market and secure a first-mover footprint in the industry."

63. Over the ensuing weeks, Krisp continued to push aggressively for the technical teams of the two companies to delve into the details and exchange engineering information directly. On August 21, 2022, Krisp told Sanas that company co-founder Artavazd Minasyan

would "lead our technical assessment project" and also brought Stepan Sargsyan, the company's chief scientist, into the discussions.

64.    The technical teams from both companies then set about working closely to comb through the details of the Sanas system.  On August 23, 2022, for example, Krisp's engineering team sent another lengthy list of highly detailed technical questions they wanted from Sanas:

- "Can a real-time demo of the technology be scheduled?
- Is there a web API we could call or can we somehow test your SDK?
- What is the algorithmic look ahead of your technology? Any estimates for end-to-end latency with different call center platforms?
- What are the estimates for Flops / CPU utilization?
- What is the performance in case of noisy input (like -5 or 0 dB SNR) and in case of reverberated speech?
- How is the technology performing with different microphones? Some microphones are doing internal signal processing which can impact your algorithm performance.
- What happens if there is another background voice(s)?
- Are the input speaker voice characteristics retained? If not, then how is the generated voice based on the input voice chosen?
- Are there any requirements for input audio bandwidth (narrowband, wideband or full band) and what is the bandwidth of converted speech?
- Do you evaluate the voice quality, acoustic quality, intelligibility, and accentedness of output speech? Are there any objective or subjective evaluation scores of the technology?
- Which accents are supported today?
- What is the performance in case of strong accent and no accent cases?
- Is the technology robust to accented speech variations due to various Indian dialects?
- Is the technology robust to different speaking rates -wpm?
- Are input speaker emotions, prosody or laughter in converted speech retained?"

65.    Although Sanas had reservations about the breadth and depth of these inquiries, operating under the belief that Krisp was acting in good faith in pursuit of a collaboration and shared the understanding that its answers would be protected by the terms of the NDA, it provided answers across numerous calls and meetings and in writing, including through the dedicated Slack channel.

66.    The information provided by Sanas to Krisp included detailed information that was at the time nonpublic and highly valuable, as it reflected Sanas' years of development of a new

and unprecedented technology, including the training and retraining of various Sanas-made models; extensive and on-the-ground market research and market studies related to source and target accents, customer requirements, and technical challenges in the field; Sanas' bespoke solutions to key technological challenges it faced in developing a commercially viable accent translation solution; and information validating that doing so was both achievable and had been achieved through Sanas' innovations, and that the ability to do so was valuable to end users.

67. The information disclosed included but is not limited to information concerning:

- Real world performance indicators of Sanas' developed accent translation software, including for example:
    - CPU utilization;
    - End-to-end latency on call-center platforms;
    - Performance in noisy environments;
    - Performance of the software using different types of microphones;
    - Performance of the software in strong and no accent cases;
    - Performance with high speaking rates; and
    - Robustness to laughter;
- Challenges with accent translation software that Sanas had identified as areas of focus for the deployment of development resources, including for example relating to:
    - Performance in noisy environments;
    - Performance problems created by certain types of input sounds;
- Whether Sanas preprocesses audio;
- Approaches for evaluating voice quality, acoustic quality, intelligibility, and accentedness of speech;
- Specific algorithm design tradeoffs;
- Sanas' development of a teacher-student architecture;
- That Sanas' product runs locally on a personal computer CPU; and
- Sanas' use of a parallel speech data processing model.

68. For example, Sanas disclosed to Krisp that it deployed a unique and proprietary algorithm that Sanas built for one of the key design elements of the software, rather than relying on a widely utilized algorithm that had been the standard tool for the purpose in question. This disclosure, among other things, alerted Krisp to the fact that the algorithm at issue was an important design feature for implementation of an effective and high-performing accent translation product, and the particular approach Sanas had identified addressed that problem

effectively. This information was the product of Sanas' years of development and practical experience with the particular problems faced in this process and Sanas' unique solutions to those problems.

69. Sanas also disclosed closely held information regarding its development of a proprietary voice activity detection ("VAD") algorithm it had developed in-house that was targeted toward accent translation. Sanas further shared specific information it had learned in the course of its market research and its in-field deployments of its product, which crystallized why Sanas decided it was necessary to create a solution for detecting voices in an acoustically complex environment, such as a call center.

70. As yet another example, in response to Krisp's requests for information regarding "end to end latency with different call center platforms," Sanas provided nonpublic information regarding its ideal latency period and how that period could be maintained or adjusted in a variety of different call center platforms. Information pertaining to Sanas' ideal latency period is critical to its accent translation product and was developed by Sanas over years of market research and through several months-long deployment cycles. This information allowed Krisp to leapfrog years of iterative research and development with respect to its creation of its software, in particular due to Krisp's lack of experience with latency, which is not a major component or issue in noise cancellation software.

71. In response to Krisp's requests for information regarding Sanas' "CPU utilization," Sanas provided Krisp with detailed and proprietary information about Sanas' technology stack. In particular, this disclosure brought into sharp focus the fundamental difference between the noise cancellation field where Krisp operated, which required little in the way of CPU bandwidth, and Sanas' revolutionary accent translation technology, which—given its novelty and complexity—had the potential to create significant demand on a user's CPU such that certain customers and systems would not be able to support running the software locally. Sanas, however, had optimized its technology stack to hit a specific CPU utilization benchmark, which it had developed based upon its market research and multiple rounds of product deployment. This in turn allowed Sanas' product to maintain the ideal latency period that Sanas

had identified by virtue of its market research. Thus, by virtue of Sanas providing Krisp confidential information about Sanas' CPU utilization, including information regarding specific implementation techniques and data sources, Sanas also provided Krisp with critical insight into Sanas' unique technology, such as the interplay of its algorithms and latency.

72. Further, Sanas shared much of its internal market research and testing with Krisp and detailed why and how the lessons learned from that work led Sanas to adapt its approach to accent translation. In one notable example, Sanas shared information it had gathered regarding the particular types of speech required to train a machine-learning algorithm that would be able to maintain a speaker's natural voice.

73. Sanas also demonstrated and explained to Krisp how its novel end-to-end accent translation product converts source speech into a target accent, including specific details regarding its approach to recognition, translation, and synthetization—the three critical components to Sanas' technology, each of which reflects Sanas' bespoke solution to accent translation.

74. For its part, Krisp expressed gratitude for Sanas' participation in the discussions, while continuing to press for additional disclosures.

75. By the fall, the teams had moved on to the details of integrating the two companies' systems, and discussions about piloting at a select group of customers. Business discussions also appeared to be progressing well, with both remote and in-person meetings between the senior leadership.

*Krisp Terminates the Discussions and Copies Sanas' Product*

76. At the end of October 2022, Krisp went cold. Sanas' senior management attempted to reach out to its Krisp counterparts but received only silence.

77. Then, without warning, Krisp terminated the discussions. In an email dated November 4, 2022, Krisp's Schoenfield emailed Sanas' Keshava and said that Krisp did not want to proceed with the partnership. He blamed an alleged lack of "integration visibility" into Sanas' technology—a contention squarely at odds with his engineering team's deep access to Sanas' product. But he also said that Krisp was not yet interested in pursuing accent translation, saying

he hoped the companies' prospects for collaboration might change in the future as "Krisp's roadmap and priorities get more aligned with accent technology."

78. Those representations were untrue.

79. At the same time that Krisp was using the prospect of a business relationship to gain access to Sanas' proprietary technology, the details of its performance, how to implement accent translation technology in real-world customer environments, and Sanas' positioning in the market, ***Krisp was secretly working on its own competing product, using what it learned from Sanas under the NDA.***

80. The first hints of the deception came to light only a few months later on April 27, 2023, when Krisp posted an article on its company blog titled "Krisp AI Accent Conversion: Get Ready for a Communication Revolution":

Home / Enterprise / AI Accent Conversion / **Krisp AI Accent Conversion: Get Ready for a Communication Revolution**

AI Accent Conversion | Krisp News

## Krisp AI Accent Conversion: Get Ready for a Communication Revolution

Apr 27, 2023

81. The Sanas team was surprised. For more than a year, Sanas personnel had communicated with Krisp by email, Slack, and in face-to-face conversations, yet they had never received any indication from Krisp that Krisp was working to develop accent translation technology.

82. The post makes clear that Schoenfield's excuses were lies. Krisp was not waiting for its "roadmap and priorities [to] get more aligned with accent technology"—Krisp was, by its own admission, developing its own competing accent translation system. The post proudly states: "We are excited to announce early access to our newest product release, **Krisp AI Accent**

**Conversion!**"[6] The blog states expressly that the project was not prospective, but the result of past work by the Krisp team:

> "Now, we are excited to announce the addition of yet another game-changing technology to our offering: AI Accent Conversion.
> ***Our team at Krisp has been working tirelessly to create a technology that utilizes real-time inflection changes to help customers understand agents better by dynamically changing agents' accents into the customer's natively understood accent.***
> This innovative product is designed to create better human-to-human connection and communication effectiveness for customers and call centers that are located outside of the United States in countries such as India and the Philippines."

*Id.* (emphasis added).

83. And the posting shows that the product already had broad capabilities across a "wide range of Indian dialects" with additional capability for "English-speaking Filipino, South African, and Chinese call center agents" "soon to follow." *Id.*

84. For the entirety of the period in which Krisp was publicly claiming to have been "working tirelessly" on AI Accent Conversion, it had had access to, and been using, the information that Sanas provided to Krisp under the protection of the NDA, including via the Slack channel that Krisp created and controlled.

85. The reality is that Krisp used its purported interest in a collaborative partnership with Sanas—a discussion that spanned almost a year—to access Sanas' proprietary technology, its testing of that technology, and the details about how to most effectively implement and incorporate that technology, and then misused Sanas' information to develop and launch its own competing product just a few months later.

