ERISE IP, P.A.
Eric A. Buresh (*pro hac vice*)
eric.buresh@eriseip.com
Michelle L. Marriott (*pro hac vice*)
michelle.marriott@eriseip.com
Chris R. Schmidt (CSB 298761)
chris.schmidt@eriseip.com
Nick R. Apel (*pro hac vice*)
nick.apel@eriseip.com
Ethan M. Buresh (*pro hac vice* forthcoming)
ethan.buresh@eriseip.com
7015 College Blvd., Suite 700
Overland Park, KS 66211

Phillip J. Haack (CSB 262060)
phaack@martonribera.com
MARTON RIBERA SCHUMANN & CHANG
LLP
548 Market Street, Suite 36117
San Francisco, CA 94104
Tel: (415) 360-2511
*Attorneys for Defendant*
*Krisp Technologies, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SANAS.AI INC.,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>KRISP TECHNOLOGIES, INC.,<br><br>　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.:  3:25-cv-05666-RS

**DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

**HEARING**

**DATE: JANUARY 15, 2026**
**TIME: 1:30 PM**
**COURTROOM: 3, 17 FLOOR**
**JUDGE: HONORABLE CHIEF DISTRICT JUDGE RICHARD SEEBORG**

**DEMAND FOR JURY TRIAL**

## NOTICE OF MOTION

PLEASE TAKE NOTICE THAT pursuant to Federal Rule of Civil Procedure 12(b)(6) Defendant Krisp Technologies, Inc. ("Defendant" or "Krisp") moves to dismiss the following Counts in Plaintiff Sanas.AI Inc.'s ("Plaintiff" or "Sanas") First Amended Complaint (Dkt. 35): Count One for infringement of U.S. Patent No. 11,948,550, Count Two for infringement of U.S. Patent No. 12,125,496, Count Four for infringement of U.S. Patent No. 11,715,457, Count Eight for infringement of U.S. Patent No. 12,412,561, and Count Nine for infringement of U.S. Patent No. 12,417,756. A hearing for this Motion noticed for Thursday January 15, 2026 at 1:30 PM, or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Chief District Judge Richard Seeborg for the Northern District of California located at Courtroom 3, 17th Floor, United States Courthouse, 450 Golden Gate Avenue, San Franscisco, California. This motion is based upon this Notice, the supporting memorandum of points and authorities, all pleadings and papers on file in this action, and other matters as may be properly presented to the Court.

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................... 1

II. FACTUAL BACKGROUND ...................................................................................... 1

III. PROCEDURAL POSTURE ....................................................................................... 2

IV. LEGAL STANDARD ................................................................................................. 3

    A. FAILURE TO STATE A CLAIM .................................................................................. 3
    B. PATENT ELIGIBILITY UNDER § 101 ......................................................................... 3

V. ARGUMENT ............................................................................................................... 4

    A. COUNTS 1, 2, AND 9 SHOULD BE DISMISSED BECAUSE THE ASSERTED CLAIMS ARE INVALID UNDER *ALICE* BECAUSE THEY ARE DIRECTED TO THE ABSTRACT IDEA OF TRANSLATION. ............................................................................................................ 4
        a) The asserted claims of the '550 patent fail *Alice*. ........................................ 4
            (i) Claim 1 is directed to an abstract idea. ............................................. 4
            (ii) Claim 1 fails to provide an inventive concept. .................................. 10
            (iii) The other '550 patent claims are invalid under *Alice*. .................... 11
        b) The Asserted Claims of the '756 Patent Fail *Alice*. ................................... 12
            (i) Claim 1 is directed to an abstract idea. ............................................. 12
            (ii) Claim 1 fails to provide an inventive concept. .................................. 14
            (iii) The other '756 patent claims fail *Alice*. .......................................... 14
        c) The Asserted Claims of the '496 Patent Fail *Alice*. ................................... 15
            (i) Claim 1 is directed to an abstract idea. ............................................. 15
            (ii) Claim 1 fails to provide an inventive concept. .................................. 17
            (iii) The other '496 patent claims are invalid under *Alice*. .................... 18
    B. COUNTS 4 AND 8 SHOULD BE DISMISSED BECAUSE THE ASSERTED CLAIMS ARE INVALID UNDER *ALICE* BECAUSE THEY ARE DIRECTED TO THE ABSTRACT IDEA OF GATHERING, ANALYZING, AND DISPLAYING CERTAIN RESULTS. ................................................... 19
        a) Claim 1 of the '457 patent is representative of all asserted claims in the '457 and '561 patents. ...................................................................................................... 19
        b) The asserted claims of the '457 and '561 patents fail *Alice*. ..................... 20
            (i) Claim 1 is directed to an abstract idea. ............................................. 20
            (ii) Claim 1 fails to provide an inventive concept. .................................. 22

VI. CONCLUSION ........................................................................................................... 22

## **TABLE OF AUTHORITIES**

**Cases**

*Abcellera Biologics Inc. v. Bruker Cellular Analysis*, 2024 WL 3074381, at *3 (N.D. Cal. June 20, 2024) _____ 2

*Adaptive Streaming Inc. v. Netflix, Inc.*, 836 F. App'x 900, 903 (Fed. Cir. 2020) __ 6, 7, 8, 13, 16

*Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016) ____ 9, 17

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) _____ 3

*Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) _____22

*Apple Inc. v. Pepper*, 587 U.S. 273 (2019) _____ 3

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) _____ 3

*Ass'n of Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) _____ 3

*Bilski v. Kappos*, 561 U.S. 593, 602 (2010) _____3

*Brightedge Techs., Inc. v. Searchmetrics, GmbH*, 304 F. Supp. 3d 859, 867 (N.D. Cal. 2018).  21

*Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1370 (Fed. Cir. 2024) _____ 18

*Cleveland Clinic Found. v. True Health Diags. LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017)___ 3

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) _____ 19

*Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020) _____ 4

*Eagle View Techs. Inc. v. Roofr, Inc.*, 2023 WL 315633, at *8 _____ 14

*EasyWeb Innovations, LLC v. Twitter, Inc.*, 689 F. App'x 969, 970 (Fed. Cir. 2017) _____ 8

*Elec. Power Grp., LLC v. Alstrom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016) __ 5, 8, 13, 17, 20

*Eolas Techs. Inc. v. Amazon.com, Inc.*, 2022 U.S. Dist. LEXIS 243302, at *33 (N.D.Cal. May. 16, 2022) _____ 10, 14, 17

*Ginegar LLC v. Slack Techs., Inc.*, 634 F. Supp. 3d 769, 776 (N.D. Cal. 2022) _____10

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023)__ 6, 7, 13, 16

*In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318-19 (9th Cir. 2017), aff'd sub nom _____ 3

