UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SANAS.AI INC.,

    Plaintiff,

  v.

KRISP TECHNOLOGIES, INC.,

    Defendant.

Case No.  25-cv-05666-RS

**ORDER DENYING KRISP'S MOTION TO DISMISS SANAS' CLAIMS AND GRANTING IN PART AND DENYING IN PART SANAS' MOTION TO DISMISS KRISP'S COUNTERCLAIMS**

## I. INTRODUCTION

Defendant and Counterclaim Plaintiff Krisp Technologies ("Krisp") and Plaintiff and Counterclaim Defendant Sanas AI ("Sanas"), two technology competitors and almost-collaborators, move to dismiss each other's claims and counterclaims, respectively. Sanas has adequately pled trade secret misappropriation, co-inventorship and co-ownership, and false advertising claims against Krisp. Accordingly, Krisp's motion to dismiss as to these claims is denied as set forth below.

Sanas' motion as to Krisp's state-law counterclaims is denied in part as well because Krisp has adequately pled violations of Cal. Bus. & Prof. Code § 17043 and §§ 17200 *et. seq*. However, since allegations of violations of Cal. Bus. & Prof. Code § 17044 cannot survive when based on a defendant freely giving away a product, Sanas' motion to dismiss is granted as to count three of Krisp's counterclaims as set forth below.

United States District Court
Northern District of California

## II. BACKGROUND[1]

Sanas and Krisp are competitors in the market for voice communication software. Specifically, their technology improves phone and video call conversations in real-time by converting accents and reducing background noise. It is most commonly deployed in call centers.

Krisp entered the market first with background noise suppression software. Concurrent with the release of its noise suppression technology, Krisp filed a provisional patent application that was awarded on August 24, 2021.

Sanas AI was founded a few years later by Maxim Serebryakov, Shawn Zhang, and Andrés Pérez Soderi, three former Stanford classmates, along with Sharath Narayana, an entrepreneur. The Sanas co-founders were originally focused on accent conversion. Between 2020 and 2021, they built out a database of accented human speech, including identifying and recording "ideal" target accents. They then developed software that translates accents between parties in real-time, fast enough and at a high enough quality that normal conversation can be carried out, leveraging unique student-teacher machine learning architecture and parallel data generation.

They launched their first product in 2021 and filed a provisional patent application titled Real-Time Accent Conversion Model in May 2021. Other applications followed, including six patents by September 2025.

### A. Collaboration Discussions Between Sanas and Krisp

Krisp alleges that by at least July 2021, it also was developing accent conversion technology using student-teacher machine learning architecture. That fall, Krisp reached out to Sanas about collaborating. Between October 2021 and November 2022, the parties explored collaboration, and Sanas provided, upon Krisp's solicitation, technical details about Sanas' accent conversion technology. That technical information included performance details in the case of strong accents, different dialects, and background voices; intelligibility of various converted audio; end to end latency metrics when used with different platforms; support for different

---

[1] For the purposes of these motions, unless otherwise stated, this order accepts well-pled factual allegations made in the complaint and counterclaims as true.

microphone types; CPU utilization; details about the technology stack and current and future technical specifications; and decisions and plans to build versus buy certain algorithms and features.

Upon Sanas' request, the parties entered a non-disclosure agreement (NDA) on November 17, 2021. The NDA acknowledged that Sanas "ha[d] disclosed, and may further disclose certain confidential technical and business information. . . that [Sanas] desires [Krisp] to treat as confidential." The NDA defined "Confidential Information" as (i) written information that is "marked 'Confidential,' 'Proprietary' or in some other manner to indicate its confidential nature," or (ii) oral information that is "reduced to a written summary [] that is marked in a manner to indicate its confidential nature and delivered to the Recipient within thirty (30) days after its initial disclosure." Dkt. 39-2, Ex. A, § 2.A. Pursuant to the NDA, Krisp promised not to use Sanas' confidential information "for any purpose except to evaluate and engage in discussions" relating to the licensing opportunity Krisp had solicited. *Id.*, § 3. The NDA further provided that "[n]othing in this Agreement is intended to . . . grant [Krisp] any rights in or to the Confidential Information of [Sanas] except as expressly set forth in this Agreement." *Id.*, § 8.

