UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANAS.AI INC.,<br><br>       Plaintiff,<br><br>    v.<br><br>KRISP TECHNOLOGIES, INC.,<br><br>       Defendant. | Case No. 25-cv-05666-RS<br><br>**ORDER DENYING JUDGMENT ON THE PLEADINGS** |

## I. INTRODUCTION

Defendant Krisp Technologies ("Krisp") brings the present motion for judgment on the pleadings to dismiss various patent infringement claims brought by Plaintiff Sansa AI ("Sanas") related to their patented accent conversion technology. Unpersuaded by Krisp's representation of each patent as directed towards longstanding human activities, patent ineligible format conversion, generic computer functions, results rather than methods, or some combination thereof, the motion is denied as to each count as set forth below.[1]

## II. BACKGROUND[2]

Having discussed the facts of this suit in this court's prior orders, *see e.g.,* Dkt. 58, only those facts relevant to this motion are included here. Sanas and Krisp are competitors in the

---

[1] Pursuant to Civil Local Rule 7-1(b), the motion is suitable for disposition without oral argument, and the hearing set for February 26, 2026 is vacated.

[2] Unless otherwise stated, this order accepts well-pled factual allegations made in the complaint and counterclaims as true.

market for real-time audio-enhancing technology.

Krisp was founded as 2Hz in 2018 and entered the market first with background noise suppression software. Concurrent with the release of its noise suppression technology, Krisp filed a provisional patent application that was awarded on August 24, 2021 as U.S. Patent No. 11,100,941 ("the '941 Patent") for Speech Enhancement and Noise Suppression Systems and Methods.

Meanwhile, the Sanas founders were focused on accent conversion. Sanas was founded by Maxim Serebryakov, Shawn Zhang, and Andrés Pérez Soderi, three former Stanford classmates, along with Sharath Keshava Narayana, an entrepreneur. Between 2020 and 2021, the Sanas founders built out a database of accented human speech, including identifying and recording "ideal" target accents. They then developed software that translates accents between parties in real-time, fast enough and at a high enough quality that normal conversation can be carried out, leveraging unique student-teacher machine learning architecture and parallel data generation.

Sanas launched their first product in 2021 and filed a provisional patent application, resulting in U.S. Patent No. 11,948,550 ("the '550 Patent"), Real-time Accent Conversion Model, on April 2, 2021. Other applications followed, resulting in five more patent awards by September 2025: U.S. Patent No. 12,125,496 ("the '496 Patent"), Methods for Neural Network-Based Voice Enhancement and Systems Thereof, issued on October 22, 2024; U.S. Patent No. 12,131,745 ("the '745 Patent"), System and Method for Automatic Alignment of Phonetic Content For real-Time Accent Conversion, issued on October 29, 2024; U.S. Patent No. 11,715,457 ("the '457 Patent"), Real Time Correction of Accent in Speech Audio Signals, issued on August 1, 2023; U.S. Patent No. 12,412,561 ("the '561 Patent"), Real Time Correction of Accent in Speech Audio Signals, issued on September 9, 2025; and U.S. Patent No. 12,417,756 ("the '756 Patent"), Systems and Methods for Real-Time Accent Mimicking, issued on September 16, 2025. Sanas is the owner of record of each of the asserted patents and owns all rights in each of them, including without limitation all rights to recover for past infringement thereof. Collectively, these are the "Sanas Accent Conversion Patents."

As discussed in this court's prior order, Dkt. 58, Krisp and Sanas engaged in extensive discussions about a partnership between July 2021 and November 2022, during which details about Sanas' accent conversion technology were shared with Krisp. Krisp abruptly terminated the discussions in November 2022, and no collaboration ensued.

On April 27, 2023, sixteen months after Krisp first reached out to Sanas about licensing its technology, Krisp publicly announced "early access" to its proprietary Krisp AI Accent Conversion technology. Three months later, on July 21, 2023, Krisp filed two provisional U.S. patent applications, which issued as U.S. Patent No. 12,205,609 ("the '609 Patent") and U.S. Patent No. 12,223,979 ("the '979 Patent") (collectively, the "Krisp Accent Conversion Patents"). The Krisp Accent Conversion Patents cite Sanas' parent applications for the '550 and '745 Patents. They also cite Sanas' asserted '496 Patent and '457 Patent, which shares a parent application with the '561 Patent.