86. Krisp asserts that its products are the result of its own hard work and innovation. "Every day we solve problems that we have never seen in the past. We solve these problems by working hard, constantly learning, adapting, and in the end - always get things done despite

[6] https://krisp.ai/blog/krisp-accent-conversion/

obstacles along our path."[7]  But that is not true.  Krisp's accent conversion is copied from Sanas, and resulted not from Krisp's hard work, but from Sanas'.

87.    On information and belief, Krisp had not developed *any* in-house capabilities relating to accent-conversion technology prior to Schoenfield's December 2021 cold outreach to Sanas.

88.    By using the confidential information Krisp received during its collaboration with Sanas, Krisp was able to forego the complex, expensive, and time-consuming data collection and market research process that Sanas had undertaken to create and perfect its proprietary and innovative technology.  Krisp likewise relied upon Sanas' foundational research and development in creating its copycat product, giving it a significant advantage as it entered the market Sanas had first created.

*Krisp's False Advertising*

89.    Since releasing its copycat accent translation product, Krisp has made objectively false statements to the market about the performance of Krisp's software relative to that of Sanas'. Krisp has attempted to deceive potential customers and to entice them to purchase services and products from Krisp rather than Sanas by disseminating false advertising that materially misstates both the functionality and capabilities of Krisp's own product, and that of Sanas' products.

90.    Krisp has continued to engage in this type of false and misleading advertising, despite being expressly advised by Sanas that the claims Krisp was making were demonstrably untrue.

91.    On or about April 21, 2025, Krisp published to its public blog a post entitled "*Krisp vs Sanas: Accent Conversion Comparison*"[8] (the "2025 ACC Blog Post") which, according to Krisp, was intended for "contact center operators to assess the quality and performance of Krisp AI Accent Conversion . . . with Sanas' offering."  That post contains numerous statements regarding Sanas' technology that Krisp knew, or had reason to know, were false, based upon information known to or readily accessible by Krisp.

[7] https://krisp.ai/about-us/
[8] https://krisp.ai/blog/krisp-vs-sanas-accent-conversion-comparison/

92. On or about August 28, 2025, Sanas wrote to Krisp regarding the false and misleading nature of the statements contained in the 2025 ACC Blog Post. Sanas specified at least 15 different false and misleading statements that Krisp had published in its 2025 ACC BlogPost, and pointed Krisp to publicly available documents that demonstrate the false and misleading nature of Krisp's claims.

93. Krisp published and continues to publish at least the following false and misleading statements in the 2025 ACC Blog Post:

a. that Sanas supports only "Indian English [and] Filipino English."

b. that Sanas' "[h]eadset robustness" "requires specific headsets."

c. that Sanas' "[h]eadset and application compatibility" has "minimal deployments and testing" because Sanas is a "[n]ew entrant."

d. that Sanas offers "8kHz only" for "[v]oice quality."

e. that Sanas has "[o]ver 30K agents," which is indicated to be fewer than Krisp's alleged "200k contact center agents."

f. that Sanas has "[c]ustomer-side" noise cancellation "only," *and* that "[c]ustomer-side [n]oise [c]ancellation" is "[n]ot available."

g. that Sanas' "[b]ackground noise and voice cancellation robustness" is "[v]ery limited."

h. that Sanas has a "Voice Preservation mode," which only "somewhat preserves the user's voice."

i. that "[w]rong pronunciations" are "[n]oticeably more frequent" with Sanas.

j. that Sanas' ability to "[p]reserve[...] user's voice" is "[l]imited."

k. that Sanas' "[a]gent-side noise cancellation" has "[a]dequate performance for low volume noises (fan, for example) [and] Noise leakage and voice degradation in contact center environments (other voices, loud chatter)."

l. that Sanas' "[r]emote deployment and settings for admins" and "[a]pp version management and auto-update" is "[v]ery [l]imited."

      m. that Sanas' "[a]nalytics for Accent Conversion, Noise Cancellation and platform usage" is "[n]ot available."

n. that Sanas' "[e]nterprise-[g]rade [s]upport" is "[l]imited."

94. Public sources available either at the time Krisp originally published the 2025 ACC Blog Post or thereafter show the above statements to be false and misleading. Sanas has also notified Krisp of the falsity of these statements and Krisp did not deny that these statements are false and misleading. Instead, Krisp has continued to publish these false and misleading statements and has not issued any correction.

95. In addition to the above harmful and false statements, and further compounding the deceptiveness and harm to Sanas, the 2025 ACC Blog Post contains false and highly misleading content by claiming to provide potential customers with "an additional, unbiased perspective into the perceptual and technical performance" of Krisp's and Sanas' technology. This purported "evaluation" is claimed to be "objective," but that assertion is false. In fact, the "objective evaluation" inaccurately represents the performance of Sanas' software and, as a result, is both false and grossly misleading.

96. Krisp claims to have compared its technology with Sanas' against the "same 70 pairs of recordings." On information and belief, based upon the quality of the audio samples, those samples (if actually taken from Sanas' software) reflect an outdated version of the software—a version from December 2023 or earlier. The 2025 ACC Blog Post, however, falsely represents the samples as being of Sanas' *current* offering.

97. In addition, on information and belief, the Krisp samples used for the comparison were selectively chosen to provide a falsely favorable depiction of the performance of Krisp's software and a falsely negative depiction of Sanas'.

98. Krisp's representation that such testing was "objective," when Krisp apparently manipulated the evaluation to bias it such that it falsely indicated that Krisp's technology outperforms Sanas', is false and misleading, and is designed to mislead potential Krisp or Sanas customers into purchasing Krisp's product instead of Sanas' product.

99.     On information and belief, Krisp has purchased Google ads describing Krisp as a "Better Sanas AI alternative," in order to cause Google to prioritize search returns for websites that direct to Krisp's products over those of Sanas' when a search engine user searches for "Sanas" on Google.  Clicking on the link containing the text "Better Sanas AI alternative" directs the user to the 2025 ACC Blog Post.  The statement that Krisp is a "Better Sanas AI alternative" is also false and misleading, at least because it summarizes and republishes the false and misleading information published in the 2025 ACC Blog Post.

100.     Sanas affirmatively put Krisp on notice of its false and misleading statements by, among other things, sending a cease and desist letter on or about August 28, 2025, which set forth the bases for Sanas' claims of false advertising and demanded that Krisp cease from making or advertising the false and misleading statements, remove the false statements contained in the 2025 ACC Blog Post, and issue a corrective statement on its blog.  Sanas also demanded that Krisp provide details regarding how the comparative audio sample testing was performed by Krisp.

101.     On or about September 9, 2025, Krisp through its outside counsel provided its response in a letter.  In the response, Krisp does not deny that the fifteen statements Sanas identified were false and misleading.  Instead, Krisp claims that the statements were "accurate at the time they were made based on publicly available information."  Krisp does not state in the letter that any of the false and misleading statements set forth above actually is true or not misleading.  Nor did Krisp deny that it has manipulated the supposedly "objective" comparison testing to bias it in Krisp's favor.  And Krisp also failed to provide the information Sanas requested to evaluate Krisp's claims, including information shedding light on the methods underlying the purported "evaluation" and support for the evaluation being "objective."

102.     To date, despite having actual knowledge of the false and misleading nature of its 2025 ACC Blog Post and the associated Google ads, Krisp has not made any changes to the 2025 ACC Blog Post, which remains active today on its blog.  Krisp's ongoing publication of the 2025 ACC Blog Post constitutes willful false advertising.

103.     Krisp likewise has made, and continues to make, false and misleading statements regarding Sanas' noise cancellation offerings.

104. In two separate public blog posts, one dated August 30, 2024 and titled "*Krisp vs. Sanas: Noise Cancellation Comparison*" (the "2024 NCC Post") and a second dated July 22, 2025 and titled "*Krisp vs. Sanas – Inbound Noise Cancellation Comparison*" (the "2025 NCC Post") (together, the "NCC Blog Posts"), Krisp made a total of at least 18 false or leading statements that are reasonably likely to confuse and mislead consumers about the features and value of Sanas' noise cancellation technology.

105. Krisp published at least the following false and misleading statements in the 2024 NCC Blog Post:

a. that Sanas only supports "Win[dows]" platform.

b. that "Customer-side Noise Cancellation" is "[n]ot available" with Sanas' product.

c. that Sanas' sample rate supports "8kHz only."

d. that an "[e]rror message" appears in the "Sanas app" when used with "older CPUs."

e. that with Sanas' product, "[u]sers often need to restart the drivers to avoid breakdown of mic and speaker audio streams."

f. that Sanas is only deployed "[w]ith over 30K agents," which is indicated to be fewer than Krisp's alleged "200 thousand contact center agents."

g. that Sanas' "Agent-side Noise Cancellation" has "[a]dequate performance for low noises" and "[n]oise leakage and voice degradation in contact center environments."

h. that Sanas is a "[n]ew entrant" with "minimal deployments and testing" for "[h]eadset and application compatibility."

i. that Sanas' "[r]emote deployments and settings for admins" is "[l]imited"

j. that Sanas' "[a]pp version management and auto-update" is "[l]imited."

k. that Sanas' "[a]nalytics for Noise Cancellation and [u]sage" is "[n]ot available."

l. that Sanas' "[e]nterprise-[g]rade [s]upport" as "24/7" but "[l]imited."

106. Public sources available either at the time Krisp originally published the 2024 NCC Blog Post or thereafter show at least the above statements to be false and misleading.