*In re Eargo, Inc. Secs. Litig.*, 656 F. Supp. 3d 928, 937 (N.D. Cal. 2023) _____ 3

*In re Killian*, 45 F.4th at 1382 _____ 18

*Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016) _____ 5, 6

*LookSmart Grp, Inc. v. Google, LLC*, 2025 WL 1785343, at *4 _____ 10

*Mayo Collaborative Servs. v. Prometheus Lab's, Inc.*, 566 U.S. 66, 77 (2012) _____ 22

*Orbcomm Inc. v. Calamp Corp.*, 215 F. Supp. 3d 499, 506 (E.D. Va. 2016) _____ 8

*People.ai, Inc. v. Clari Inc.*, 2023 WL 2820794, at *8 (Fed. Cir. 202)3 _____ 11, 14, 18, 22

*PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021) _____ 6

*Power Analytics Corporation v. Operation Technology, Inc.*, 2017 WL 5468179, at *6 (C.D. Cal. July 13, 2017) _____ 11, 14, 18, 22

*Recentive Analytics, Inc.*, 134 F.4th at 1214 _____ 9, 10, 11, 13, 14, 17

*RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017 _____ 4

*SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018) _____ 10

*Sensormatic Elecs., LLC v. Wyze Labs, Inc.*, 484 F. Supp. 3d 161, 167 (D. Del. 2020), aff'd, No. 20-2320, 2021 WL 2944838 (Fed. Cir. July 14, 2021) _____ 8

*Software Rts. Archive, LLC v. Facebook, Inc.*, 485 F. Supp. 3d, 1096 1110 _____ 10, 22

*Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019) _____ 4

*Ubisoft Ent., S.A. v. Yousician Oy*, 814 F. App'x 588, 589-90 (Fed. Cir. 2020) _____ 21

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) _____ 4

*United States v. Sutter Health*, 2021 WL 9182525, at *3 (N.D. Cal. Nov. 2, 2021) _____ 2

*Univ. of Fla. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1368 (Fed. Cir. 2019) _____ 8

*Voip-Pal.com, Inc. v. Apple Inc.*, 375 F. Supp. 3d 1110, 1145 (N.D. Cal. 2019) _____ 10

*Voip-Pal.com, Inc. v. Twitter, Inc.*, 798 F. App'x 644 (Fed. Cir. 2020) _____ 11

*Yu v. Apple Inc.*, 1 F.4th 1040, 1046 (Fed. Cir. 2021) _____ 3

Statutes

iv

35 U.S.C. § 101

v

## I.    INTRODUCTION

Plaintiff asserts five patents directed to 'accent conversion' and 'accent modification.' When the claims are viewed in light of the specifications and governing Federal Circuit precedent, they are directed to abstract ideas implemented on generic computer components and lack the inventive concept required under 35 U.S.C. § 101.[1] ***First***, Counts One, Two, and Nine should be dismissed because the '550, '496, and '756 patents are directed to the abstract idea of translation—i.e., converting audio data from one form to another. The '550 patent simply applies generic computing components and machine learning to translate speech content from a first accent to a second accent. Inversely, the '756 patent applies the same generic technology to translate input speech from a second accent to a first accent. Further, the '496 patent simply applies generic computing components and neural networks to convert audio data containing non-content elements (such as background noise) to audio data without the non-content elements. ***Second***, Counts Four and Eight should be dismissed because the '457 and '561 patents are directed to the abstract of gathering data, analyzing it, and displaying results. Even accepting Sanas's factual allegations as true for this motion, patent eligibility under § 101 is appropriately resolved at the pleading stage. Resolving eligibility now promotes judicial efficiency and avoids unnecessary discovery.

## II.    FACTUAL BACKGROUND

Sanas' First Amended Complaint ("FAC") contains no allegations relevant to the two-step *Alice* inquiry. *See generally* Dkt. 35. Sanas did not attempt to articulate any inventive concept, nor to provide similar factual allegations. *Id*.

The '550 patent is titled "Real-Time Accent Conversion Model." Dkt. 35-1. The '550 patent purports to achieve accent conversion by utilizing "machine-learning models to receive input speech in a first accent and then output a synthesized version of the input speech in a second accent." *Id*. at 2:4-10. The '756 patent is titled "Systems and Methods For Real-Time Accent

---

[1] Sanas asserts U.S. Patent Nos. 11,948,550 (the "'550 patent"), 12,125,496 ("'496 patent"), 11,715,457 ("'457 patent"), 12,412,561 (the "'561 patent"), and 12,417,756 (the "'756 patent").

Mimicking." Dkt. 35-6. Inversely to the '550 patent, the '756 patent purports to achieve accent conversion by utilizing machine learning models to translate input speech from "a second accent… to a first accent." *Id*. at 4:53-56. The '496 patent is titled "Methods For Neural Network-Based Voice Enhancement and Systems Thereof." Dkt. 35-2. The '496 patent purports to achieve voice enhancement by apply neural networks to "omit one or more…non-content elements" from input audio. *Id*. at 9:56-10:10.

The '561 and '457 patents are both titled "Real Time Correction of Accent In Speech Audio Signals." Dkt. 35-4; Dkt. 35-5. The '561 patent is a continuation-in-part of the '457 patent. Both patents purport to achieve real-time accent correction through the same steps of (1) extracting acoustic and linguistic features and (2) generating an output chunk based on those features. Dkt. 35-4, at 16:16-33; Dkt. 35-5, at 20:45-55.

## III.     PROCEDURAL POSTURE

Krisp previously moved to dismiss Sanas' non-patent claims under Rule 12(b)(6), and that motion is pending. Krisp respectfully submits this second Rule 12(b)(6) motion to addressing Sanas' patent infringement claims—that the Asserted Patents are directed to patent-ineligible subject matter under 35 U.S.C. § 101 – in the interest of judicial economy and to avoid unnecessary delay. "[C]ourts faced with a successive motion often exercise their discretion to consider new arguments in the interests of judicial economy." *United States v. Sutter Health*, 2021 WL 9182525, at *3 (N.D. Cal. Nov. 2, 2021) (citations omitted).

Krisp respectfully requests that the Court consider Krisp's Section 101 invalidity challenge in the context of this motion under Rule 12(b)(6). While Krisp could file this this motion under a Rule 12(c) Motion for Judgment on the Pleadings after the close of the pleadings, and had intended to do so, Sanas' amendment to its Complaint and numerous pending motions to dismiss have prolonged the pleadings stage and judicial economy is promoted by not delaying adjudication of the issue of patent eligibility. *Abcellera Biologics Inc. v. Bruker Cellular Analysis*, 2024 WL 3074381, at *3 (N.D. Cal. June 20, 2024) (granting second 12(b)(6) when "[f]orcing Defendants to answer the Consolidated Complaint, and then bring a separate Rule 12(c) motion would only result

in a waste of resources for both the parties and the Court"). Otherwise, Krisp "would repeat the briefing they have already undertaken, and the Court would have to address the same questions in several months… [which is] contrary to the direction of Rule 1." *See In re Apple iPhone Antitrust Litig.*, 846 F.3d 313, 318-19 (9th Cir. 2017), *aff'd sub nom. Apple Inc. v. Pepper*, 587 U.S. 273 (2019).