The parties continued to explore collaboration, creating a Slack channel for exchange of information directly between the companies' technical teams. At various times, Sanas also sought an exclusivity agreement to enhance protection of the information it was sharing. Krisp refused. Sanas proceeded nonetheless, expressly indicating to Krisp that it understood the NDA to provide sufficient protection for the technical discussions the two companies were having. At the end of October 2022, however, Krisp stopped responding to outreach from Sanas' senior management. On November 4, 2022, Krisp emailed Sanas stating that Krisp did not want to proceed with the partnership for various reasons, including that Krisp was not yet interested in pursuing accent translation.

### B. Krisp's Accent Conversion Technologies and Patent Filings

On April 27, 2023, sixteen months after Krisp first reached out to Sanas about licensing its technology and five months after discussions terminated, Krisp publicly announced "early access"

to its own proprietary AI accent conversion technology. It posted an article on its company blog announcing "Krisp AI Accent Conversion: Get Ready for a Communication Revolution." The article explains that Krisp "ha[d] been working tirelessly to create a technology that utilizes real-time inflection changes to help customers understand agents better by dynamically changing agents' accents into the customer's natively understood accent." It announced a range of dialects for which the product already worked.

On July 21, 2023, Krisp filed two provisional U.S. patent applications, which issued as U.S. Patent No. 12,205,609 ("the '609 Patent") and U.S. Patent No. 12,223,979 ("the '979 Patent" and, together with the '609 Patent, the "Krisp Accent Conversion Patents"). The Krisp Patents cite Sanas' accent conversion technology patents and patent applications.

Sanas alleges that the Krisp Accent Conversion Patents do not disclose or claim any novel or non-obvious approaches to generating parallel data for speech conversion but rather claim, as Krisp's own inventions, techniques and approaches discussed in Sanas' earlier patent applications and issued patents. Sanas also alleges that the Krisp Patents rely and build upon information provided by Sanas employees, including co-founder Serebryakov, such that they should have been named as joint inventors. Specifically, they assert that information regarding the process of training the student machine learning algorithm with the teacher algorithm, which Sanas employees shared with Krisp, are reflected in the '609 and '979 Patents.

In March 2025, Krisp launched "Krisp AI Accent Conversion v3." Krisp also markets a product called "Accent Localization" (together, the "Accused Products").

**C. Krisp's Public Statements about Sanas Accent Conversion Technology**

On April 21, 2025, Krisp published a public blog post, "*Krisp vs. Sanas: Accent Conversion Comparison*" (the "2025 Accent Conversion Blog Post"), comparing Krisp's accent conversion technology to Sanas'. Sanas alleges Krisp knew, or had reason to know, many of the statements regarding Sanas' accent conversion technology were false or misleading. Sanas also alleges that Krisp has run and continues to run Google ads which read, "Better Sanas AI alternative," and link to the 2025 Accent Conversion Blog Post.

On or about August 28, 2025, Sanas wrote a cease-and-desist letter to Krisp regarding the

false and misleading statements in the 2025 Accent Conversion Blog Post, identifying at least 15 different false and misleading statements. At the time of filing, September 22, 2025, Krisp continued to publish various false and misleading statements in its blog post.

Krisp claims to have used 70 pairs of recordings to inform these statements about Sanas' technology. Sanas, however, alleges those samples reflect an outdated version of their software from December 2023 or earlier. On or about September 9, 2025, Krisp, through its outside counsel, responded to Sanas' cease and desist, insisting the fifteen statements were "accurate at the time they were made based on publicly available information."