Sanas alleges that the Krisp Accent Conversion Patents do not disclose or claim any novel or non-obvious approaches to generating parallel data for speech conversion but rather claim as Krisp's own inventions techniques and approaches discussed in Sanas' earlier patent applications and issued patents. Sanas also alleges that the Krisp Accent Conversion Patents rely and build upon information provided by Sanas employees, including co-founder Serebryakov, such that the Sanas employees should have been named as joint inventors. In March 2025, Krisp launched "Krisp AI Accent Conversion v3." Krisp also markets a product called "Accent Localization."

This lawsuit followed. Sanas' first amended complaint, filed in September 2025, asserts patent claims, among other claims against Krisp, for alleged willful infringement of the '550, '496, '745, and '457 Patents (counts one, two, three, and four, respectively) and infringement of the '561 and '756 Patents (counts eight and nine, respectively). Krisp brought counterclaims including one for patent infringement of Krisp's asserted '941 Patent (count one) for making, using, offering for sale, and selling Sanas' noise cancellation products.

In September and October 2025, Krisp and Sanas moved to dismiss each other's non-infringement claims and counterclaims under Rule 12(b)(6). In November 2025, Krisp made a successive motion to dismiss Sanas' patent infringement claims. On December 1, 2025, this court

denied both parties' motions to dismiss the non-infringement claims and counterclaims in their entirety except for Sanas' motion to dismiss count three of Krisp's counterclaims for violation of California Business and Professions Code § 17044. Dkt. 58. On December 19, 2025, this court also denied Krisp's successive motion to dismiss Sanas' claims for patent infringement on procedural grounds under Rule 12(g)(2). Dkt. 63.

With the pleadings now closed, Krisp makes the present motion for judgement on the pleadings, renewing its arguments from its second motion to dismiss that Sanas' patents reflect non-patentable abstract ideas. Specifically, Krisp argues that counts one, two, and nine of Sanas' first amended complaint should be dismissed because the '550, '496, and '756 Patents are directed to the abstract idea of translation, converting audio data from one form to another, and counts four and eight should be dismissed because the '457 and '561 Patents are directed to the abstract idea of gathering data, analyzing it, and displaying results.

### III. LEGAL STANDARD

Patent eligibility "is a question of law, based on underlying facts" that "may be… resolved on a [Rule 12(c)] motion," *see SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018), which is "substantially identical" to the analysis under a Rule 12(b)(6) motion, *see Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012). The primary difference is procedural: Rule 12(c) permits a party to move for judgment on the pleadings after the pleadings close but "early enough not to delay trial[.]" Fed. R. Civ. P. 12(c). All allegations must be accepted as true and construed in the light most favorable to the non-moving party: in this case, Sanas. *See Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004). Furthermore, the moving party, i.e., Krisp, bears the burden of demonstrating invalidity by clear and convincing evidence. *See* 35 U.S.C. § 282; *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95, 131 S.Ct. 2238, 180 L.Ed.2d 131 (2011).

### IV. DISCUSSION

Under Section 101 of the Patent Act, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefore," 35 U.S.C. § 101, but the Supreme Court has "long held

that this provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216, 134 S. Ct. 2347, 2354, 189 L. Ed. 2d 296 (2014) (internal quotation marks and citations omitted). "[S]uch discoveries are manifestations of… nature, free to all men and reserved exclusively to none." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) (internal quotation marks and citations omitted). On the other hand, "[a]t some level, all inventions… embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," and so "[a]pplications of such concepts to a new and useful end… remain eligible for patent protection." *Alice*, 573 U.S. at 217 (internal quotation marks and citations omitted). "The Supreme Court has established a two-step framework," the *Alice* test, "for 'distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts.' " *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1092 (Fed. Cir. 2019) (citing *Alice*, 573 U.S. at 217).

The first *Alice* step asks, "whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice*, 573 U.S. at 217. The inquiry does not focus on the results achieved by the patents, but instead "must turn to any requirements for *how* the desired result is achieved." *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016) (emphasis in original). *See also McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (*Alice* step one inquiry "look[s] to whether the claims… focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery.").