107. Krisp published at least the following false and misleading statements in the 2025 NCC Blog Post:

a. that Sanas' noise cancellation model only handles "[u]p to 8kHz."

b. that Sanas' "[i]nbound noise cancellation was announced in May 2025" and "production readiness [is] unverified."

c. that Sanas' "[d]eployment through SDK" is "unknown."

d. that the "sanas-inbound" noise cancellation model has a "Sampling Rate" of "up to 8kHz," which is indicated to be fewer than the listed Krisp models.

e. that the "sanas-inbound" noise cancellation model is limited to a "Single Speaker" scenario and is indicated to be less robust than Krisp's "krisp-nc-i-v8-pro" noise cancellation model, which supports multi-speaker scenarios.

f. that the "sanas-inbound" noise cancellation model is "limited" in its voice isolation capabilities.

108. Public sources available either at the time Krisp originally published the 2025 NCC Blog Post or thereafter show at least the above statements to be false and misleading.

109. As it did in the 2025 ACC Blog Post, Krisp summarizes key takeaways of what it describes as "Objective Evaluation[s]" that purport to compare Sanas' and Krisp's noise cancellation solutions across various metrics.

110. Specifically, in the NCC Blog Posts, Krisp relies on the Perceptual Objective Listening Quality Analysis ("POLQA") evaluation, and additionally relies on Meta's AudioBox Aesthetics assessment in the 2025 NCC Post. Krisp presents the results of these evaluations, allegedly having used Sanas' software when processing audio samples, as objective and representative.

111. In addition, the 2025 NCC Post summarizes the results of a "Subjective Evaluation" reliant on a crowdsourced A/B test where 24 audio samples were processed using both the "krisp-viva-v6-lite" model and the "sanas-inbound" model and then, allegedly,

anonymously evaluated by nearly a thousand participants.  The 2025 NCC Post asserts that the vast majority of votes in this A/B test were in favor of Krisp's product.

112.    The conclusions of those sections falsely represent that Krisp's noise cancellation is superior to Sanas' across the board (Krisp is reflected as the "Winner" in every metric measured across all evaluations Krisp supposedly conducted).

113.    Similarly, the 2024 NCC Post purports to contain playable "[c]omparative audio samples" categorized by "[c]ontact center-specific noises" that provide readers with the ability to compare the audio under "[o]riginal conditions" with audio processed by Krisp and what Krisp claims to be Sanas' software.

114.    To the extent Krisp actually used Sanas' software in processing audio samples in both its alleged objective evaluations and subjective evaluations, the provided results suggest that rather than creating an objective comparison using fairly representative samples from each of Sanas' and Krisp's software, Krisp instead chose a biased set of samples that were designed to produce Krisp's desired outcome.

115.    Sanas has completed its own fair evaluations comparing its software and Krisp's software, with results indicating that Sanas outperforms Krisp.

116.    Accordingly, Krisp's representations in the NCC Blog Posts that the POLQA and Meta AudioBox Aesthetics evaluations it conducted were "objective" and that the crowdsourced A/B test was a "fair comparison" are additional false and misleading statements.

117.    This is further demonstrated by the fact that the samples purportedly from Sanas' software on the Krisp site only include 8kHz versions, and in doing so reaffirm the false assertion that Sanas does not have 16 kHz capabilities, which Sanas has had for some time.

118.    Similarly, the 2024 NCC Post makes misleading claims about Sanas' noise cancellation product's CPU utilization, stating that Sanas' model uses "2x more" utilization than Krisp on "i5-8th Gen CPU."  Sanas has conducted its own internal testing of CPU utilization against Krisp's noise cancellation solution, and the results reflect that CPU utilization with Sanas' noise cancellation product is comparable to Krisp's.

119. Sanas relies on unbiased testing metrics for objective evaluations when conducting internal assessments.

120. Upon information and belief, Krisp, however, does not use unbiased testing metrics.

121. Sanas affirmatively put Krisp on notice of its false and misleading statements by, among other things, sending a cease and desist letter on or about September 12, 2025, which set forth the bases for Sanas' claims of false advertising and demanded that Krisp cease from making false and misleading statements and remove the false statements contained in the NCC Blog Posts.

122. To date, despite having actual knowledge of the false and misleading nature of its NCC Blog Posts, Krisp has not made any changes to the NCC Blog Posts, nor has it responded to Sanas' cease and demand letter.

*Krisp Misleads the U.S. Patent and Trademark Office*

123. In addition to making false and misleading statements to the general public regarding Sanas' innovative technology, Krisp sought to bolster its public image by seeking patent protection for certain "inventions" in the U.S. Patent and Trademark Office ("USPTO").

124. On July 21, 2023—*after* Krisp's COO had reached out to Sanas in a cold approach, *after* Krisp spent nearly a year leading Sanas to believe that they were working toward the shared goal of incorporating Sanas' accent-conversion technology into Krisp's applications, *after* Krisp pressured Sanas to disclose more and more detailed information, and *after* Krisp unilaterally terminated further discussions with Sanas by claiming that Krisp's roadmap and priorities were not sufficiently "aligned with accent technology"—Krisp filed two provisional U.S. patent applications, which ultimately issued as U.S. Patent No. 12,205,609 ("the '609 Patent") and U.S. Patent No. 12,223,979 ("the '979 Patent" and, together with the '609 Patent, the "Krisp Patents"). Krisp has aggressively marketed the issuance of its patents, saying that their issuance "validates our unique approach to accent transformation[.]"[9] Yet in this marketing and its application to the patent office, Krisp failed to disclose that the subject matter claimed in the patents was taken from Sanas.

[9] https://krisp.ai/blog/krisp-ai-accent-conversion-v3/.

125. The Krisp Patents explain in their Abstracts that they are directed primarily to "[t]echniques … for generating parallel data for real-time speech form conversion," which include "training a teacher machine learning model that is offline and is substantially larger than a student machine learning model for converting speech form."

126. The Krisp Patents do not disclose or claim any novel or non-obvious approaches to generating parallel data for speech conversion. In fact, many of the techniques and approaches discussed in the Krisp patents and claimed as Krisp's own inventions had already been described in Sanas' own earlier patent applications and issued patents. Beyond that material, Krisp layers on concepts that are known in the art.

127. To the extent Krisp Patents claim a novel and non-obvious invention (which, in Sanas' view, there is not), those patents rely and build upon information provided by one or more Sanas employees, including Mr. Maxim Serebryakov, such that Krisp was required to name Mr. Serebryakov as a joint inventor for the Krisp Patents.

128. Sanas employees, including at least Maxim Serebryakov, provided information to Krisp employees that is reflected in at least Figure 7 of the Krisp Patents, which purports to show "a block diagram that depicts the process of training the Student ML Algorithm using the Teacher ML Model, in one or more embodiments."

129. The information that Sanas employees, including at least Maxim Serebryakov, provided is therefore reflected in at least all of the independent claims of the ’609 Patent, specifically, Claims 1, 13, and 19, each of which includes the limitations of a “teacher machine learning (ML) model;” “parallel speech data;” and “a student machine learning algorithm.”

130. The information that Sanas employees, including at least Maxim Serebryakov, provided is also reflected in at least all of the independent claims of the ’979 Patent, specifically, Claims 1, 12, and 19, each of which includes the limitations of training a “first machine learning model” and a “second machine learning algorithm;” and the limitations of “comparing a subset of a second plurality of parameters of the second machine learning model with a corresponding subset of the first plurality of parameters of the first machine learning model.”

131. On information and belief, at least some of the information that Mr. Serebryakov and other Sanas employees provided to Krisp and that was later incorporated into the disclosures of the Krisp Patents is reflected in notes, emails, internal memoranda, text messages, or other documents drafted by Krisp personnel during the course of its meetings, and/or the written communications between Krisp and Sanas.

## DIVISIONAL ASSIGNMENT

132. This Complaint includes an intellectual property action, which is an excepted category under Civil Local Rule 3-2(c). Consequently, this action is assigned on a district-wide basis.

## PATENTS-IN-SUIT

133. This action concerns U.S. Patent Nos. 11,948,550 (“the ’550 Patent”), 12,125,496 (“the ’496 Patent”), 12,131,745 (“the ’745 Patent”), 11,715,457 (“the ’457 Patent”), 12,412,561 (“the ’561 Patent), and 12,417,756 (“the ’756 Patent) (together, the “Asserted Patents”).

### *U.S. Patent No. 11,948,550*

134. Sanas is the lawful owner of all right, title, and interest in the ’550 Patent entitled “REAL-TIME ACCENT CONVERSION MODEL,” including the right to sue and recover for infringement thereof. The ’550 Patent was duly and legally issued on April 2, 2024, naming Maxim Serebryakov and Shawn Zhang as the inventors.

135. The ’550 Patent has 22 claims: 3 independent claims and 19 dependent claims.

136. The ’550 Patent describes and claims Sanas’ pathbreaking approach to producing high quality, high accuracy, low-latency accent translation that has created a new and valuable commercial market. Sanas’ solution produces remarkably natural sounding outputs, which preserve the speaker’s voice and personality while converting only the speaker’s accent to a more intelligible form. Sanas achieves this high-quality conversion in real-time, thereby allowing for natural conversation without lags or dropped content—all of which are critical for customer-facing applications such as call centers. Sanas delivers these valuable features even while the software runs on a local computer—i.e., without reliance on streaming or a remote computer with the massive computing resources typically used for machine learning models. The ’550 Patent describes particular methods and systems which can be used to achieve the foregoing benefits.

137. A true and correct copy of the ’550 Patent is attached as **Exhibit A**.

*U.S. Patent No. 12,125,496*

138. Sanas is the lawful owner of all right, title, and interest in the ’496 Patent entitled “METHODS FOR NEURAL NETWORK-BASED VOICE ENHANCEMENT AND SYSTEMS THEREOF,” including the right to sue and recover for infringement thereof. The ’496 Patent was duly and legally issued on October 22, 2024, naming Shawn Zhang, Lukas Pfeifenberger, Jason Wu, Piotr Dura, David Braude, Bajibabu Bollepalli, Alvaro Escudero, Gokce Keskin, Ankita Jha, and Maxim Serebryakov as the inventors.