## IV.   LEGAL STANDARD

### A.   Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim that is facially plausible." *In re Eargo, Inc. Secs. Litig.*, 656 F. Supp. 3d 928, 937 (N.D. Cal. 2023. "The court 'must take all of the factual allegations in the complaint as true,' but it is 'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id*. at 937–38 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)) "[I]n ruling on a 12(b)(6) motion, a court need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit, such as the claims and the patent specification." *Yu v. Apple Inc.*, 1 F.4th 1040, 1046 (Fed. Cir. 2021). Patent eligibility under Section 101 is a "threshold test" that should be answered early in a case. *See Bilski v. Kappos*, 561 U.S. 593, 602 (2010). The Federal Circuit has "repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery has commenced." *Cleveland Clinic Found. v. True Health Diags. LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017).

### B.   Patent Eligibility Under § 101

"[A]bstract ideas are not patentable" under 35 U.S.C. § 101. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (quoting *Ass'n of Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). Determining whether a patent claim is directed to an impermissible abstract idea involves two steps. First, the court determines "whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Id.* at 217. Second, if the claim contains an abstract idea, the court evaluates whether there is "an 'inventive concept' —i.e., an element or combination of elements that is sufficient to ensure that the patent in practice

amounts to significantly more than a patent upon the ineligible concept itself." *Id*. (internal quotations and citations omitted). To avoid invalidation under this second step, the claims "must include additional features" that "must be more than well-understood, routine, conventional activity." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) (citations and internal quotation marks omitted).

## V.   ARGUMENT

### A.   Counts 1, 2, and 9 Should Be Dismissed Because The Asserted Claims are Invalid Under *Alice* Because They Are Directed To The Abstract Idea of Translation.

The asserted claims of the '550, '496, and '756 patents fail *Alice* step one for two reasons. First, the claims are directed to the abstract idea of translation—a longstanding human activity that has been found patent ineligible numerous times by the Federal Circuit. Second, the claims incorporate, in purely functional terms, generic and well-known machine-learning algorithms and computing components without providing "a specific means or method" for improving the relevant technology. *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017). The asserted claims fail *Alice* step two because other than providing result-oriented steps to perform the abstract idea of translation, the claims recite only generic computer components described entirely in terms of their function.

#### a)   The asserted claims of the '550 patent fail *Alice*.

##### (i)   Claim 1 is directed to an abstract idea.

Under Alice step one, Courts "evaluate the focus of the claimed advance over the prior art to determine if the character of the claim as a whole, considered in light of the specification, is directed to excluded subject matter." *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019) (quotation omitted). For computer-implemented claims, the "inquiry often turns on whether the claims focus on [a] specific asserted improvement in computer capabilities or, instead, on a process that qualifies as an abstract idea for which computers are invoked merely as a tool." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir. 2020) (cleaned up). For example, claims are directed to abstract ideas where, "with the exception of

generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human." *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016). The "essentially result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101, especially in the area of using generic computer and network technology." *Elec. Power Grp., LLC v. Alstrom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016). Applying this framework confirms that the claims of the '550 patent are directed to an abstract idea.

When viewed in light of the specification, claim 1 of the '550 patent is directed to the abstract idea of converting speech in one accent to another accent, expressed at a functional level without reciting any specific technical mechanism for performing that conversion. The claimed steps recite the functional results of (1) "*train[ing]* a first machine-learning algorithm with first audio data comprising speech content… having a first accent," (2) "*apply[ing]* the first machine-learning algorithm to speech content received via at least one microphone… to derive a non-text linguistic representation of the set of phonemes associated with the first pronunciation of the received speech content," (3) "*synthesiz[ing]*, using a second machine-learning-algorithm trained with (i) second audio data comprising the first accent and (ii) third audio data comprising a second accent, fourth audio data representative of the received speech content having the second accent," and (4) "*convert[ing]* the synthesized fourth audio data into a synthesized version of the received speech content having the second accent." Dkt. 35-1, 10:5-49. Thus, at a high level, claim 1 merely envisions the idea of converting speech audio from a first accent to a second accent.

These steps embody longstanding human activities. The '550 patent admits "[o]ne of the oldest communication challenges faced by people around the world is the barrier presented by different languages… [and] accents can sometimes present a communication barrier that is nearly as difficult to overcome…." *Id*. at 1:33-36. Numerous other solutions have been attempted to "address the problem of accent conversion," but operate with a "degree of latency…that makes it impractical for use in real-time communication scenarios such as an ongoing conversation (e.g., a phone call)." *Id*. at 1:42-2:3. Therefore, the problem the '550 patent purports to solve is performing

"accent conversion… in real time." *Id*. at 2:10-11.  But although the specification refers to 'real-time' operation as a desired outcome, the claims recite no technical mechanism, beyond the application of generic machine learning techniques, for achieving real-time performance. A specification-described benefit does not supply an inventive concept unless reflected in the claim language along with a technological solution for achieving that benefit.

The steps of claim 1 are simply directed to automating existing human processes. The Federal Circuit has recognized this as a "telltale sign of abstraction." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021) (claims for data management tools are "directed to a medley of [human] mental processes" and therefore abstract).  Indeed, taking a manual process and automating it is quintessentially an abstract idea.  *See, e.g., Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1318 (Fed. Cir. 2016) ("With the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper.") (internal citation omitted). Take, for example, a human translator. They must train with a first accent to understand the intricacies and dynamics of that accent; they must then train with a second accent to understand its intricacies and dynamics. Then, they would use those skills to bridge the communication gap between the accents by listening to the speech content of a first speaker having a first accent, take away only the necessary speech content, think about how to deliver that speech content in a second accent to a target listener, and then deliver the speech in a second accent. Such "translation of content —from a format (including language) of a sender to one suited to a recipient —[i]s a fundamental communication practice in both the electronic and pre-electronic worlds." *Adaptive Streaming Inc. v. Netflix, Inc.*, 836 F. App'x 900, 903 (Fed. Cir. 2020).

The Federal Circuit has held claims patent ineligible that are akin to converting speech audio data from one accent to another. For example, in *Hawk Technology*, the claims recited a series of "functional results," including "'receiving video images,' 'digitizing any of the images not already in digital form,' … 'converting… the video source images into a selected video format,' … [and] 'transmitting… the video images.'" *Hawk Tech. Sys., LLC v. Castle Retail, LLC*,

60 F.4th 1349, 1357 (Fed. Cir. 2023). The claims included two translation steps: (1) "digitizing any of the images not already in digital form using an analog-to-digital converter"; and (2) "converting one or more of the video source images into a selected video format in a particular resolution, using a second set of temporal and spatial parameters associated with each image." *Id.* at 1353.