**D. Sanas Noise Cancellation Technology and Krisp's Public Statements**

In August 2024, Sanas announced that it was offering noise cancellation technology, giving it away for free to users who do not have the Krisp app. Around the same time, in two separate public blog posts, one dated August 30, 2024 and titled "*Krisp vs. Sanas: Noise Cancellation Comparison*" (the "2024 Noise Cancellation Post") and a second dated July 22, 2025 and titled "*Krisp vs. Sanas – Inbound Noise Cancellation Comparison*" (the "2025 Noise Cancellation Post") (together, the "Noise Cancellation Blog Posts"), Krisp made a total of at least eighteen statements regarding the features and value of Sanas' noise cancellation technology. Sanas alleges public sources available at the time showed those statements to be false or misleading.

In the 2024 Noise Cancellation Post, the statements included the following: that Sanas only supports Windows platforms; customer-side noise cancellation technology is not available; there is noise leakage and voice degradation in contact center environments; the sample rate supports 8kHz only; the app does not support older CPUs; users often have to restart their drivers to avoid breakdown of mic and speaker audio streams; only 30,000 agents use Sanas; Sanas is a "new entrant" with minimal deployments and testing for headset and application compatibility and remote deployments; settings for admins, app version management, auto-update, and enterprise grade support are all limited; and certain analytics are not available. The statements in the 2025 Noise Cancellation Post were similar to those in the 2024 Noise Cancellation Post.

Krisp represents in its blog posts that the evaluations are based on "objective" and

representative analysis of Sanas software while processing audio samples as well as crowdsourced A/B testing that presented a "fair comparison." Sanas alleges that Krisp's evaluations were not objective nor representative but rather reflect a biased set of samples.

### E. Sanas' Claims and Krisp's Counterclaims

In July 2025, Sanas filed suit against Krisp. The first amended complaint, filed in September 2025, brought claims for infringement of six of Sanas' accent conversion technology patents, including four instances of alleged willful infringement; misappropriation of trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, and California's Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 *et seq*; false advertising in violation of the Lanham Act, 15 U.S.C. § 1125, and California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500 *et seq.*; and unfair competition in violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*.

Krisp brought counterclaims against Sanas for patent infringement with regard to its noise cancellation technology and violations of the California Unfair Practices Act ("UPA"), Cal. Bus. & Prof. Code §§ 17043, 17044 et seq., and California's UCL, *id.* § 17200 et seq. for allegedly giving away that technology for free as a loss leader in order to injure Krisp and competition generally.

Both parties have filed cross-motions to dismiss. Krisp moves to dismiss Sanas' trade secret, co-inventorship and co-ownership claims, and false advertising claims. Sanas moves to dismiss Krisp's state-law counterclaims for violations of the California's UPA and UCL.

### III. LEGAL STANDARD

Rule 12(b)(6) governs motions to dismiss for failure to state a claim. A complaint must contain a short and plain statement of the claim showing the pleader is entitled to relief, Fed. R. Civ. P. 8(a), and "giv[ing] the defendant fair notice of what the... claim is and the grounds upon which it rests," *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While "detailed factual allegations" are not required, a complaint must have sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)).

Dismissal under Rule 12(b)(6) may be based on either the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged" under a cognizable legal theory. *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (internal quotation marks and citation omitted). When evaluating such a motion, courts "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

In dismissing a complaint, leave to amend must be granted unless it is clear the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't of Corrections,* 66 F.3d 245, 248 (9th Cir.1995). When amendment would be futile, however, dismissal may be ordered with prejudice. *Dumas v. Kipp,* 90 F.3d 386, 393 (9th Cir.1996). When the "plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, '[t]he district court's discretion to deny leave to amend is particularly broad.' " *Zucco Partners LLC v. Digimarc Corp.,* 552 F.3d 981, 1007 (9th Cir.2009) (quoting *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1097–98 (9th Cir.2002)).