For computer-related claims, courts look to whether the claims "improve the functioning of the computer itself," *Alice*, 573 U.S. at 219, or whether "computers are invoked merely as a tool" to implement an abstract process, *Enfish*, 822 F.3d at 1336. "[A]dding a computer cannot spare a claim that otherwise would be directed to an abstract idea[.]" *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1260 (Fed. Cir. 2017). Claims that "delineate steps through which the machine learning technology achieves an improvement" or otherwise "disclos[e] improvements to

the machine learning models to be applied" are likely to be directed to a patent eligible invention. *See Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1213, 1215-16 (Fed. Cir. 2025). However, claims which disclose only "the application of generic machine learning to new data environments" are not. *Id.*

If the claims are directed at a patent-ineligible concept, the second *Alice* step asks whether "the elements of each claim both individually and as an ordered combination… transform the nature of the claim into a patent-eligible application." *Alice*, 573 U.S. at 216. This step entails the "search for an inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217–18 (internal citations and quotations omitted). "For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347–48 (Fed. Cir. 2014). "[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 1348. However, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *BASCOM Glob. Internet Servs., Inc. v. AT & T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016).

Krisp argues the '550, '496, and '756 Patents are directed to the abstract idea of translation, converting audio data from one form to another, and thus patent ineligible and the '457 and '561 Patents are directed to the abstract idea of gathering, analyzing, and displaying certain results.

**A. The '550 Patent**

The '550 Patent, Real-time Accent Conversion Model, achieves specific improvements over other accent conversion technology, but, despite Krisp's insistence otherwise, the patent is not directed at those achievements. Instead, the '550 Patent is directed at particular methods, which achieve those improvements. *See Elec. Power Grp.*, 830 F.3d at 1355 (The inquiry "must

turn to any requirements for *how* the desired result is achieved."). Nor does the '550 Patent reflect longstanding human activities or digital format conversation such that it is not patentable.

The '550 Patent improves upon prior accent conversion strategies that "adjust the audio characteristics ( e.g., pitch, intonation, melody, stress) of a first speaker's voice" and others that "involve[] a speech-to-text (STT) conversion of input speech as a midpoint, followed by a text-to-speech (TIS) conversion to generate the output[.]" Dkt. 35-1 at 1:44-51, 60-63. The former "type of approach does not account for the different pronunciations of certain sounds that are inherent to a given accent" such that if a speaker pronounces "th" as "d," the output will do the same. *Id.* at 1:44-51. The latter approach does not "capture many of the nuances of input speech" and "generally involves a degree of latency (e.g., up to several seconds) that makes it impractical for use in real-time communication[.]" Dkt. 35-1 at 1:44-51; *id.* at 1:64-2:2. The '550 Patent is directed at methods that improve upon these: identifying non-text linguistic units of speech common to an accent, mapping those to other non-text linguistic units of speech common to a second accent, and, finally, generating an audio output of the first speech in the accent of the second.

Krisp conclusively explains that this technology automates "longstanding human activities," which is a telltale sign of abstraction, Dkt. 40 at 6, but translating *non-linguistic* sounds is not a longstanding human activity. Krisp also conclusively likens Sanas' accent conversion to format conversions which are considered abstract ideas. However, the authorities Krisp's cites for this proposition all relate to the conversion of data from one *digital* format to another. *See e.g., Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023) (digitizing images and converting video images into selected video formats with particular resolution); *Adaptive Streaming, Inc., v. Netflix, Inc.*, 836 F.App'x 900, 901 (Fed. Cir. 2020) (unpublished) (converting incoming videos in one format from one device type to a second format better-suited for a second device); *GoTV Streaming, LLC v. Netflix, Inc.*, No. 2024-1669, 2026 WL 346200, at *9 (Fed. Cir. Feb. 9, 2026) ("using a template for tailoring the final set of specifications the device uses to put an image on the screen, with use of the ordinary capacity of computers (including a

given wireless device) and networks to aid (in automating or speeding up, *e.g.*) that process"). In contrast, Sanas' technology translates between audio "formats" whose differences are intelligible and meaningful to humans apart from the devices rendering them, making the cited authority unconvincing.