139. The ’496 Patent has 20 claims: 3 independent claims and 17 dependent claims.

140. The ’496 Patent describes and claims a novel approach to enhancing the intelligibility and quality of voice communication by, for example, removing background noise. The inventions of the ’496 Patent address a particularly difficult problem with creating a functional and effective accent translation system. An accented voice communication, for example in a call center, may include elements that need to be excluded in order for the outputted, converted speech to be intelligible. Those elements could also confuse the artificial intelligence in performing the conversion—thereby potentially jumbling the converted voice. The ’496 Patent describes inventions which include using a low-dimensional representation of input speech frames

to generate target accent frames and ultimately target audio—an approach which enhances the quality and clarity of the output speech. Using this approach produces converted accent audio which is distinct and easily comprehended.

141. A true and correct copy of the '496 Patent is attached as **Exhibit B.**

*U.S. Patent No. 12,131,745*

142. Sanas is the lawful owner of all right, title, and interest in the '745 Patent entitled "SYSTEM AND METHOD FOR AUTOMATIC ALIGNMENT OF PHONETIC CONTENT FOR REAL-TIME ACCENT CONVERSION," including the right to sue and recover for infringement thereof. The '745 Patent was duly and legally issued on October 29, 2024, naming Lukas Pfeifenberger and Shawn Zhang as the inventors.

143. The '745 Patent has 20 claims: 3 independent claims and 17 dependent claims.

144. The '745 Patent discloses Sanas' solution to another key problem in deploying a commercially valuable implementation of real-time accent translation: how to align phonetically dissimilar audio of two distinct accents. Sub-optimal alignment can lead to poor accent translation accuracy as well as unstable, unintelligible, and/or unnatural sounding speech. It may also provide poor conversions when the source accent is complex and differs substantially from the accents on which the machine learning model was trained. The '745 Patent provides a solution to the alignment problem that produces remarkably smooth, natural-sounding, and accurate accent translated speech.

145. A true and correct copy of the '745 Patent is attached as **Exhibit C.**

*U.S. Patent No. 11,715,457*

146. Sanas is the lawful owner of all right, title, and interest in the '457 Patent entitled "REAL TIME CORRECTION OF ACCENT IN SPEECH AUDIO SIGNALS," including the right to sue and recover for infringement thereof. The '457 Patent was duly and legally issued on August 1, 2023, naming Andrei Golman and Dmitrii Sadykov as the inventors and Intone Inc. as its assignee. Subsequently, on January 14, 2025, Intone assigned the '457 Patent to Sanas.

147. The '457 Patent has 20 claims: 3 independent claims and 17 dependent claims.

148. A true and correct copy of the '457 Patent is attached as **Exhibit D.**

*U.S. Patent No. 12,412,561*

149. Sanas is the lawful owner of all right, title, and interest in the ’561 Patent entitled “REAL TIME CORRECTION OF ACCENT IN SPEECH AUDIO SIGNALS,” including the right to sue and recover for infringement thereof. The ’561 Patent was duly and legally issued on September 9, 2025, naming Andrei Golman and Dmitrii Sadykov as the inventors and Sanas as its assignee.

150. The ’561 Patent has 18 claims: 6 independent claims and 12 dependent claims.

151. A true and correct copy of the ’561 Patent is attached as **Exhibit E.**

*U.S. Patent No. 12,417,756*

152. Sanas is the lawful owner of all right, title, and interest in the ’756 Patent entitled “SYSTEMS AND METHODS FOR REAL-TIME ACCENT MIMICKING,” including the right to sue and recover for infringement thereof. The ’756 Patent was duly and legally issued on September 16, 2025, naming Ankita Jha, Lukas Pfeifenberger, Piotr Dura, David Braude, Alvaro Escudero, Shawn Zhang, Maxim Serebryakov, and Sharath Keshava Narayana as the inventors and Sanas as its assignee.

153. The ’756 Patent has 20 claims: 3 independent claims and 17 dependent claims.

154. A true and correct copy of the ’756 Patent is attached as **Exhibit F.**

155. Sanas is the owner of record of each of the Asserted Patents and owns all rights in each of them, including without limitation all rights to recover for past infringement thereof.

156. Sanas has been in compliance with the marking provisions of 35 U.S.C. § 287(a).

**KRISP’S WILLFUL INFRINGEMENT OF SANAS’ PATENTS**

157. Krisp markets and sells a product called “AI Accent Conversion,” and has also marketed a product called “Accent Localization.” On information and belief, these products, along with prior and subsequent versions (collectively, “the Accused Products”) infringe the Sanas patents asserted herein. Krisp’s infringement includes the making, using, selling, offering for sale the listed products, as well as Krisp’s active inducement of infringement and contributory infringement, including by supplying the listed products to third parties that use those products to practice the claimed methods of the Asserted Patents and that make and use the claimed systems

and apparatuses of the Asserted Patents. Sanas reserves the right to supplement and amend its identification of the Accused Products as permitted by the Court.

158. Krisp infringes and continues to infringe the Asserted Patents by making, using, selling, offering to sell, and/or importing, without license or authority, the Accused Products as alleged herein. For example, Krisp advertises, offers for sale, and otherwise promotes the Accused Products on its website. Therein, Krisp describes and touts the use of the subject matter claimed in the Asserted Patents, as described and alleged below. Krisp has also made, used, sold, and offered for sale its products in the United States in connection with its marketing and demonstration of the Accused Products via direct customer marketing in the United States, and marketing at trade shows including the Customer Contact Week ("CCW") trade show held annually in Las Vegas, Nevada. Moreover, on information and belief, Krisp has offered for sale and sold the Accused Products to major customers in the United States.

159. Krisp markets, advertises, offers for sale, and/or otherwise promotes the Accused Products and does so to induce, encourage, instruct, and aid one or more persons in the United States to make, use, sell, and/or offer to sell its Accused Products.

160. On information and belief, Krisp has had knowledge of the '550, '496, '745, '457, '561, and '756 Patents since at or around the time of each patent or its parent application being published. This knowledge is reflected in the fact that such publications are cited in Krisp's own accent conversion patents—the '609 Patent and the '979 Patent. Those patents both cite U.S. Patent Application 2022/0358903 (which is a parent application for the '550 Patent); and U.S. Patent Application 2024/0347070 (which is a parent application for the '745 Patent). The Krisp patents also cite Sanas' asserted '496 and '457 Patents. The '457 Patent shares a parent application with the '561 Patent.

161. In addition, on information and belief, Krisp has paid close attention to Sanas' and Intone's patenting practices and routinely reviews published applications and patents from those companies. As alleged herein, Krisp expressed deep interest in Sanas' accent translation technology as early as 2021 and acknowledged Sanas' leading position in innovating in this space. When the Krisp-Sanas discussions broke off, Krisp told Sanas that the companies were in direct

competition. This suggests a systematic effort to assemble competitive intelligence on Sanas, its products, its customers, its market behavior, and its patents.

162. On information and belief, Krisp has made, used, sold, or offered for sale the Accused Products with full knowledge of those patents as described above, and knowing that such conduct would constitute an infringement. Krisp acknowledged that Sanas was the leader in developing accent translation technology and affirmatively sought to license Sanas' technology or otherwise form a partnership. But after learning of Sanas' market-ready solutions, Krisp elected to copy Sanas instead. Krisp's imitation rises to the level of willful patent infringement of Sanas' patents and willful misappropriation of Sanas' trade secrets.

* * *

163. As a result of Krisp's actions, which include patent infringement, trade secret theft, patenting and claiming ownership over Sanas' technological contributions, and false advertising, Sanas has suffered material financial and reputational harm. On information and belief, Krisp has sold its accent translation product at a price that is lower than Sanas' price because that cost does not reflect the true development costs and value of such a product. Krisp is able to do so only because it unlawfully used Sanas' confidential information and market research to build a knock-off product. Krisp's lower-quality, copycat software has undercut the market, harming not just Sanas but fair competition itself.

**COUNT ONE: INFRINGEMENT OF U.S. PATENT 11,948,550**

164. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

165. On information and belief, Krisp directly infringes, either literally or under the doctrine of equivalents, at least claim(s) 1-4, and 6-22, of the '550 Patent by making, using, offering for sale, and selling the Accused Products in violation of 35 U.S.C. § 271(a).

166.    For example, Krisp's website describes this product as follows: "Accent Conversion enhances communication for customers and call centers by softening accents while preserving the speaker's voice for authenticity and personal connection in every interaction."





167.    A Krisp blog[10] indicates that Krisp's technical approach uses "high-quality parallel data" to "directly map input accented speech to target native speech" such that it "generat[es] a native target-accent sounding output for each accented speech input, maintaining consistent emotions, naturalness, and vocal characteristics, and achieving an ideal frame-by-frame alignment with the input data." A video demo of Krisp's software[11] in use similarly promotes the software as keeping the speaker's "voice intact while softening challenging parts of my accent" and preserving the speaker's "natural tone and personality."

---

[10] https://krisp.ai/blog/deep-dive-ai-accent-conversion-for-call-centers/
[11] www.youtube.com/shorts/uV3xJ5-Sna8

168. The Krisp blog further describes Krisp's technical approach, which includes (among other things) "utterance alignment" and "feature extraction":

169. Krisp has also filed multiple patent applications related to its accent translation product, which have resulted in the issuance of Krisp's two U.S. translation patents, the '609 Patent and the '979 Patent. On information and belief, the written descriptions and/or claims of these patents describe the technical approach employed in the Accused Products.

170. For example, the '979 Patent, along with the web pages, blog post, and demo videos described above, demonstrate that each of the Accused Products is a system that contains all of the elements of claim 1 of the '550 Patent.