At *Alice* step one, the Court reaffirmed that "encoding and decoding image data and… converting formats, including when data is received from one medium and sent along through another, are by themselves abstract ideas." *Id.* at 1357 (alteration in original) (quoting *Adaptive Streaming Inc.*, 836 F. App'x at 903). The Court rejected the argument that the claims solved "a technical problem .... by performing special data conversion of the video streams and by digitizing and converting data to change the nature of the data." *Id.* (quotations omitted). Instead, the claims were directed to "converting information from one format to another," which "is an abstract idea." *Id.*

Similarly, in *Adaptive Streaming*, the Federal Circuit affirmed a Rule 12(b)(6) dismissal invalidating a patent addressed to a similar problem as the '550 patent: "communication between devices of different types is hindered by the fact that devices use different formats." *Adaptive Streaming Inc.*, 836 F. App'x at 901. The patent claimed a system "to retrieve at least one incoming video signal having a first format," "determine parameters for second compression formats," and "transcode the at least one incoming video signal from the first format into multiple compressed output video signals having respective second compression formats," which were "more suitable" for recipient devices. *Id.* at 901-02. The Court held that the claims failed *Alice* step one because "the claims and written description make clear that the focus of the claimed advance is the abstract idea of format conversion, from an incoming signal's format to a variety of formats suited to different destination devices." *Id.* at 903. As the Court recognized, the "translation of content—from a format (including a language) of a sender to one suited to a recipient—[i]s a fundamental communication practice in both the electronic and pre-electronic worlds." *Id.*

CASE NO. 3:25-CV-05666-RS
DEFENDANT KRISP TECHNOLOGIES, INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

Claim 1 and the '550 specification make clear that the focus of the invention is to offer "real-time accent conversion" between a first and second accent. *See* D.I. 35-1, at 4:16-18; 10:5-49. As in *Hawk* and *Adaptive Streaming*, converting speech content from one format (a first accent) to another format (a second accent) is directed to the patent-ineligible idea of translation. Multiple other cases have reached the same result.[2]

Claim 1 is further abstract because it claims generic computing and machine-learning technology without claiming any improvement or specific implementation of the relevant technology. Instead, the "machine learning algorithms" are claimed in purely functional terms without describing how they achieve the claimed steps—a critical hallmark of abstractness under Federal Circuit decisions. *See Elec. Power Grp.*, 830 F.3d at 1356 ("[R]esult-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101."). For example, claim 1 of the '550 patent requires a processor capable of performing the steps of "***train[ing]*** a first machine-learning algorithm with first audio data comprising speech content…having a first accent," "***apply[ing]*** the first machine-learning algorithm to speech content…to derive a non-text linguistic representation" and "based on the derived non-text linguistic representation, ***synthesiz[ing]***, using a second machine-learning-algorithm…fourth audio data," and "***convert[ing]*** the synthesized fourth audio data into a synthesized version of the received speech content having the second accent." However, claim 1 fails to describe or limit how the "first machine-learning algorithm" is "trained" with accent data or "applied" to speech content to derive "a non-text linguistic representation," what steps the "second machine-learning-

---

[2] *See Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1368 (Fed. Cir. 2019) (invalidating claims that recited "converting . . . a machine specific format into a machine independent format"); *EasyWeb Innovations, LLC v. Twitter, Inc.*, 689 F. App'x 969, 970 (Fed. Cir. 2017) (invalidating claims that recited step to "convert at least a second portion of [a] message from [a] first format to a second format"); *Sensormatic Elecs., LLC v. Wyze Labs, Inc.*, 484 F. Supp. 3d 161, 167 (D. Del. 2020), *aff'd*, No. 20-2320, 2021 WL 2944838 (Fed. Cir. July 14, 2021) (invalidating claims "drawn to the abstract idea of translating information between different formats"); *Orbcomm Inc. v. Calamp Corp.*, 215 F. Supp. 3d 499, 506 (E.D. Va. 2016) (invalidating "claims describ[ing] a process of gathering information and translating it between two or more incompatible formats" as "directed to the wholly abstract idea of translation.

algorithm" takes to "synthesize…fourth audio data," or how the "processor…converts the synthesized fourth audio data into a synthesized version of the received speech having the second accent." Thus, claim 1 does nothing more than recite "a desired function or outcome without providing any limiting detail that confines the claim to a particular solution to an identified problem" beyond using a generically "trained" machine learning algorithm to accomplish the result. *Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016).

In this way, *Recentive Analytics* is instructive. *See Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205 (Fed. Cir. 2025). There, the Federal Circuit held claims patent ineligible that were directed to the general application of machine learning to determine event schedules. *Id*. at 1213. The claims recited a method containing "(i) a collecting step (receiving event parameters and target features); (ii) an iterative training step for the machine learning model; (iii) an output step (generating an optimized schedule); and (iv) an updating step." *Id*. at 1208. The Court noted, "[i]nstead of disclosing a specific implementation of a solution to a problem in the software arts, or a specific means or method that solves a problem in an existing technological process, the only thing the claims disclose about the use of machine learning is that machine learning is used in a new environment." *Id*. at 1213 (internal quotations omitted). Thus, the claims were directed to an abstract idea because "the claims do not delineate steps through which the machine learning technology achieves an improvement." *Id*.

The logic from *Recentive* applies directly to claim 1. Claim 1 has no specific implementation of "a first machine-learning algorithm" or a particular method of how the algorithm is "applied" to achieve the result of "deriv[ing] a non-text linguistic representation of the set of phonemes;" nor does it describe the implementation or steps the "second machine-learning-algorithm" takes to "synthesize…fourth audio data." Thus, the claimed machine learning algorithms are couched in purely results-oriented language, without any explanation of how the claimed machine learning algorithms carry out the steps, other than machine learning algorithms doing what machine learning algorithms do. That is not sufficient to meet *Alice*'s step one. *Recentive*, 134 F.4th at 1213. This Court has repeatedly found that the functional nature of claim

1 only confirms that it is directed to an abstract idea.[3] Such broad functionality "preempts virtually all possible ways of performing" the idea of accent conversion utilizing machine learning models on a computing device. *Eolas Techs. Inc. v. Amazon.com, Inc.*, 2022 U.S. Dist. LEXIS 243302, at *33 (N.D.Cal. May. 16, 2022). Indeed, claim 1 falls squarely within the language the Federal Circuit warned may defeat the very purpose of the patent system. *Recentive*, 134 F.4th at 1213. ("Allowing a claim that functionally describes a mere concept without disclosing how to implement that concept risks defeating the very purpose of the patent system.").