## IV. DISCUSSION

### A.  Krisp's Motion to Dismiss Sanas' Trade Secret Claims

To state a claim for trade secret misappropriation under CUTSA, a plaintiff must allege that: (1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff." *Autodesk, Inc. v. ZWCAD Software Co., Ltd.*, No. 14–1409, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015) (citation omitted). The elements of misappropriation under the DTSA are similar to those under CUTSA. *Compare* 18 U.S.C. § 1839(5) *with* Cal. Civ. Code § 3426.1(b). *See InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 657–58 & n. 1 (9th Cir. 2020) (noting courts have analyzed claims together based on similarity of elements). "A 'trade secret' is defined as information that: (1) derives independent economic value from not being generally known to the public; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Gatan, Inc. v. Nion Company*, No. 15–1862, 2017 WL 1196819, at * 6 (N.D. Cal. Mar. 31, 2017) (citing Cal. Civ. Code § 3426.1).

United States District Court
Northern District of California

ORDER RE MOTIONS TO DISMISS
CASE NO. 25-cv-05666-RS

7

*See also Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476 (1974) ("The subject of a trade secret must be secret, and must not be of public knowledge or of a general knowledge in the trade or business.").

Krisp moves to dismiss Sanas' trade secret claims, count six and seven for misappropriation of trade secrets under DTSA and under CUTSA, respectively. Krisp argues that Sanas cannot plead reasonable secrecy measures, the alleged categories of information are not trade secrets, and Sanas has not pled any independent economic value.

### i. Secrecy

Krisp insists that Sanas' allegations do not establish Sanas exercised reasonable care to ensure the confidentiality of their alleged trade secrets because Sanas did mark the information it shared as "Confidential" or "Proprietary." Dkt. 39 at 15. Even assuming the NDA controls the parties' relationship regarding those disclosures, Krisp's argument fails because the NDA allows written Confidential Information to be designated as such by being "marked 'Confidential,' 'Proprietary' *or in some other manner to indicate its confidential nature.*" Dkt. 39-2, Ex. A, § 2.A (emphasis added).

Sanas has alleged that its CEO expressly sought, in an email to Krisp's COO Schoenfield, further protections for its confidential information before responding to Krisp's requests in late summer 2022 for additional technical information about Sanas' technology. Dkt. 35 ¶ 59. Sanas alleges that Schoenfield refused to agree to exclusivity at that time. So, in response, Sanas agreed to continued exchange of information with express reference to the NDA as providing protection over future technical discussions. *Id.* Sanas alleges that Krisp, in turn, responded, stating he was "glad to get us started." *Id.* at ¶ 61. Subsequently, information was exchanged through a Slack channel set-up specifically for exchange of this information, among other communications.

There are no bright line rules as to what steps a party must take to preserve its trade secrets, including how to "indicate its confidential nature" "in some… manner" as the NDA requires. Dkt. 39-2, Ex. A, § 2.A. Admittedly, Sanas may be hard-pressed to persuade a trier of fact that their preliminary email communications with Krisp regarding the need for information protections and use of a specially designated Slack channel satisfied the requirements of the NDA.

Nevertheless, dismissal on these grounds is not warranted at this stage. *See Medtronic MiniMed, Inc. v. Nova Biomed. Corp.*, 2009 WL 10671420, at *5 (C.D. Cal. May 22, 2009) (Whether a party's efforts were "reasonable measures to maintain secrecy are factual issues for the jury to decide."). *See also Vesta Corp. v. Amdocs Mgmt., Ltd.*, 2018 WL 4354301, at *16 (D. Or. Sept. 12, 2018) ("[W]hether plaintiff took reasonable efforts to maintain the secrecy of its [ ] information is an issue best left for the trier of fact.").