Even if Sanas' conversion of speech in one accent to that of another were an abstract idea as Krisp contends, Krisp's argument that the claims are not directed at particular methods because the claim steps do not "recit[e] any specific technical mechanism" for the conversion is plainly untrue. Dkt. 40 at 5. The steps of claim 1 include: via one machine-learning algorithm, "aligning and classifying…frames of… captured speech content" of a first accent such that the frames "correspond[] to respective [frames] of [a] plurality of different speakers;" via that same algorithm, "deriv[ing] a non-text linguistic representation of the set of phonemes" of received speech having first accent; via a second machine-learning algorithm, "mapping… [a] non-text linguistic representation of a…phoneme… associated with the first [accent] to a second non-text linguistic representation of a second phoneme…associated with a second" accent; "convert[ing]" synthesized audio representative of that map "into a synthesized version of" inputted speech "having the second accent" which "comprises the updated set of phonemes[.]" Dkt. 35-1 at 10.

Despite Krisp's best efforts to excerpt these steps and reduce them to their most generic data-processing terms,[3] the claim steps reflect more than "generic computing and machine-learning technology" "incorporated in purely functional terms." Dkt 40 at 15. They reflect frame alignment, identification of and mapping across non-text linguistic representations, and frame wise mapping—alleged innovations which allow speech to be outputted in a second accent while retaining key vocal characteristics in near real-time. In *Enfish* as discussed in *Visual Memory*, "the district court's characterization of the claims as being 'directed to the abstract idea of "storing,

---

[3] Krisp's excerpt emphasizes the verbs "***training*… *applying*… *synthesizing*… *converting***," reducing the patent to those generic terms, makes only cursory reference to the non-text linguistics representations, and omits reference to the frames and phonemes. Dkt. 40 at 9 (emphases added in Krisp's filing). Adopting Krisp's characterization, "describing the claims at a high level of abstraction, divorced from the claim language itself" and "overgeneralizing [the] claims," however, would be reversible error. *See, e.g., Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1379–80 (Fed. Cir. 2024); *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020).

organizing, and retrieving memory in a logical table" ' " was "rejected" because the claims "recit[ed] a self-referential table." *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017) (discussing and citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1333, 1337 (Fed. Cir. 2016)). "The [claim] specification described the benefits of using a self-referential table—faster searching and more effective data storage—and highlighted the differences between the claimed self-referential table and a conventional database structure." *Id.* (citing *Enfish*, 822 F. 3d at 1336). Here, the identification of frames and non-linguistic units of sound are akin to reference to self-referential tables in *Enfish*.

In *GoTV Streaming, LLC v. Netflix, Inc.*, for which Krisp filed a statement of recent decision, Dkt. 69, the Federal Circuit considered the patent eligibility of claims related to tailoring video content to specific mobile device screens. The claims "refer[red] to the 'algorithm' and 'architecture' "— "highly general labels"— "without further identification of details," and were held to be not patent eligible. *GoTV Streaming, LLC v. Netflix, Inc.*, No. 2024-1669, 2026 WL 346200, at *9 (Fed. Cir. Feb. 9, 2026). The Court indicated the outcome would have been different had the claims referred to specific " 'structure' (akin to header/payload or bit-slot assignments) of the bit collections transferred between server and wireless device" that improved tailoring video content to specific mobile device screens. *Id.* As if heeding this advice, the '550 Patent claims do not rely on highly general labels but rather invoke specific data segments such as frames and phonemes and processes such as non-linguistic mapping.

In sum, the '550 Patent claims are not directed to an abstract idea because they are directed at specific technical mechanisms, leveraging non-linguistic frame alignment/classification and mapping, for accent conversion. Accordingly, we need not reach the second *Alice* step.[4]

---

[4] As many cases have noted, though, "the two [*Alice*] stages are plainly related…[T]he two stages involve overlapping scrutiny of the content of the claims, but... there can be close questions about when the inquiry should proceed from the first stage to the second." *Elec. Power Grp.*, 830 F.3d at 1353 (citations omitted). In other words, the step one analysis here reflects how a step two analysis, asking whether "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces," *BASCOM*, 827 F.3d at 1350, likely would result.