171. With knowledge of the '550 Patent, Krisp has also actively induced the infringement of one or more claims of the '550 Patent in violation of 35 U.S.C. § 271(b) by its

customers and/or end users of its products, including at least the Accused Products, by selling products with a particular design, providing for support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the ’550 Patent, including claim(s) 1-4, and 6-22 , with intent to encourage those customers and/or end-users to infringe the ’550 Patent.

172. By way of example, Krisp has actively induced infringement of the ’550 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use the Accused Products, to make, use, sell, and/or offer to sell Krisp’s products, including the Accused Products, in a manner that infringes at least one claim of the ’550 Patent, including claim(s) 1-4, and 6-22.

173. With knowledge of the ’550 Patent, Krisp has also contributed to the infringement of one or more claims of the ’550 Patent in violation of 35 U.S.C. § 271(c) by its customers and/or end users of its products, including at least the Accused Products, by offering to sell and selling software that constitutes a component of the infringing systems and computer-readable media claimed by the ’550 Patent, and/or a material for use in practicing the methods claimed by the ’550 Patent, which constitutes a material part of the inventions and is not a staple article or commodity of commerce suitable for non-infringing uses. In doing so, Krisp knew that the software would contribute to infringement of the ’550 Patent.

174. With knowledge of the ’550 Patent, Krisp has willfully, deliberately, and intentionally infringed the ’550 Patent. Krisp had actual knowledge of the ’550 Patent and Krisp’s infringement of the ’550 Patent as set forth above. After acquiring that knowledge, Krisp directly and indirectly infringed the ’550 Patent as set forth above. Krisp knew, or should have known, that its conduct amounted to infringement of the ’550 Patent at least because Krisp had sought out technical information from Sanas about the state of its development of Sanas’ products; on information and belief, Krisp was reviewing Sanas’ patent applications and patents in order to build a software product based on Sanas’ innovations; and Krisp’s own products, as reflected in its patents, closely follow the Sanas template for accent translation.

175. Krisp will continue to infringe the ’550 Patent unless it is enjoined by this Court. Krisp, by way of its infringing activities, has caused and continues to cause Sanas to suffer damages in an amount to be determined, and has caused and is causing Sanas irreparable harm. Sanas has no adequate remedy at law against Krisp’s acts of infringement and, unless enjoined from its infringement of the ’550 Patent, Sanas will continue to suffer irreparable harm.

176. Sanas is entitled to recover from Krisp damages at least in an amount adequate to compensate for its infringement of the ’550 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

177. Sanas has complied with the requirements of 35 U.S.C. § 287 with respect to the ’550 Patent.

**COUNT TWO: INFRINGEMENT OF U.S. PATENT 12,125,496**

178. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

179. On information and belief, Krisp directly infringes at least claim(s) 1-20 of the ’496 Patent by making, using, offering for sale, and selling the Accused Products in violation of 35 U.S.C. § 271(a).

180. Krisp’s infringement of the ’496 Patent is reflected in the web pages, blog posts, demo videos, and patents previously mentioned.

181. A Krisp blog post asserts that “[t]he speech synthesis part of the model, which is sometimes referred to as the vocoder algorithm in research, should . . . be robust against noise and background voices,”[12] suggesting that the Accused Products have these characteristics.

182. Krisp has also represented that the Accused Products provide “Background noise and voice cancellation robustness” which is “highly robust, automatically included in the Accent Conversion models.”[13] Krisp further asserts that “Krisp maintains speech quality in real-world noisy conditions, including multi-speaker and contact center environments.”

[12] https://krisp.ai/blog/deep-dive-ai-accent-conversion-for-call-centers/

[13] https://krisp.ai/blog/krisp-vs-sanas-accent-conversion-comparison/. As explained above, the “comparison” post by Krisp contains numerous falsehoods and radically distorts the relative performance of Krisp’s accent conversion product to Sanas’. The reality is that Sanas has long been the market leader, and even with Krisp’s brazen misappropriation of Sanas’ intellectual property, Krisp’s product is manifestly inferior to Sanas’.

183. For example, each of the Accused Products, when installed on a computer, constitutes a voice enhancement system that contains all of the elements of claim 1 of the ’496 Patent.

184. With knowledge of the ’496 Patent, Krisp has actively induced the infringement of one or more claims of the ’496 Patent, in violation of 35 U.S.C. § 271(b), by its customers and/or end users of its products, including at least the Accused Products, by selling products with a particular design, providing for support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the ’496 Patent, including claim(s) 1- 20, with intent to encourage those customers and/or end-users to infringe the ’496 Patent.

185. By way of example, Krisp has actively induced infringement of the ’496 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use the Accused Products, to make, use, sell, and/or offer to sell Krisp’s products, including the Accused Products, in a manner that infringes at least one claim of the ’496 Patent, including claim(s) 1-20.

186. With knowledge of the ’496 Patent, Krisp has also contributed to the infringement of one or more claims of the ’496 Patent in violation of 35 U.S.C. § 271(c) by its customers and/or end users of its products, including at least the Accused Products, by offering to sell and selling software that constitutes a component of the infringing systems and computer-readable media claimed by the ’496 Patent, and/or a material for use in practicing the methods claimed by the ’496 Patent, which constitutes a material part of the inventions and is not a staple article or commodity of commerce suitable for non-infringing uses. In doing so, Krisp knew that the software would contribute to infringement of the ’496 Patent.

187. With knowledge of the ’496 Patent, Krisp has willfully, deliberately, and intentionally infringed the ’496 Patent. Krisp had actual knowledge of the ’496 Patent and Krisp’s infringement of the ’496 Patent as set forth above. After acquiring that knowledge, Krisp directly and indirectly infringed the ’496 Patent as set forth above. Krisp knew or should have known that its conduct amounted to infringement of the ’496 Patent at least because Krisp had sought out

technical information from Sanas about the state of its development of Sanas' products; on information and belief, Krisp was reviewing Sanas' patent applications and patents in order to build a software product based on Sanas' innovations; and Krisp's own products, as reflected in its patents, closely follow the Sanas template for accent translation.

188. Krisp will continue to infringe the '496 Patent unless it is enjoined by this Court. Krisp, by way of its infringing activities, has caused and continues to cause Sanas to suffer damages in an amount to be determined, and has caused, and is causing, Sanas irreparable harm. Sanas has no adequate remedy at law against Krisp's acts of infringement and, unless enjoined from its infringement of the '496 Patent, Sanas will continue to suffer irreparable harm.

189. Sanas is entitled to recover from Krisp damages at least in an amount adequate to compensate for its infringement of the '496 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

190. Sanas has complied with the requirements of 35 U.S.C. § 287 with respect to the '496 Patent.

**COUNT THREE: INFRINGEMENT OF U.S. PATENT 12,131,745**

191. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

192. Krisp directly infringes at least claim(s) 1-20 of the '745 Patent by making, using, offering for sale, and selling the Accused Products in violation of 35 U.S.C. § 271(a).

193. For example, a Krisp blog[14] explains that "getting precise alignment is exceedingly challenging due to variations in the duration of phoneme pronunciations. Nonetheless, improved alignment accuracy contributes to superior results." The blog further suggests that Krisp's software "generat[es] a native target-accent sounding output for each accented speech input, maintaining consistent emotions, naturalness, and vocal characteristics, and achieving an ideal frame-by-frame alignment with the input data." The blog also includes a block diagram which includes a step of "utterance alignment."

[14] https://krisp.ai/blog/deep-dive-ai-accent-conversion-for-call-centers/

194. Krisp's '979 Patent also describes Krisp's alignment process, providing further indication of Krisp's infringement of the '745 Patent.

195. Finally, Krisp's website and other public materials include demonstrations of the output speech produced by the Accused Products. An evaluation of that output speech suggests that the Accused Products do not use non-infringing approaches to alignment of the speech and instead uses an infringing approach including differentiable alignment by maximizing cosine distance between phonetic embedding vectors.

196. Together, the blog, the '979 Patent, and the information available on Krisp's website (including the demonstrations of output speech), reflect that each of the Accused Products when installed on a computer is, on information and belief, an accent translation system containing all of the elements claimed in Claim 1 of the '745 Patent.

197. With knowledge of the '745 Patent, Krisp has actively induced the infringement of one or more claims of the '745 Patent in violation of 35 U.S.C. § 271(b) by its customers and/or end users of its products, including at least the Accused Products, by selling products with a particular design, providing for support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '745 Patent, including claim(s) 1-20, with intent to encourage those customers and/or end-users to infringe the '745 Patent.

198. By way of example, Krisp has actively induced infringement of the '745 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use the Accused Products, to make, use, sell, and/or offer to sell Krisp's products, including the Accused Products, in a manner that infringes at least one claim of the '745 Patent, including claim(s) 1-20.

199. With knowledge of the '745 Patent, Krisp has also contributed to the infringement of one or more claims of the '745 Patent in violation of 35 U.S.C. § 271(c) by its customers and/or end users of its products, including at least the Accused Products, by offering to sell and selling software that constitutes a component of the infringing systems and computer-readable media claimed by the '745 Patent, and/or a material for use in practicing the methods claimed by the

'745 Patent, which constitutes a material part of the inventions and is not a staple article or commodity of commerce suitable for non-infringing uses. In doing so, Krisp knew that the software would contribute to infringement of the '745 Patent.

200. With knowledge of the '745 Patent, Krisp has willfully, deliberately, and intentionally infringed the '745 Patent. Krisp had actual knowledge of the '745 Patent and Krisp's infringement of the '745 Patent as set forth above. After acquiring that knowledge, Krisp directly and indirectly infringed the '745 Patent as set forth above. Krisp knew or should have known that its conduct amounted to infringement of the '745 Patent at least because Krisp had sought out technical information from Sanas about the state of its development of Sanas' products; on information and belief, Krisp was reviewing Sanas' patent applications and patents in order to build a software product based on Sanas' innovations; and Krisp's own products, as reflected in its patents, closely follow the Sanas template for accent translation.