Additionally, the requirement that the first and second machine learning algorithm need to be trained is not enough to provide an inventive concept. *Recentive*, at 1212 ("The requirements that the machine learning model be 'iteratively trained' or dynamically adjusted in the Machine Learning Training patents do not represent a technological improvement.").

### (ii)    Claim 1 fails to provide an inventive concept.

Under *Alice* step two, claim 1 fails to recite "an inventive concept in the non-abstract application realm." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018). As discussed above, the '550 patent seeks to overcome prior art systems by offering "new software technology that utilizes machine-learning models" to perform accent conversion "with very low latency." However, the claim itself does not provide a specific architectural change that is claimed to reduce latency beyond result-oriented claim language that relies on generic machine learning models. Thus, latency reduction cannot supply the inventive concept. *Voip-Pal.com, Inc. v. Apple*

---

[3] *Ginegar LLC v. Slack Techs., Inc.*, 634 F. Supp. 3d 769, 776 (N.D. Cal. 2022) ("Although [plaintiff] identifies an improvement to instant messaging technology . . . it does not explain the specific means or method underlying the improvement. It focuses only on the desired result . . .."); *Software Rts. Archive, LLC v. Facebook, Inc.*, 485 F. Supp. 3d 1096, 1108 (N.D. Cal. 2020) ("[D]espite [plaintiff's] insistence to the contrary, the claims do not specify how a computer achieves the desired result. The claims instead recite broad functions—'identifying' and 'accessing' hyperjump data, 'identifying' and 'analyzing' URLs, 'displaying' a document, and 'generating' cluster links, among others—which 'provide[ ] only a results-oriented solution.'") (citation omitted); *LookSmart Grp, Inc. v. Google, LLC*, 2025 WL 1785343, at *4 ("[I]t is clear that claim 1 neither limits [n]or [ ] specifies the process by which the generic processes that the claims invoke are to be carried out.") (internal citations omitted).

*Inc.*, 375 F. Supp. 3d 1110, 1145 (N.D. Cal. 2019), *aff'd sub nom. Voip-Pal.com, Inc. v. Twitter, Inc.*, 798 F. App'x 644 (Fed. Cir. 2020) (holding a patent ineligible where "the purported improvements have not been captured in the claim language."). The same is true for the idea of "real-time accent conversion" – claim 1 fails to provide "a specific means or method that improves" accent conversion. *People.ai, Inc. v. Clari Inc.*, 2023 WL 2820794, at *8 (Fed. Cir. 2023). Instead, claim 1 only provides desired results and functions without providing any technological means for achieving the results. Indeed, "increased speed and efficiency" using existing machine learning and computing technology "with no improved computer techniques" does not create eligibility. *Recentive Analytics, Inc.*, 134 F.4th at 1214; *see also Power Analytics Corporation v. Operation Technology, Inc.*, 2017 WL 5468179, at *6 (C.D. Cal. July 13, 2017), *aff'd sub nom*, Fed. Appx. 334 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 910 (2020) (internal citations omitted) (holding the recitation of a "machine learning engine

" in the claims did not turn an abstract idea into patentable subject matter, where "a few claims recite a 'machine learning engine' but the patents describe this in functional terms, without purporting to add any particular inventive implementation"). The claims therefore do not improve the functioning of any computer, machine learning architecture, or audio processing system; they simply use those tools to implement an abstract objective.

### (iii)    The other '550 patent claims are invalid under *Alice*.

Claims 2-22 of the '550 patent also fail to provide any inventive concepts that would transform the claimed abstract ideas into patent-eligible subject matter.

Specifically, independent claim 11 mirrors the steps of claim 1, and independent claim 19 places the steps of claim 1 into a method claim. These changes in form, rather than in substance, are immaterial and do not alter the focus of the claim on the abstract idea of accent translation. *Alice*, 573 U.S. at 226.

Further, the asserted dependent claims do not change the focus of the alleged invention and add trivial details regarding the abstractness of the invention —i.e., specifying the second machine-learning-algorithm is a "learned mapping" algorithm that "maps each frame in the non-text

linguistic representation" (claims 2, 3, 12, 13, and 20); classifying the audio data (claims 4, 5, 7, 14, 16, and 22); claiming the result-oriented time it takes to achieve accent conversion (claims 9, 18, and 20); and requiring if "the received speech content having the first accent further comprises a set of prosodic features," then "the synthesized version of the received speech content having the second accent has the set of prosodic features" (claim 10).

### b)    The Asserted Claims of the '756 Patent Fail *Alice.*

### (i)    Claim 1 is directed to an abstract idea.

Nearly identical to the '550 patent, the '756 patent is directed to the abstract idea of translation—i.e., converting speech content data from one accent to another. Claim 1 requires a processor capable of achieving the functional results of: (1) "*apply[ing]* one or more trained machine learning models to first input audio data… to extract accent features of first input speech associated with a first accent," (2) "*analyz[ing]* obtained second input audio data associated with second input speech associated with a second accent… to generate characteristics specific to a natural voice of the second user," (3) "*synthesiz[ing]* a modified version of th second input speech by modifying the obtained second input audio data," and (4) "*provid[ing]* to the audio interface output audio data for output via the audio output device." Dkt. 35-6, 9:43-10:4. Thus, at a high level, claim 1 envisions converting input speech audio from a second accent to a first accent.

As above, this is a longstanding human activity. The '756 patent admits that "[c]larity and understandability of speech are critical to enable speakers to convey their thoughts and listeners to comprehend the intended message accurately." *Id*. at 1:19-22. Thus, "[e]xisting technologies have attempted to address accent-related issues through various means." *Id*. at 1:35-36. Some of these solutions "rely on machine learning models trained on pre-recorded speech data," but "these machine learning algorithms may not accurately capture the dynamic features of spontaneous speech." *Id*. at 1:45-51. The '756 patent purports to address this problem by offering "real-time accent mimicking." *Id*. at 1:10-12; 2:6-9. Although the specification refers to "real-time" operation as a desired outcome, once again, the claims do not recite any technical solution for achieving real-time performance beyond the use of generic machine learning models. A specification-described

benefit does not supply an inventive concept unless reflected in the claim language along with a technological solution securing the benefit. Instead, the '756 patent is directed to automating basic human process. Indeed, a human can learn the nuances of two different accent-types of the same language and using that knowledge to translate speech from one accent to the other, further compounding the abstractness of claim 1. *See Intellectual Ventures I LLC*, 838 F.3d at 1318 ("With the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper.") (internal citation omitted)

Further, applying *Hawk Technology* and *Adaptive Streaming*, claim 1 falls squarely within the realm of translation claims that the Federal Circuit has found patent-ineligible. Claim 1 recites the steps of translating voice audio data from one format (a second accent) to a different format (a first accent), which is a communication tactic used long before the electronic age. *See Adaptive Streaming Inc.*, 836 F. App'x at 903; *see also Hawk Tech. Sys., LLC*, 60 F.4th at 1357.