### ii.  Not Trade Secrets

Krisp argues that Sanas' alleged categories of information are not protectable as trade secrets as a matter of law. A plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the secret lies." *Pellerin v. Honeywell Int'l, Inc.*, 877 F. Supp. 2d 983, 988 (S.D. Cal. 2012) (quoting *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968)). That said, a plaintiff need not "spell out the details of the trade secret." *Autodesk, Inc. v. ZWCAD Software Co.*, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015).

In this case, Sanas' allegations meet the pleading threshold. For example, Sanas alleges the following are trade secrets: customer requirements, intensive market research, results of in-field deployments, performance metrics related to CPU utilization for particular hardware configurations, and latency with different call center platforms. Dkt. 35 ¶¶ 67, 70-71. This is sufficient for notice. The appropriate mechanism for Krisp to obtain greater specificity as to what trade secrets are claimed is to pursue the matter through disclosures, interrogatories, meet and confer negotiations, or such other facets of the discovery process as may be warranted.

### iii.  Independent Economic Value

Sanas also must plausibly allege that its trade secrets have independent economic value that derives from not being generally known. The allegations establish that both parties found economic value in the trade secrets. Krisp made significant efforts to obtain the information, following up with Sanas repeatedly, and indicated that the possibility of a business partnership depended on the information. Sanas itself spent years conducting market research and developing

1   and testing its technology to develop the alleged trade secrets, which helped it raise a $32 million

2   Series A financing. Sanas also took efforts to protect the information through the NDA and use of

3   secure communication channels. This establishes independent economic value.

4   **B. Krisp's Motion to Dismiss Sanas' Co-Inventorship and Co-Ownership Claims**

5          Krips also moves to dismiss Sanas' co-inventorship and co-ownership claims, arguing

6   Sanas makes threadbare and conclusory allegations regarding Sanas' inventors and, as a matter of

7   law, the contributions are well-known concepts in the art insufficient for inventorship. To plead a

8   co-inventorship claim and associated claims of co-ownership properly, a plaintiff must overcome

9   the presumption that the patent's named inventors are correct. A plaintiff does this by alleging

10  facts from which a court can infer (1) the plaintiff "made a more-than-insignificant contribution"

11  to the conception of at least one claim and (2) the plaintiff and named inventors engaged in some

12  "joint behavior, such as 'collaboration or working under common direction.' " *See CelLink Corp.*

13  *v. Manaflex LLC*, No. 23-CV-04231-HSG, 2025 WL 1993517, at *5 (N.D. Cal. July 17, 2025)

14  (citation omitted).

15         Sanas has met this burden by alleging that Sanas co-founder Serebryakov described

16  specific features, e.g., teacher-student machine learning models and parallel data generation, to

17  Krisp, *see* Dkt. 35 ¶¶ 67, 127-131, 218-219, and these features are key to the claims of Krisp's

18  '609 and '979 Patents, for which Sanas claims co-inventorship. Sanas co-founder Serebryakov

19  shared much of this information in response to Krisp's solicitation, *see id.* ¶¶ 31-34, via meetings,

20  emails, and a Slack channel created by Krisp, *id.* ¶ 53, 65, 81, 227. This shows Sanas and Krisp

21  engaged in joint behavior and reflects evidence, such as soliciting emails, that corroborate

22  collaboration.

23         Krisp's argument that these alleged contributions are invalid as obvious also fails to

24  persuade at this stage. These contributions, at least in combination with other claim terms, are core

25  to the patent claims Krisp successfully persuaded the U.S. PTO to issue, and, based on the

26  extensive solicitation and subsequent exchange of information alleged, it can be inferred that

27  Sanas contributed to those presumably patentable combinations. Accordingly, assuming the

28

patents are valid, Sanas alleges facts sufficient to establish co-inventorship and co-ownership.