ORDER DENYING JUDGEMENT ON THE PLEADINGS
CASE NO. 25-cv-05666-RS

9

**B. '756 Patent**

Similar to the '550 Patent, the '756 Patent, Systems and Methods for Real-Time Accent Mimicking, is directed at non-abstract methodological improvements. The '756 Patent extracts features from voices, identifies those associated with the accent and those associated with a particular speaker's natural voice, combines them, and translates audio in one accent to audio in another, with the natural vocal characteristics of the speaker preserved. The alleged claim advances include extraction of specific features (e.g., pitch, speed, intonation, phoneme pronunciation, prosodic features, articulation, timbre, rhythm); classification and identification of those features between those associated with an accent (e.g., pitch, speed. intonation, phoneme pronunciation) and those associated with a speaker's unique vocal characteristics (e.g., pitch, speed, prosodic features, intonation, articulation, timbre, rhythm) [5] along with specifications about how that is carried out (e.g., mel frequency cepstral coefficient fingerprinting, identity encodings); development of a voice "fingerprint" reflecting the natural sound of a speaker via "mel frequency cepstral coefficient (MFCC) analysis"; and synthesis of the accent features and voice fingerprint to generate audio that mimics the speaker in a secondary accent via a specified pipeline process with steps invoking these processes (extraction, classification, identification, recombination) along the way. [6] Dkt. 36-6 at 9-10.

Krisp recycles much of its arguments for the '550 Patent here: simplifying the '756 claim 1 steps into generic terms, characterizing the '756 Patent as directed at "a longstanding human

---

[5] Note, an accent has unique intonation as does a speaker's vocal style. This process would identify that associated with the accent and that associated with the vocal style.

[6] In the specific language of the patent, the claim 1 steps include: "extract[ing] accent features of first input speech associated with a first accent of a first user;" "generat[ing] characteristics specific to a natural voice of [a] second user" with a second accent "wherein the generated characteristics correspond to vocal traits that are distinct to the second user and comprise one or more of a voice quality or one or more phonetic patterns, prosodic features, articulation styles, or intonation patterns[;]" modifying second input speech of a second user and synthesizing it "based on the generated characteristics and the extracted accent features" to "mimic[] the first accent" while "preserv[ing] aspects of the natural voice of the second user;" and "provid[ing]… output audio… generated based on the modified version of the second input speech." *Id.*

activity," Dkt. 40 at 14, and comparing the '756 Patent's accent conversion to digital format conversions that have failed the first *Alice* step. To be sure, humans have been mimicking accents for a long time. Yet, this is not dispositive. Krisp's other arguments fail for the same reasons as they did before: the '756 Patent is directed at particular processes related to selective feature preservation and recombination that improve accent mimicking, and which are not analogous to reformatting for enhanced digital performance.

### C. '496 Patent

The '496 Patent, Methods for Neural Network-Based Voice Enhancement and Systems, Thereof, identifies and suppresses non-linguistic and non-meaningful noise in speech audio to generate clearer speech while "enhancing" the speaker's natural voice. The '496 Patent does this through a series of steps: "fragment[ing] input audio data into… input speech frames… compris[ing] foreground speech content, … non-content elements, and … speech characteristics;" using "a first neural network," "convert[ing] the input speech frames to low-dimensional representations" "omit[ing]" some non-content elements; using "a second neural network," "generat[ing] target speech frames" from the low-dimensional representations of the input speech. Dkt. 35-2 at 9:60-10:11. Claims 4 and 5 detail how the first neural network is to be trained including augmentations, a process of artificially increasing the size and diversity of training data without collecting more data, for features like background noise, masked data, microphone pops, and convolving speech. *Id.* 10:39-43. Claims 6 and 7 detail how the second neural network will be trained and structured, including specifying what models should be used for this network (a combination of diffusion probabilistic, flow-based, and generative adversarial network-based). *Id.* 10:54-57.

Again, Krisp makes the same arguments for why the '496 Patent is directed at an abstract idea. They fail for similar reasons as before: stripping away background noise while retaining features key to what we recognize as a person's voice (e.g., pitch, intonation, melody, stress) is not a longstanding human process with an analogue equivalent; the patent is directed at particularized design choices, methods, and ordered steps for achieving voice enhancement rather than at voice

enhancement itself; and the patent's audio transformation is distinguishable from digital format conversions that have been held patent ineligible.