201. Krisp will continue to infringe the '745 Patent unless it is enjoined by this Court. Krisp, by way of its infringing activities, has caused and continues to cause Sanas to suffer damages in an amount to be determined, and has caused and is causing Sanas irreparable harm. Sanas has no adequate remedy at law against Krisp's acts of infringement and, unless enjoined from its infringement of the '745 Patent, Sanas will continue to suffer irreparable harm.

202. Sanas is entitled to recover from Krisp damages at least in an amount adequate to compensate for its infringement of the '745 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

203. Sanas has complied with the requirements of 35 U.S.C. § 287 with respect to the '745 Patent.

**COUNT FOUR: INFRINGEMENT OF U.S. PATENT 11,715,457**

204. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

205. Krisp directly infringes at least claim(s) 1-20 of the '457 Patent by making, using, offering for sale, and selling the Accused Products in violation of 35 U.S.C. § 271(a).

206. Krisp's website includes audio demos of the performance of the Accused Products, which in turn display the availability of "Voice Profiles" in the Accused Products, which are features that are described and claimed in the '457 Patent.

207. The Accused Products' Voice Profiles Mode is likewise described in a Krisp user guide[15]:

**Choosing your Accent Conversion mode**

- Voice Preservation mode: This mode retains your natural voice while softening harder-to-understand inflections. It's ideal if you want to maintain individuality in conversations while improving clarity.
- Voice Profiles mode: This mode replaces your voice with a pre-configured male or female voice, creating a professional, neutral-sounding tone.

> **Info**
>
> Your Team Admin may have already set a default Accent Conversion mode for your team, **limiting access to a single mode.**
> If not, you can configure your preferred mode directly in the Krisp app.

208. Krisp has also claimed in a blog post[16] that the Accused Products have an audio latency of 220ms, as claimed in the '457 Patent.

[15] https://help.krisp.ai/hc/en-us/articles/18308013509916-Krisp-Accent-Conversion-user-guide
[16] https://krisp.ai/blog/krisp-vs-sanas-accent-conversion-comparison/

209. The Krisp blog, websites, demonstrations, and patents described above disclose that each of the Accused Products when installed on a computer is, on information and belief, a computing apparatus containing each of the elements of claim 14 of the ’457 Patent.

210. With knowledge of the ’457 Patent, Krisp has actively induced the infringement of one or more claims of the ’457 Patent in violation of 35 U.S.C. § 271(b) by its customers and/or end users of its products, including at least the Accused Products, by selling products with a particular design, providing for support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the ’457 Patent, including claim(s) 1-20, with intent to encourage those customers and/or end-users to infringe the ’457 Patent.

211. By way of example, Krisp has actively induced infringement of the ’457 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use the Accused Products, to make, use, sell, and/or offer to sell Krisp’s products, including the Accused Products, in a manner that infringes at least one claim of the ’457 Patent, including claim(s) 1-20.

212. With knowledge of the ’457 Patent, Krisp has also contributed to the infringement of one or more claims of the ’457 Patent in violation of 35 U.S.C. § 271(c) by its customers and/or end users of its products, including at least the Accused Products, by offering to sell and selling software that constitutes a component of the infringing computing apparatuses and computer-readable storage media claimed by the ’457 Patent, and/or a material for use in practicing the methods claimed by the ’457 Patent, which constitutes a material part of the inventions and is not a staple article or commodity of commerce suitable for non-infringing uses. In doing so, Krisp knew that the software would contribute to infringement of the ’457 Patent.

213. With knowledge of the ’457 Patent, Krisp has willfully, deliberately, and intentionally infringed the ’457 Patent. Krisp had actual knowledge of the ’457 Patent and Krisp’s infringement of the ’457 Patent as set forth above. After acquiring that knowledge, Krisp directly and indirectly infringed the ’457 Patent as set forth above. Krisp knew or should have known that its conduct amounted to infringement of the ’457 Patent at least because on information and belief,

Krisp was reviewing Intone's patent applications and patents in order to build a software product to compete in the accent translation marketplace.

214. Krisp will continue to infringe the '457 Patent unless it is enjoined by this Court. Krisp, by way of its infringing activities, has caused and continues to cause Sanas to suffer damages in an amount to be determined, and has caused and is causing Sanas irreparable harm. Sanas has no adequate remedy at law against Krisp's acts of infringement and, unless enjoined from its infringement of the '457 Patent, Sanas will continue to suffer irreparable harm.

215. Sanas is entitled to recover from Krisp damages at least in an amount adequate to compensate for its infringement of the '457 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

216. Sanas has complied with the requirements of 35 U.S.C. § 287 with respect to the '457 Patent.

## COUNT FIVE: DECLARATORY JUDGMENT

## (Co-Inventorship and Co-Ownership Over U.S. Patent Nos. 12,205,609 and 12,223,979)

217. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

218. To the extent they are not invalid, Sanas is at least the joint owner of the '609 and '979 Patents by virtue of the facts alleged herein, including that during the technical discussions between the parties in 2022, Sanas employees, including at least Maxim Serebryakov, disclosed details to Krisp regarding the manner in which Sanas' accent translation software was being developed based upon a teacher-student architecture; disclosures relating to how Sanas' product is optimized to run on personal computer CPUs; and that Sanas' product uses a parallel speech data processing model.

219. The '609 and '979 Patents incorporate these concepts as central features of the claimed inventions therein. For example, both patents (which share a common specification) summarize the inventions in the Abstract as claiming "[t]echniques . . . for generating parallel data for real-time speech form conversion" which include "training a teacher machine learning model that is offline and is substantially larger than a student machine learning model for

converting speech form" and "[t]ransferring 'knowledge' from the trained Teacher model for training the Production Student Model that performs the speech form conversion on an end-user computing device." Independent claims 1, 13, and 19 of the '609 Patent include the limitations of a "teacher machine learning (ML) model;" "parallel speech data;" and "a student machine learning algorithm." The independent claims of the '979 Patent likewise encompass these concepts, as explained above.

220. The inventive contributions of one or more Sanas employees, including Mr. Serebryakov, to the subject matter claimed in the '609 and '979 Patents require that they be named as joint inventors of such patents.

221. Sanas' property interests in the '609 and '979 Patents will be prejudiced if the issue of ownership is not adjudicated in connection with the instant action. Unless Sanas obtains from this Court a declaratory judgment of its ownership rights, title, and interests in the '609 and '979 Patents, it faces significant harm, as Krisp's assertion of ownership of the patents prevents Sanas from licensing those patents.

222. Krisp's conduct in asserting that it is the sole owner of the '609 and '979 Patents, and not recognizing the Sanas employees' inventive contributions and Sanas' co-ownership, is a direct and proximate cause of Sanas' injury, which would be redressed by the declaratory judgment sought herein.

223. An actual, present, and justiciable controversy has arisen between Sanas and Krisp concerning ownership of the '609 and '979 Patents.

224. Accordingly, Sanas seeks a declaration that the Sanas employees are co-inventors of the '609 and '979 Patents and that Sanas owns a *pro rata* undivided interest in the '609 and '979 Patents.

**COUNT SIX: MISAPPROPRIATION OF TRADE SECRETS**

**(Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836)**

225. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

226. As set forth above, Krisp has also improperly and without Sanas' consent accessed,

acquired, remained in possession of, used, and/or disclosed certain confidential and proprietary information of Sanas constituting "trade secrets" as defined by 18 U.S.C. § 1839(3). These trade secrets, as described above, are related to a product or service that is used in, that has been used in and/or that is intended for use in interstate and/or foreign commerce. Sanas is the owner of such information. This information is integral to Sanas' unique speech AI software solutions and services, and is the result of extensive research, development and investment, as well as market research and real-world product testing and optimization. These trade secrets were developed, compiled, and enhanced over time by Sanas employees.

227. Sanas has taken numerous, reasonable precautions to protect and to maintain the value of its trade secrets. Sanas employees are subject to obligations to maintain the confidentiality of the trade secrets, including pursuant to employee confidentiality agreements. Licensees of Sanas' software are likewise subject to contractual confidentiality obligations. Sanas also maintains IT security practices and processes, which are designed to and do protect Sanas' sensitive information from being accessed by malicious outside parties. Sanas divulged sensitive and confidential information to Krisp only after the parties signed the NDA. Sanas also took a graduated approach to disclosure, waiting until Krisp provided what Krisp stated were genuine expressions of an intent to enter into a "partnership" and also setting up a dedicated Slack room before Sanas provided responses to Krisp's most detailed technical questions. And before making those disclosures, Sanas communicated to Krisp that Krisp was subject to the protections of the NDA by expressly referencing the NDA as covering Sanas' provision of technical information to Krisp. Krisp knew, or should have known, that the materials were confidential, subject to the restrictions of the NDA, and could not be used for Krisp's own purposes.

228. Sanas' trade secrets derive actual or potential independent economic value by virtue of the fact that these trade secrets are not known or readily ascertainable through proper means by any other person who can obtain economic value from the disclosure or use of the information.

229. Sanas' trade secrets are not accessible to the public and are not generally known within the trade or by persons who are skilled in the trade, other than by those who are bound to

maintain its secrecy and confidentiality.

230. Krisp used Sanas' trade secrets without express or implied consent from Sanas, while knowing or having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret.

231. As a result of the above-described misappropriation, Sanas has been harmed, including by enabling Krisp to improve its ability to compete with Sanas to win customers by using improperly obtained Sanas information to inform the development of its own product, to save on research and development costs, and to otherwise unfairly gain a competitive advantage.