Claim 1 is also abstract because it claims generic computing and machine-learning technology without claiming any improvement or specific implementation of the relevant technology. *Recentive Analytics, Inc.*, 134 F.4th at 1213. Instead, claim 1 is written in purely functional, result-based terms and fails to disclose *how* the "processor" is configured to "***apply*** one or more trained machine learning models to first input audio data… to ***extract*** accent features," "***analyze*** obtained second input audio data associated with second input speech associated with a second accent… to ***generate*** characteristics specific to a natural voice of the second user," "***synthesize*** a modified version of the second input speech by ***modifying*** the obtained second input audio data," and "***provide*** to the audio interface output audio data for output." Dkt. 35-6, 9:43-10:4 (emphasis added). The purely functional nature of claim 1 is a hallmark of abstractness under Federal Circuit decisions. *See Elec. Power Grp.*, 830 F.3d at 1356 ("[R]esult-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101."). Like the '550 patent, the broad functionality of claim 1 "preempts virtually all possible ways of performing" the abstract idea of accent translation using generic machine learning models and

"risks defeating the very purpose of the patent system." *Eolas Techs. Inc.*, 2022 U.S. Dist. LEXIS 243302, at *33; *Recentive*, 134 F.4th at 1213.

### (ii)    Claim 1 fails to provide an inventive concept.

Claim 1 of the '756 patent also fails *Alice* step two. The '756 patent purports to offer "real-time accent mimicking." Dkt. 35-6, at 2:6-9. However, claim 1 fails to provide a specific means or method for achieving real-time accent mimicking. Instead, the claimed steps are written in purely functional, result-based language and rely on generic computing and machine learning technology. Therefore, "real-time accent mimicking" cannot provide the inventive concept. *Recentive Analytics, Inc.*, 134 F.4th at 1214 ("increased speed and efficiency" using existing machine learning and computing technology "with no improved computer techniques" does not create eligibility); *People.ai, Inc.*, 2023 WL 2820794, at *8; *see also Power Analytics Corp.*, 2017 WL 5468179, at *6.  The '756 claims and specification contemplate only generic computing components and machine learning technology. Claim 1 requires "one or more processors coupled to memory… configured to execute the instructions" to carry out the claimed steps. Dkt. 35-6, at 9:45-47. Thus, any generic processor capable of executing instructions is contemplated in claim 1. Additionally, the '756 patent provides no guidance on the selection of a particular machine learning algorithm or technique that describes how the machine learning achieves "extract[ing] accent features" or otherwise improves the computing system. *Id*. at 9:48-51. This inclusion of generic computing components and machine learning technology cannot confer patent eligibility. *Eagle View Techs. Inc. v. Roofr, Inc.*, 2023 WL 315633, at *8 (recital of "conventional technology to implement conventional steps" not enough to confer patent eligibility).  Because claim 1 does not improve the functioning of any computer, machine learning architecture, or audio processing system, and simply uses those tools to implement an abstract objective, the claim fail *Alice* step two.

### (iii)    The remaining '756 patent claims also fail *Alice*.

Claims 2-20 of the '756 patent also do not provide any inventive concepts that would transform the claimed abstract ideas into patent-eligible subject matter.

Specifically, independent claim 7 changes the format of claim 1 into a method claim that recites the same steps. Independent claim 14 recites a "non-transitory computer-readable medium comprising instructions that… cause at least one processor to" perform the same steps of claim 1. These changes in form, rather than in substance, are immaterial and do not alter the focus of the claim on the abstract idea of accent translation. *Alice*, 573 U.S. at 226.

Further, the remaining dependent claims do not change the focus of the alleged invention and add only trivial details regarding the abstractness of the invention —i.e., further configuring the processor to extract "from the first input audio data one or more prosodic features, linguistic features, or global speaker characteristics" (claims 2, 9, 16); specifying the accent features that are extracted (claims 3, 10, 17); further configuring the processor to apply generic acoustic feature extraction techniques (claims 4, 5, 11, 12, 18, and 19); specifying characteristics of the "modified version of the second input speech" (claims 8 and 15); and receiving the second input audio data via "one or more communication networks and from a user computing device that is remote from the speech processing system" (claims 6, 13, and 20). Thus, the remaining claims are also directed to an abstract idea and provide no technological improvements the operation of the computing system.

### c)    The Asserted Claims of the '496 Patent Fail *Alice*.

### (i)    Claim 1 is directed to an abstract idea.

The '496 patent is also directed to the abstract idea of audio translation. Specifically, converting audio data with non-content elements into audio data without non-content elements. Claim 1 requires "one or more processors" that execute instructions to achieve the functional results of: (1) "*fragment[ing]* input audio data into a plurality of speech frames, wherein the input audio data comprises foreground speech content, one or more non-content elements, and one or more speech characteristics," (2) "*convert[ing]* the input speech frames to low-dimensional representations of the input speech frames, wherein one or more of the fragmentation or the conversion is based on an application of a first neural network to the input audio data and the low-dimensional representations of the input speech frames omit one or more of the non-content

elements," (3) "*apply[ing]* a second neural network to the low-dimensional representations of the input speech frames to generate target speech frames," and (4) "*combining* the target speech frames to generate output data, wherein the output audio data further comprises one or more portions of the foreground speech content and one or more of the speech characteristics."  Dkt. 35-2, 9:56-10:11. Thus, at a high level, the '496 patent "performs voice enhancement and/or noise suppression" by "convert[ing] the input audio data into the output audio data using the first and second neural networks." *Id*. at 4:38-41.

If the application of generic computing components (i.e., "processors") and machine learning algorithms (i.e., "first" and "second neural networks") are removed, a human would be capable of performing the steps of claim 1. And humans have long employed the mental process of distinguishing background and other noises to identify content of a spoken message. Prior to computers, court reporters and professional transcribers routinely listened to speech and filtered out non-content audio—such as breaths, hesitations, "um's," lip smacks, room noise, or overlapping background sounds—while preserving the speaker's linguistic message. Audio technicians and radio operators also have long enhanced speech clarity by reducing microphone pops, hiss, echo, and ambient noise while leaving the speech content untouched. The '496 patent similarly identifies and suppresses non-linguistic noise to make speech more intelligible, but does so using general-purpose machine learning components without claiming any specific improvement in audio processing or machine learning architecture.  Thus, the '496 patent merely automates this longstanding noise-removal function using conventional computing tools.