**C. Krisp's Motion to Dismiss Sanas' False Advertising Claims**

Krisp moves to dismiss Sanas' false advertising claims, counts ten and eleven under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and California's FAL, Cal. Bus. & Prof. Code § 17500 *et seq.*, respectively. To state a claim under California's FAL, "it is necessary only to show that members of the public are likely to be deceived" as judged by a "reasonable consumer." *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009) (internal quotation omitted); *Shaeffer v. Califia Farms*, LLC, 44 Cal. App. 5th 1125, 1136 (2020); Cal. Bus. & Prof. Code, § 17500 *et seq.* A plaintiff advancing a claim for false advertising under Section 43(a) of the Lanham Act must show (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to a defendant or by a lessening of the goodwill associated with its products. *Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012) (citing 15 U.S.C. § 1125(a)(1)(B)).

With regard to the making of a false statement, " 'district courts in the Ninth Circuit have held that the heightened pleading standard of Rule 9(b) applies…[and] requires the plaintiff to plead the "time, place, and specific content of the false representations," the identities of the parties to the misrepresentation, and what about the statement is claimed to be misleading.' " *Corsair Gaming, Inc. v. Choice Elecs. Inc.*, No. 5:25-CV-00045-BLF, 2025 WL 2822691, at *5 (N.D. Cal. Oct. 3, 2025) (citations omitted). If either party is guilty of "flippan[cy]" or failing to "even attempt to explain," as Krisp suggests, *see* Dkt. 39 at 26, it is Krisp not Sanas. Krisp writes that "[s]tating that, 'Krisp published and continues to publish at least the following false and misleading statements' does not cut it," *id.,* as if Sanas' allegations did not include substantial additional detail. Sanas identifies over thirty specific statements in Krisp's 2025 Accent

Conversion, 2024 Noise Cancellation, and 2025 Noise Cancellation Blog Posts[2] that it alleges are false with regard to Sanas technology. *See* Dkt. 35 at ¶¶ 89, 91, 93, 104-107. Sanas also alleges Krisp manipulated the methodology on which it based these comparisons, rendering the performance statements themselves as well as Krisp's statements about its "objective" methodology false and misleading, Dkt. 35 ¶¶ 95-98, 109-117. Further, Sanas alleges these statements were false and misleading at the time they were made, as they informed Krisp through cease-and-desist letters.[3]

As for injury, courts "presume[] commercial injury when defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers," as Sanas has alleged here. *See TrafficSchool.com*, 653 F.3d at 826. Further, Sanas also alleges that it has suffered and will continue to suffer damage to its business reputation and goodwill and has lost sales, revenue, customers, and market share. Dkt. 35 ¶274-76. This is sufficient at this stage.

**D. Sanas' Motion to Dismiss Krisp's Loss Leader, Giveaway, and UCL State-Law Counterclaims**

Sanas moves to dismiss Krisp's state-law counterclaims, counts two and three for violations of California's UPA, Cal. Bus. & Prof. Code § 17043 and § 17044, respectively, and count four for violation of California's UCL, Cal. Bus. & Prof. Code § 17200 *et. seq*. Sanas argues Krisp has not pled and cannot adequately plead the elements of these claims.

The elements of a violation of § 17044 are: (1) that the defendant sold a product below its

---

[2] Sanas requests the court take judicial notice of these blog posts and its subsequent cease-and-desist letters. Sanas alleges in its complaint that it sent Krisp two cease-and-desist letters, each of which included detailed charts that identified (i) each false statement made by Krisp; (ii) the truth corresponding to each false statement; and (iii) citations to publicly available sources supporting Sanas' position. Putting aside whether these items are properly the subject of judicial notice, as Sanas' allegations are sufficient, that question need not be reached.