**D.   '457 and '561 Patents**

Krisp asserts claim 1 of the '457 Patent is representative of all the asserted claims in the '457 Patent, Real Time Correction of Accent in Speech Audio Signals, and '561 Patent, also named Real Time Correction of Accent in Speech Audio Signals, and that the other claims fail to save either patent.[7] Dkt. 40 at 21. Krisp argues both patents are directed to the abstract idea of gathering, analyzing, and displaying certain results. Again, this is an oversimplification.

The '457 and '561 Patents describe correction of "chunks" of speech audio through the extraction of certain acoustic and linguistic features and generation of new, corrected output. Dkt. 35-4 at 16:17-33 (claim 1). Specifically, the linguistic features identified and extracted include those reflecting a standardized phonetic dictionary and those arising from a data-driven phonetic library; the acoustic features include pitch, speed, and binary indicator of human speech; and the features are identified by looking at both the chunk being corrected and a specific set of preceding chunks. *Id.* at 16:51-55 (claim 5, dependent on claim 1); *id.* at 16:62-67 (claim 7, dependent on claim 1); *id.* 16:25-26 (claim 1, "context associated with the input chunk"). The patent also describes use of a neural network trained with an accent-reduction loss function and accent-discriminator module to remove accent markers while preserving phonetic content. *Id.* at 16:55-16 (claim 6, dependent on claim 1), 18:46-52 (dependent claim 19). Moreover, the claims delineate specific steps in which the audio should be processed, including when loudness should be adjusted, *id.* at 17:58-65 (claim 13, dependent on claim 1), or ordered steps for generating melspectograms, such as encoding linguistic features to generate hidden features, followed by combining hidden features, acoustic features, and speaker embeddings, and lastly decoding, *id.* at 17:19-24 (dependent claim 10).

---

[7] If the '457 Patent is found patent eligible, Krisp's motion also fails as to the '561 Patent for which it makes no particularized argument.

ORDER DENYING JUDGEMENT ON THE PLEADINGS
CASE NO. 25-cv-05666-RS

12

Krisp relies on *Electric Power Group* to argue these claims reflect an abstract idea without an inventive concept to save it at *Alice* step two. Dkt. 40 at 23 (citing *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016)). However, the asserted claims at issue in *Electric Power Group* differ dramatically from those at issue here. In *Electric Power Group*, the representative claim details a method of detecting, analyzing, and displaying events and related metrics on an electric power grid in real time. *Elec. Power Grp.*, 830 F.3d at 1352. The metrics and analyses to be displayed all reflect standard, non-inventive power system metrics except for a "composite indicator of reliability," which is not defined in any greater detail[8] and for whose derivation no process is described except for the "combination of one or more real time measurements or computations of measurements[.]" *Id.* Further, no particular (let alone inventive) method for real-time display is described. *Id.* at 1354 ("The advance they purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions… limiting the claims to the particular technological environment of power-grid monitoring is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core.").

The unpublished opinion in *Ubisoft Enterprises*, on which Krisp also relies, is similarly distinguishable. The patent at issue was for a guitar teaching program that displays finger notations for a song, assesses whether the student has played the right notes, adjusts the difficulty of the notations based on the student's performance, and suggest songs or "mini-games" (portions of songs or notations) based on the student's skill level. *Ubisoft Ent., S.A. v. Yousician Oy*, 814 F. App'x 588, 590 (Fed. Cir. 2020). Notably, "[n]othing in the claims or the specification of the '852 patent disclose[d] a technological improvement over conventional methods." *Id.* at 592.

The '457 Patent, by contrast, generates an audio output whose features have been specifically and inventively isolated and curated—which goes far beyond the display of standard power metrics or musical notations and the admittedly abstract concept of gathering, analyzing, and displaying results. Even if the '457 Patent did not survive *Alice* step one, it survives *Alice* step

---

[8] The description "an indicator of power grid vulnerability" provides no further detail. *Id.*

ORDER DENYING JUDGEMENT ON THE PLEADINGS
CASE NO. 25-cv-05666-RS

two because it describes "a combination of elements" that go to its specific method of accent conversion such that "the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. 217–18 (internal citations and quotations omitted).

## V. CONCLUSION

For the foregoing reasons, Krisp's motion for judgment on the pleadings is denied as to all counts on which Krisp moved.

**IT IS SO ORDERED**.

Dated: February 23, 2026

_____
RICHARD SEEBORG
Chief United States District Judge