232. As a direct and proximate result of Krisp's unlawful, tortious conduct, Sanas has been damaged and Krisp has been unjustly enriched. The damage to Sanas includes the loss of revenue from Krisp's use of Sanas' own trade secrets to compete with Sanas for business, and to offer services based on those trade secrets at a lower price. The unjust enrichment includes the profits Krisp has obtained through its misappropriation of the trade secrets and the value attributed to the misappropriated information, including amounts Krisp saved in research and development costs using the misappropriated information and increased productivity from use of the misappropriated information.

233. Krisp's conduct constitutes willful and malicious misappropriation within the meaning of the DTSA. In wrongfully and intentionally misappropriating Sanas' trade secrets, as outlined above, Krisp has demonstrated specific intent to cause substantial injury or harm to Sanas. As such, Sanas is entitled to an award of exemplary damages as well as an award of its reasonable attorneys' fees pursuant to the DTSA.

234. Unless Krisp is enjoined from misappropriating Sanas' trade secrets, Sanas will suffer irreparable harm for which there is no adequate remedy at law.

**COUNT SEVEN: MISAPPROPRIATION OF TRADE SECRETS**

**(Violation of the California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*)**

235. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

236. As set forth above, Krisp has improperly and without Sanas' consent accessed,

acquired, remained in possession of, used, and/or disclosed certain confidential and proprietary information of Sanas constituting "trade secrets," as defined by Cal. Civ. Code § 3426 *et seq.* Sanas is the owner of these trade secrets.

237. Sanas has taken reasonable precautions to protect and maintain the value of its trade secrets, including as described above.

238. Sanas' trade secrets derive actual or potential independent economic value from not being generally known to the public or to other persons who can obtain economic value from the disclosure or use of the information.

239. On information and belief, Krisp has used the Sanas trade secrets without express or implied consent from Sanas, while knowing or having reason to know that the trade secrets were acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

240. As a result of the above-described misappropriation, Sanas has been harmed, including by enabling Krisp to improve its ability to compete with Sanas to win customers by using improperly obtained Sanas information to inform the development of its own product, to save on research and development costs, and to otherwise unfairly gain a competitive advantage.

241. Sanas has suffered and will continue to suffer damages and irreparable harm as a direct and proximate result of Krisp's misappropriation of Sanas' trade secrets. As a direct and proximate result of Krisp's misappropriation of Sanas' trade secrets, Krisp has been unjustly enriched and Sanas has sustained damages in an amount to be proven at trial.

242. Krisp's conduct is malicious, oppressive, and deceitful, justifying an award of exemplary damages and attorneys' fees recovery.

243. Unless Krisp is enjoined from misappropriating Sanas' trade secrets, Sanas will suffer irreparable harm for which there is no adequate remedy at law.

**COUNT EIGHT: INFRINGEMENT OF U.S. PATENT 12,412,561**

244. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

245. Krisp directly infringes at least claim(s) 1-18 of the '561 Patent by making, using, offering for sale, and selling the Accused Products in violation of 35 U.S.C. § 271(a).

246. Krisp's website includes audio demos of the performance of the Accused Products, which in turn display the availability of "Voice Profiles" in the Accused Products, which are features that are described and claimed in the '561 Patent.

247. The Accused Products' Voice Profiles Mode is likewise described in a Krisp user guide[17]:

## Choosing your Accent Conversion mode

- Voice Preservation mode: This mode retains your natural voice while softening harder-to-understand inflections. It's ideal if you want to maintain individuality in conversations while improving clarity.
- Voice Profiles mode: This mode replaces your voice with a pre-configured male or female voice, creating a professional, neutral-sounding tone.

> **Info**
>
> Your Team Admin may have already set a default Accent Conversion mode for your team, **limiting access to a single mode.**
> If not, you can configure your preferred mode directly in the Krisp app.

[17] https://help.krisp.ai/hc/en-us/articles/18308013509916-Krisp-Accent-Conversion-user-guide

248. Krisp also claims to offer a variety of voice quality outputs, including 8kHz, 16kHz, and 32kHz, as described in the '561 Patent.

| | |
|---|---|
| **Voice quality** | • 8kHz (narrow-band, standard telephony, good voice quality)<br>• 16khz (wide-band, VOIP, industry-leading voice quality)<br>• 32kHz (full-band, best voice quality – near studio-grade) |

249. As of at least the date of this First Amended Complaint, Krisp has knowledge of the '561 Patent and its conduct as follows constitutes active inducement of the infringement of one or more claims of the '561 Patent in violation of 35 U.S.C. § 271(b) by its customers and/or end users of its products, including at least the Accused Products, by selling products with a particular design, providing for support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '561 Patent, including claim(s) 1-18, with intent to encourage those customers and/or end-users to infringe the '561 Patent.

250. By way of example, Krisp actively induces infringement of the '561 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use the Accused Products, to make, use, sell, and/or offer to sell Krisp's products, including the Accused Products, in a manner that infringes at least one claim of the '561 Patent, including claim(s) 1-18.

251. With knowledge of the '561 Patent, Krisp also contributes to the infringement of one or more claims of the '561 Patent in violation of 35 U.S.C. § 271(c) by its customers and/or end users of its products, including at least the Accused Products, by offering to sell and selling software that constitutes a component of the infringing computing apparatuses and computer-readable storage media claimed by the '561 Patent, and/or a material for use in practicing the methods claimed by the '561 Patent, which constitutes a material part of the inventions and is not a staple article or commodity of commerce suitable for non-infringing uses. In doing so, Krisp knows that the software would contribute to infringement of the '561 Patent.

252. With knowledge of the ’561 Patent, Krisp is willfully, deliberately, and intentionally infringing the ’561 Patent. Krisp has actual knowledge of the ’561 Patent and Krisp’s infringement of the ’561 Patent as set forth above. After acquiring that knowledge, Krisp directly and indirectly infringes the ’561 Patent as set forth above. Krisp knows or should know that its conduct amounts to infringement of the ’561 Patent at least because on information and belief, Krisp has monitored Sanas’ patent applications and patents.

253. Krisp will continue to infringe the ’561 Patent unless it is enjoined by this Court. Krisp, by way of its infringing activities, has caused and continues to cause Sanas to suffer damages in an amount to be determined, and has caused and is causing Sanas irreparable harm. Sanas has no adequate remedy at law against Krisp’s acts of infringement and, unless enjoined from its infringement of the ’561 Patent, Sanas will continue to suffer irreparable harm.

254. Sanas is entitled to recover from Krisp damages at least in an amount adequate to compensate for its infringement of the ’561 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

255. Sanas has complied with the requirements of 35 U.S.C. § 287 with respect to the ’561 Patent.

**COUNT NINE: INFRINGEMENT OF U.S. PATENT 12,417,756**

256. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

257. On information and belief, Krisp directly infringes at least claim(s) 1-20 of the ’756 Patent by making, using, offering for sale, and selling the Accused Products in violation of 35 U.S.C. § 271(a).

258. Krisp’s infringement of the ’756 Patent is reflected in the web pages, blog posts, demo videos, and patents previously mentioned.

259. Krisp’s website includes audio demos of the performance of the Accused Products, which in turn display the availability of “Voice Profiles” and “Voice Preservation mode” in the Accused Products, which are features that are described and claimed in the ’756 Patent.

Audio demos with different agents

Without Krisp With Krisp

Voice Preservation mode

Agents

Ishika
Mandovi
Manoj
Sherwin

Voice Profiles mode

Male

Colin
Fred
George
Henry

Female

Bella
Chloe
Flora
Gina

260. The Accused Products' Voice Preservation and Voice Profile modes are likewise described in a Krisp user guide[18]:

## Choosing your Accent Conversion mode

- Voice Preservation mode: This mode retains your natural voice while softening harder-to-understand inflections. It's ideal if you want to maintain individuality in conversations while improving clarity.
- Voice Profiles mode: This mode replaces your voice with a pre-configured male or female voice, creating a professional, neutral-sounding tone.

**Info**

Your Team Admin may have already set a default Accent Conversion mode for your team, **limiting access to a single mode.**
If not, you can configure your preferred mode directly in the Krisp app.

261. As of at least the date of this First Amended Complaint, Krisp has knowledge of the '756 Patent and its conduct as follows constitutes active inducement of the infringement of one or more claims of the '756 Patent in violation of 35 U.S.C. § 271(b) by its customers and/or end users of its products, including at least the Accused Products, by selling products with a particular design, providing for support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '756 Patent, including claim(s) 1-20, with intent to encourage those customers and/or end-users to infringe the '756 Patent.

[18] https://help.krisp.ai/hc/en-us/articles/18308013509916-Krisp-Accent-Conversion-user-guide

262. By way of example, Krisp actively induces infringement of the ’756 Patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who purchase, test, operate, and use the Accused Products, to make, use, sell, and/or offer to sell Krisp’s products, including the Accused Products, in a manner that infringes at least one claim of the ’756 Patent, including claim(s) 1-20.

263. With knowledge of the ’756 Patent, Krisp also contributes to the infringement of one or more claims of the ’756 Patent in violation of 35 U.S.C. § 271(c) by its customers and/or end users of its products, including at least the Accused Products, by offering to sell and selling software that constitutes a component of the infringing systems and computer-readable media claimed by the ’756 Patent, and/or a material for use in practicing the methods claimed by the ’756 Patent, which constitutes a material part of the inventions and is not a staple article or commodity of commerce suitable for non-infringing uses. In doing so, Krisp knows that the software contributes to infringement of the ’756 Patent.