Further, as the Federal Circuit held in *Hawk Technology* and *Adaptive Streaming*, the conversion of audio data from one format (audio data comprising "foreground speech content, one or more non-content elements, and one or more speech characteristics") to another format (audio data that "omit[s] one or more of the non-content elements") is directed to an abstract idea. *See Hawk Tech. Sys., LLC*, 60 F.4th at 1357 ("[C]onverting information from one format to another…is an abstract idea."); *see also Adaptive Streaming Inc.*, 836 F. App'x at 903 ("[T]ranslation of

content—from a format (including a language) of a sender to one suited to a recipient—[i]s a fundamental communication practice in both the electronic and pre-electronic worlds.").

Claim 1 is also directed to an abstract idea because it claims generic computing and machine-learning technology without claiming any improvement or specific implementation of the relevant technology. *Recentive Analytics, Inc.*, 134 F.4th at 1213. The '496 patent teaches that the "processor(s)" must be "designed to process instructions." Dkt. 35-2, 2:59-64. Therefore, any generic processor is contemplated. Further, the '496 patent does not claim a novel neural network or implementation of neural networks. *See, e.g., Id*. at 10:54-57 ("[T]he second neural network comprises one or more of a diffusion probabilistic model, a flow-based model, or a generative adversarial network-based model."). Further, the steps of claim 1 are couched in purely functional, result-based terms, which is "a frequent feature of claims held ineligible under § 101." *Elec. Power Grp.*, 830 F.3d at 1356. For example, claim 1 requires a "processor" capable of executing instructions to carry out the steps of claim 1, but fails to describe or claim *how* the processor "***fragment[s]*** input audio data into a plurality of input speech frames," "***convert[s]*** the input speech frames to low-dimensional representations of the input frames" that "***omit[s]*** one or more of the non-content elements," or how the processor "***combine[s]*** the target speech frames to generate output audio data." Dkt. 35-2, 9:55-10:3. Further, claim 1 fails to describe or claim *how* the "first neural network" is "***applied***… to the input audio data" or *how* the "second neural network" is "***applied*** to the low-dimensional representations… to generate target speech frames." *Id*. The purely functional nature of claim 1 "preempts virtually all possible ways of performing" neural network-based voice enhancement and confirms that it is directed to an abstract idea. *Eolas Techs. Inc.*, 2022 U.S. Dist. LEXIS 243302, at *33; *Affinity Labs of Tex.*, 838 F.3d at 1269.

### (ii)    Claim 1 fails to provide an inventive concept.

Claim 1 of the '496 patent fails *Alice* step two for essentially the same reasons as the '550 and '756 patents. First, the claimed steps to achieve the abstract idea of converting audio data are written in purely functional, result-based terms. Second, as addressed above, claim 1 recites only generic computing (Dkt. 35-2, 2:59-64) and machine learning technology (*Id*. at 10:54-57) without

providing a specific technological means to achieve the claimed results. *See Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1370 (Fed. Cir. 2024) ("When the patent's specification 'describes the components and features listed in the claims generically,' it 'support[s] the conclusion that these components and features are conventional.'") (citations omitted) Thus, applying *Power Analytics*, the generic recitation of neural networks without a particular inventive implementation fails to transform the abstract idea of converting audio data into patentable subject matter. 2017 WL 5468179, at *6. Further, although the '496 patent purports to offer "real-time" voice enhancement (Dkt. 35-2, 4:61-62), the claimed steps are written in purely functional, result-based language and rely on generic computing and machine learning technology. Therefore, "real-time voice enhancement" cannot provide the inventive concept. *Recentive Analytics, Inc.*, 134 F.4th at 1214 ("increased speed and efficiency" using existing machine learning and computing technology "with no improved computer techniques" does not create eligibility); *People.ai, Inc.*, 2023 WL 2820794, at *8; *see also Power Analytics Corp.*, 2017 WL 5468179, at *6.

### (iii)    The other '496 patent claims are invalid under *Alice*.

Claims 2-20 of the '496 patent also fail to provide any inventive concepts that would transform the claimed abstract ideas into patent-eligible subject matter.

Specifically, independent claim 11 only adds "training a first neural network" and "a second neural network" to the steps of claim 1, which, as addressed above, generically "training" a machine learning model provides no inventive concept. Further, independent claim 16 requires performing the abstract steps on a "non-transitory computer-readable medium," which provides inventive concept. *In re Killian*, 45 F.4th at 1382.

Additionally, the asserted dependent claims do not change the focus of the alleged invention and add only trivial details regarding the abstractness of the invention —i.e., claiming generic computing hardware and steps (claims 2, 9, and 15), specifying data (claims 3, 5, 13, and 17), training and applying various types of neural networks (claims 4, 6, 7, 10, 12, 18, 19, 20), and pre-processing the input data to remove background noise (claims 8 and 14), all of which are

directed to the same abstract idea and provide no technological improvement to the operation of the computing system.

        **B.**      **Counts 4 and 8 Should be Dismissed Because the Asserted Claims Are Invalid Under *Alice* As They Are Directed to the Abstract Idea of Gathering, Analyzing, and Displaying Certain Results.**

        **a)**      **Claim 1 of the '457 patent is representative of all asserted claims in the '457 and '561 patents.**

For purposes of a §101 analysis, it is sufficient to analyze a "representative claim" when the claims are substantially similar and linked to the same abstract idea. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). The claims of the '457 and '561 patent far surpass the "substantially similar and linked" standard. First, the independent claims of the '457 and '561 patent are nearly identical. Both patents claim "real-time correction of an accent" and purport to do it using the exact same steps. Dkt. 35-4, 16:16-33; Dkt. 35-5, 20:45-55. A representative chart showing that the asserted independent claims differ only in phrasing, not in any technical implementation detail is attached to this motion as **Exhibit A**. Further, the '561 patent is a continuation-in-part to the '457 patent. *See* Dkt. 35-5. As a result, they have substantially similar specifications and drawings.

Additionally, each of the dependent claims from the asserted patents fall into one of the following categories, none of which alter the independent claims' abstract concept and none of which are any less abstract. The '457 patent's dependent claims include:

- specifying the information extracted and analyzed (*see* dependent claims 3, 4, 5, 7, 8, 11, 16, 18, and 20);

- generic application of a neural network and neural network training (*see* dependent claims 6, 9, 10, and 19); and

- Further processing the speech audio to adjust one or more of the characteristics (*see* dependent claims 12 and 13).

Additionally, the '561 dependent claims include:

- specifying the information extracted and analyzed (*see* dependent claims 2, 7, and 12)

- specifying ways to process the data and generate a result (*see* dependent claims 4, 5, 9, 10, 14, and 15)

- digitizing the input audio signal (*see* dependent claims 3, 8, and 13).

Accordingly, given the similarity of the asserted patent claims, it is appropriate for the Court to focus on claim 1 of the '457 patent as a representative claim when analyzing patent eligibility.