[3] It is not necessary at this time to decide whether, for the purposes of California's False Advertising Law and the Lanham Act, Krisp is currently making or republishing these statements by running advertisements that link to the blog posts. Relatedly, Krisp's argument that its Google advertisements that call Krisp a "Better Sanas AI alternative" are nonactionable puffery is unavailing because Sanas does not allege these ads are false and misleading as standalone statements. *See* Dkt. 35 ¶ 99 ("The statement that Krisp is a 'Better Sanas AI alternative' is also false and misleading, at least because it summarizes and *republishes the false and misleading information published in the 2025 ACC Blog Post*.") (emphasis added).

costs; (2) that in doing so, the purpose or effect was one of the bases listed in Cal. Bus. & Prof. Code § 17030; (3) that the defendant made the sale with the purpose of injuring competitors or destroying competition; (4) that the claimant was harmed; and (5) causation. Cal. Bus. & Prof. Code §§ 17044, 17030; *Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 169 (1999) (adding purpose requirement). *See also* Judicial Counsel of Cal. Civil Jury Instructions ("CACI") 3302. Section 17044 does not apply to a defendant providing a service "free of charge" because "no sale is involved." *Co-opportunities, Inc. v. Nat'l Broad. Co.*, 510 F. Supp. 43, 49 (N.D. Cal. 1981). By alleging that Sanas gave away its noise cancellation technology for free, Sanas fails to state a claim under § 17044. Accordingly, Sanas' motion to dismiss count three is granted.

Section 17043, on the other hand, expressly contemplates giving products away for free for anticompetitive reasons. The elements of a claim under § 17043 are: (1) that the defendant sold a product below cost or gave away the product for free; (2) the defendant acted with the purpose of injuring competitors or destroying competition; (3) that defendant was harmed; and (4) causation. *See* Cal. Bus. & Prof. Code § 17043, CACI 3301. The first element is plainly satisfied by Krisp's allegations.

As to the second, Sanas argues that offering an item for free as a new market entrant is a form of anti-monopolistic competition permissible under § 17043, explaining " 'the device of below-cost sales can only be effectively used by the large monopolistic-tending seller against a small business which is unable to respond in kind.' " Dkt. 38 at 15 (quoting *Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of San Francisco*, 114 Cal. App. 4th 309, 328 7 Cal. Rptr. 3d 628 (2003)). "When a smaller player is attempting to 'improve its weak position' against a market leader, 'predation [is] not a real possibility[.]' " Dkt. 38 at 15 (quoting *Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of San Francisco*, 114 Cal. App. 4th at 328).

This argument is unavailing. Krisp alleges Sanas conditioned its "free forever" noise cancellation giveaways on a customer not using any Krisp app and programmed technological checks that will not allow Sanas' noise cancelling app to install if the Krisp app was downloaded. Dkt. 28 ¶ 44. Additionally, Krisp's allegations establish Sanas had at least some lead in the accent

United States District Court
Northern District of California

conversion space. *See e.g., id.* 28 ¶ 18, 26. Even accepting Sanas' representation of the law that freemium models are only anticompetitive in the presence of market power, a jury could find on these allegations that Sanas had certain market power in the sector for live call management technology and acted with the purposes of injuring Krisp or destroying competition. The scheme Krisp alleges specifically seeks to turn customers away from Krisp, and Krisp has alleged it has lost profits directly because of it. Dkt. 28, at ¶¶ 43–45, 67, 71. Accordingly, the elements of § 17043 are satisfied, and Sanas' motion to dismiss count two is denied.

California's UCL prohibits unfair competition, which means 'any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising.'" *A.B. by & Through Turner v. Google LLC*, 737 F. Supp. 3d 869, 880–81 (N.D. Cal. 2024. The properly alleged violation of § 17043 provides a predicate violation that would satisfy the unlawful prong of the UCL. Accordingly, questions as to whether Sanas' conduct was also unfair need not be reached at this time. Sanas' motion to dismiss count four is also denied.

## V. CONCLUSION

For the reasons set forth above, Krisp's motion to dismiss is denied and Sanas' motion to dismiss is granted in part, as to count three, and denied as to the rest.

**IT IS SO ORDERED**.

Dated: December 1, 2025

_____

RICHARD SEEBORG
Chief United States District Judge

United States District Court
Northern District of California