264. With knowledge of the ’756 Patent, Krisp willfully, deliberately, and intentionally infringes the ’756 Patent. Krisp has actual knowledge of the ’756 Patent and Krisp’s infringement of the ’756 Patent as set forth above. After acquiring that knowledge, Krisp directly and indirectly infringes the ’756 Patent as set forth above. Krisp knows or should know that its conduct amounts to infringement of the ’756 Patent at least because Krisp had sought out technical information from Sanas about the state of its development of Sanas’ products; on information and belief, Krisp was reviewing Sanas’ patent applications and patents in order to build a software product based on Sanas’ innovations; and Krisp’s own products, as reflected in its patents, closely follow the Sanas template for accent translation.

265. Krisp will continue to infringe the ’756 Patent unless it is enjoined by this Court. Krisp, by way of its infringing activities, has caused and continues to cause Sanas to suffer damages in an amount to be determined, and has caused, and is causing, Sanas irreparable harm. Sanas has no adequate remedy at law against Krisp’s acts of infringement and, unless enjoined from its infringement of the ’756 Patent, Sanas will continue to suffer irreparable harm.

266. Sanas is entitled to recover from Krisp damages at least in an amount adequate to compensate for its infringement of the ’756 Patent, which amount has yet to be determined, together with interest and costs determined by the Court.

267. Sanas has complied with the requirements of 35 U.S.C. § 287 with respect to the ’756 Patent.

**COUNT TEN: FALSE ADVERTISING**

**(Violation of the Lanham Act, 15 U.S.C. § 1125(a))**

268. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

269. Krisp’s false and misleading advertisements and statements constitute false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

270. As set forth above, Krisp has made, and continues to make, false and misleading statements of fact concerning Sanas’ accent translation and noise cancellation products in Krisp’s advertisements and marketing materials.

271. Upon information and belief, Krisp’s false statements have actually deceived or tended to deceive a substantial segment of the relevant consumers for the parties’ competing accent translation and noise cancellation products.

272. Upon information and belief, Krisp’s false and misleading statements are material in that they have influenced or are likely to influence the purchasing decisions (including pricing) made by the relevant consumers for the parties’ competing accent translation and noise cancellation products throughout the United States.

273. Krisp’s false and misleading statements were and are made in interstate commerce.

274. Sanas has suffered and will continue to suffer damage to its business reputation and goodwill as a result of Krisp’s false advertising.

275. Sanas has lost and will continue to lose sales, revenue, customers, and market share as a result of Krisp’s false advertising.

276. Sanas has suffered and will continue to suffer reputational harm as a result of Krisp’s false advertising.

277. Sanas has suffered an irreparable injury and has no adequate remedy at law.

278. The balance of hardships favors granting Sanas injunctive relief.

279. The public interest would be served by enjoining Krisp because it would, among other things, stop Krisp's false and misleading advertising, stop consumer deception from continuing, and stop the ongoing harms caused by Krisp's continued false statements.

**COUNT ELEVEN: UNFAIR COMPETITION**

**(Violation of Cal. Bus. & Prof. Code § 17200 *et seq.*)**

280. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

281. Krisp's false statements about Sanas' accent translation and noise cancellation products described herein constitute false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

282. Sanas has been and is likely to continue being injured as a result of Krisp's false advertising in the form of lost profits, loss of market share, loss of sales, and loss of reputation and goodwill, which damage and injury will continue if not enjoined.

283. By advertising with false statements about Sanas' accent translation and noise cancellation products, Krisp has engaged in unfair competition, including unfair, deceptive, untrue, or misleading advertising, in violation of Cal. Bus. & Prof. Code § 17200 *et seq*.

**COUNT TWELVE: FALSE ADVERTISING**

**(Violation of Cal. Bus. & Prof. Code § 17500 *et seq.*)**

284. Sanas repeats and realleges all preceding paragraphs of this Complaint, as if set forth herein in full.

285. Krisp's false statements about Sanas' accent translation and noise cancellation products described herein constitute false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

286. Krisp knew or should have known by the exercise of reasonable care that its advertising included false statements about Sanas' accent translation and noise cancellation products.

287. Sanas has been and is likely to continue being injured as a result of Krisp's false advertising in the form of lost profits, loss of market share, loss of sales, and loss of reputation and goodwill, which damage and injury will continue if not enjoined.

288. By advertising with false statements about Sanas' accent translation and noise cancellation products, Krisp has engaged in unfair competition, including unfair, deceptive, untrue, or misleading advertising, in violation of Cal. Bus. & Prof. Code § 17500, *et seq.*

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for entry of judgment for Sanas and against Krisp and enter the following relief:

**For Patent Infringement:**

A. A judgement that Krisp has infringed (directly and/or indirectly) one or more claims of the Asserted Patents, namely U.S. Patent Nos. 11,948,550 ("'550 Patent"), 12,125,496 ("'496 Patent"), 12,131,745 ("'745 Patent"), 11,715,457 ("'457 Patent") 12,412,561 ("'561 Patent), and 12,417,756 ("'756 Patent) and continues to do so with respect to the '550, '496, '745,'457, '561 and '756 Patents;

B. That Sanas recover all damages to which it is entitled under 35 U.S.C. § 284, including its lost profits, but in no event less than a reasonable royalty;

C. That Krisp be permanently enjoined from further infringement of the Asserted Patents;

D. That Sanas, as the prevailing party, shall recover from Krisp all taxable costs of court;

E. That Sanas shall recover from Krisp all pre- and post-judgment interest on the damages award, calculated at the highest interest rates allowed by law;

F. That Sanas shall recover from Krisp an ongoing royalty in an amount to be determined for continued infringement after the date of judgment;

G. That Krisp's conduct was willful and that Sanas should therefore recover treble damages, including attorneys' fees, expenses, and costs incurred in this action, and an action in the damages award pursuant to 35 U.S.C. § 284;

H. That this case is exceptional and that Sanas shall therefore recover its attorneys' fees and other recoverable expenses, under 35 U.S.C. § 285;

I. That Sanas shall recover from Krisp such other and further relief as the Court deems appropriate;

**For Declaratory Judgment:**

J. Enter declaratory judgment that the Sanas employees are co-inventors of the '609 and '979 Patents and that Sanas holds an undivided *pro rata* ownership interest in the '609 and '979 Patents.

**For Trade Secret Misappropriation:**

K. Permanent injunctive relief enjoining Krisp, and each of its respective agents, servants, employees, attorneys, representatives, and all others acting on its behalf or in concert with them:

1. From any further misappropriation of Sanas' trade secrets;
2. From selling or marketing any product or process derived from misappropriation of any Sanas trade secret;
3. From otherwise further accessing, using, or disclosing Sanas' trade secrets;
4. To return and/or destroy all of Sanas' trade secrets, any record or reflection thereof, and any information derived in whole or in part thereof;
5. To place appropriate restrictions on personnel who have been exposed to any of Sanas' trade secrets or information derived therefrom, including any involvement in product development or customer interactions;
6. To identify and destroy any code (including any source code or operating code) that includes, was derived from, or the creation or modification of which was influenced in any way by the improper access to and/or use of Sanas' trade secrets, including any features or aspect thereof whose creation was aided or motivated by Krisp's access to Sanas' trade secrets;
7. From making false and misleading statements complained of herein or otherwise; and

8. Any other injunctive relief deemed appropriate by the Court;

L. Compensation in an amount to be proven at trial, including but not limited to unjust enrichment, actual losses, lost profits, and/or imposition of a reasonable royalty;

M. An order requiring Krisp to account for all gains, profits, and advantages derived from its misappropriation of Sanas' confidential, proprietary, and/or trade secret information;

N. General and special damages according to proof;

O. Compensatory, exemplary, and punitive damages according to proof;

P. Disgorgement of profits;

Q. Restitution;

R. Pre-judgment and post-judgment interest;

S. Costs of suit;

T. Reasonable attorneys' fees and costs incurred in prosecuting this action; and

U. Such other and further relief as the Court deems just and proper.

**For False Advertising and Unfair Competition:**

V. Permanent injunctive relief enjoining Krisp, and each of its respective agents, servants, employees, attorneys, representatives, and all others acting on its behalf or in concert with them from making false and misleading statements complained of herein or otherwise.

W. An order requiring Krisp to issue a statement, in the form and manner to be approved by the Court, that publicly retracts and corrects the false and misleading statements complained of herein, and make such statement through the same channels and with the same prominence as the original false and misleading advertising to remedy the lingering effects of Krisp's unlawful conduct.

X. A declaration that the statements complained of herein are false and misleading.

Y. An order requiring Krisp to pay full restitution of all funds, profits, and property that may have been acquired by means of the unlawful, unfair, and fraudulent business acts and practices alleged herein, to Sanas and all other persons who have been injured by such practices, along with prejudgment interest.

Z. An order requiring Krisp to pay for Sanas' costs of suit, including reasonable

attorneys' fees, to the extent provided by law.

AA. Such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable, pursuant to Fed. R. Civ. P. 38(b).

Dated: September 22, 2025

Respectfully submitted,

*/s/ Michael Ng*

Michael Ng (SBN 237915)
Michael.Ng@kobrekim.com
Daniel Zaheer (SBN 237118)
Daniel.Zaheer@kobrekim.com
**KOBRE & KIM LLP**
150 California Street, 19th Floor
San Francisco, CA 94111
Telephone: (415) 582-4800
Fax: (415) 582-4811

Victoria Fordin (Admitted *pro hac vice*)
Victoria.Fordin@kobrekim.com
Zachary Ritz (SBN 301281)
Zachary.Ritz@kobrekim.com
**KOBRE & KIM LLP**
201 South Biscayne Blvd., Suite 1900
Miami, FL 33131
Telephone: (305) 967-6100
Fax: (305) 967-6120

Jessica Fender (Admitted *pro hac vice*)
Jessica.Fender@kobrekim.com
**KOBRE & KIM LLP**
800 Third Avenue, 6th Floor
New York, NY 10022
Telephone: (202) 488-1200
Fax: (212) 488-1220

*Attorneys for Plaintiff*
SANAS.AI INC.