    **b)**    **The asserted claims of the '457 and '561 patents fail *Alice*.**

    **(i)**    **Claim 1 is directed to an abstract idea.**

Claim 1 is directed to the abstract idea of gathering, analyzing, and displaying certain results. Claim 1 functionally claims the steps of: (1) "***dividing*** the speech audio signal into a stream of input chunks," (2) "***extracting***… acoustic features," (3) "***extracting***… linguistic features with a reduced accent," (4) "***receiving*** a speaker embedding from a human speakers," and (5) "***generating*** an output chunk of an output audio signal based on the speaker embedding, the acoustic features, and the linguistic features." Dkt. 35-4, 16:16-33 (emphasis added). Thus, at a high level, claim 1 gathers data by extracting acoustic and linguistic features and receiving a speaker embedding, analyzes the data, and generates an output chunk based on the analyzed data.

The Federal Circuit has repeatedly found the idea of collecting data, analyzing it, and displaying results unpatentable. In *Electric Power Group*, the asserted claims were directed to a method of detecting events on a power grid in real-time by receiving a plurality of data streams, detecting and analyzing the data streams for specific measurements, and displaying results of the analysis or diagnosing problems based on the data streams. *Elec. Power Grp., LLC*, 830 F.3d at 1351-52. The Court held the claims were directed to the abstract idea of "collecting information, analyzing it, and displaying certain results of the collection and analysis," because "[i]nformation as such is an intangible." *Id*. at 1353. In the same way, claim 1 of the '457 patent is directed to receiving and dividing a data stream into chunks, extracting acoustic features, linguistic features,

and a speaker embedding from the data stream, and generating a result (an output chunk) based on the features.

Similarly, the claims in *Ubisoft* were directed to an interactive game designed for learning to play the guitar. *Ubisoft Ent., S.A. v. Yousician Oy*, 814 F. App'x 588, 589-90 (Fed. Cir. 2020) would perform the steps of presenting a song to be played by the user, receiving an audio signal, assessing the audio signal to identify a portion of the performance that needs improvement, and based on that portion, generating a mini-game targeted to improving the user's skills. *Id*. The court held that "the claims recite nothing more than a process of gathering, analyzing, and displaying certain results," and, therefore, are directed to an abstract idea. *Id*. at 592. In the same way, claim 1 requires a method implemented in a computing device that receives an audio signal, extracts and receives specific portions of the audio signal (acoustic features, linguistic features, and a speaker embedding), and generates an output chunk based on that data.

Thus, claim 1 fits squarely within the "line of precedent that…classifies data collection, organization, and analysis as abstract—even where that produces new data—in the absence of a claimed technological improvement." *Brightedge Techs., Inc. v. Searchmetrics, GmbH*, 304 F. Supp. 3d 859, 867 (N.D. Cal. 2018).

Claim 1 is also abstract because it claims generic computing and machine-learning technology without claiming any improvement or specific implementation of the relevant technology. Claim 1 is directed to using a "computing device" to achieve the abstract end-result of "real-time correction of an accent." Dkt. 35-4, 16:16-19. The claim does not recite any specific improvement in computing technology nor in the way the computing device operates. Further, the specification states the "computing device" can be any generic device. *Id*. at 4:64-5:03. Further, claim 1 recites purely functional, result-based language and fails to describe *how* the computing device achieves the claimed steps. For example, claim 1 uses functional terms such as "***dividing***," "***extracting***," "***receiving***," and "***generating***" without providing any detail of how the computing device achieves "dividing the speech audio signal into…chunks," how it "extract[s]" acoustic and linguistic features, or how it "generates" an output chunk. *Id*. at 16:16-33. Failure to identify any

limiting features preempt all past, present, and future techniques for doing so. Such claims directed to "certain functionality" but not a "particular way of programming or designing the software" to perform that functionality have been found invalid. *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016).

### (ii)   Claim 1 fails to provide an inventive concept.

Claim 1 of the '457 patent recites the use of a "computing device." The specification of the '457 patent makes it clear that only conventional computing devices are contemplated. *See, e.g., id.*, at 4:64-5:03. Such generic references to computing devices fail to transform the claimed abstract idea into patent-eligible subject matter. *See Alice*, 573 U.S. at 224. Further, although claim 1 of both the '457 and '561 patent purport to claim "real-time accent correction" (Dkt. 35-4, 16:16-33; Dkt. 35-5, 20:45-55), claim 1 fails to provide a specific means or method for achieving real-time accent conversion. Instead, the claimed steps are written in purely functional, result-based language and rely on generic computing and machine learning technology. Therefore, "real-time accent conversion" cannot provide the inventive concept. *Recentive Analytics, Inc.*, 134 F.4th at 1214 ("increased speed and efficiency" using existing machine learning and computing technology "with no improved computer techniques" does not create eligibility); *People.ai, Inc.*, 2023 WL 2820794, at *8; *see also Power Analytics Corp.*, 2017 WL 5468179, at *6. Additionally, claim 1 fails to "involve more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Software Rts. Archive, LLC v. Facebook, Inc.*, 485 F. Supp. 3d, 1096 1110. As addressed above, claim 1 is directed to the routine method of collecting data, analyzing it, and producing a result. Neither the claimed steps nor the '457 specification purport to improve the functionality of the computing device. Thus, the claim "amount[s] to nothing 'significantly more' than an instruction to apply the abstract idea ... using some unspecified, generic computer." *Alice*, 573 U.S. at 225-226. The Supreme Court has explained "that is not 'enough' to transform an abstract idea into a patent-eligible invention." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Lab's, Inc.*, 566 U.S. 66, 77 (2012)).

### VI.   CONCLUSION

For the foregoing reasons, Krisp respectfully requests that the Court find that the '550, '496, '756, '457, and '561 patents fail to claim patent eligible subject matter, and dismiss Counts 1, 2, 4, 8, and 9 of Sanas's First Amended Complaint.

November 19, 2025                         Respectfully Submitted,

                                          By: */s/ Eric A. Buresh*

                                          ERISE IP, P.A.
                                          Eric A. Buresh (*pro hac vice*)
                                          eric.buresh@eriseip.com
                                          Michelle L. Marriott (*pro hac vice*)
                                          Michelle.marriott@eriseip.com
                                          Chris R. Schmidt (CSB 298761)
                                          chris.schmidt@eriseip.com
                                          Nick Apel (*pro hac vice*)
                                          Nick.apel@eriseip.com
                                          Ethan M. Buresh (*pro hac vice* forthcoming)
                                          ethan.buresh@eriseip.com
                                          7015 College Blvd., Suite 700
                                          Overland Park, KS 66211

                                          *Attorneys for Defendant Krisp Technologies, Inc.*